1  XAVIER BECERRA
    Attorney General of California
2  ROBERT W. BYRNE
    Senior Assistant Attorney General
3  TRACY L. WINSOR (SBN 186164)
    Supervising Deputy Attorney General
4  JOHN D. BUTTERFIELD (SBN 328997)
    COLLEEN R. FLANNERY (SBN 297957)
5  DANIEL M. FUCHS (SBN 179033)
    ADAM LEVITAN (SBN 280226)
6  COREY M. MOFFAT (SBN 305620)
    L. ELIZABETH SARINE (SBN 285631)
7  SARA D. VAN LOH (SBN 264704)
    Deputy Attorneys General
8    1515 Clay Street, Suite 2000
      Oakland, CA 94612-0550
9    Tel: (510) 879-3139
      Fax: (510) 622-2270
10    E-mail:  Sara.VanLoh@doj.ca.gov
    *Attorneys for Plaintiffs California Natural*
11  *Resources Agency, California Environmental*
    *Protection Agency, and People of the State of*
12  *California by and through Xavier Becerra, Attorney*
    *General of the State of California*

13

14                    IN THE UNITED STATES DISTRICT COURT

15                    FOR THE NORTHERN DISTRICT OF CALIFORNIA

16

17  **THE CALIFORNIA NATURAL**          Case No.
    **RESOURCES AGENCY, THE**
18  **CALIFORNIA ENVIRONMENTAL**        **COMPLAINT FOR**
    **PROTECTION AGENCY, THE PEOPLE**   **DECLARATORY AND**
19  **OF THE STATE OF CALIFORNIA,** *EX REL.*  **INJUNCTIVE RELIEF**
    **CALIFORNIA ATTORNEY GENERAL**
20  **XAVIER BECERRA**
                                         Administrative Procedure Act Case
21                              Plaintiffs,

22          v.

23  **WILBUR ROSS,** in his official capacity as
    Secretary of Commerce; **CHRIS OLIVER,** in
24  his official capacity as Assistant Administrator
    for Fisheries at the National Oceanic and
25  Atmospheric Administration; **NATIONAL**
    **MARINE FISHERIES SERVICE; DAVID**
26  **BERNHARDT**, in his official capacity as
    Secretary of the Interior; **AURELIA**
27  **SKIPWITH**, in her official capacity as
    Director, U.S. Fish and Wildlife Service; **U.S.**
28  **FISH AND WILDLIFE SERVICE;**
    **BRENDA BURMAN**, in her official capacity

                                    1

1
2    as Commissioner of the Bureau of
     Reclamation; **U.S. BUREAU OF**
     **RECLAMATION**
3
                                  Defendants.
4

## INTRODUCTION

1.      The fish species listed as threatened or endangered under the federal Endangered Species Act (ESA) residing in the Sacramento River and San Joaquin River watersheds of the State of California have declined dramatically in abundance in the past decade.  Recognizing this undisputed fact, in 2016, the United States Bureau of Reclamation (Reclamation) reinitiated consultation under Section 7 of the ESA as to the coordinated operations of the federal Central Valley Project and the California State Water Project (the Proposed Action) with the stated purpose of improving conditions for the listed species.  However, the result of the reinitiated consultation is contrary to its original stated purpose of responding to, among other things, recent data demonstrating extremely low abundance levels for listed species.  On October 21, 2019, the National Marine Fisheries Service (NMFS) and the U.S. Fish and Wildlife Service (USFWS) (together, the Services) issued biological opinions (the 2019 Biological Opinions) under the ESA that, contrary to their findings of "no jeopardy," actually significantly *reduce* protections for the listed species and their designated critical habitat, thereby increasing the likelihood of their extinction, contravening the requirements of Section 7 of the ESA and the ESA's conservation purpose.[1]  Further, by issuing a Record of Decision adopting these defective biological opinions, Reclamation has violated, and will continue to violate, federal law as described in this complaint.

2.      California Attorney General Xavier Becerra, acting in his independent capacity as representative of the People of the State of California, the California Natural Resources Agency (Resources Agency), and the California Environmental Protection Agency (CalEPA) (together, California) bring this action to halt these law violations and prevent ongoing and irreparable harm to California's natural resources.

---

[1] "Biological Opinion for the Reinitiation of Consultation on the Coordinated Operations of the Central Valley Project and the State Water Project" (USFWS Biological Opinion); "Biological Opinion on Long-term Operation of the Central Valley Project and the State Water Project" (NMFS Biological Opinion).

2

3.     California brings this civil action for declaratory and injunctive relief under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706, and alleges violation of the Endangered Species Act (ESA), 16 U.S.C. §§ 1531–1544, and the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4347, and its implementing regulations, 40 C.F.R. §§ 1500–1508.

4.     California seeks a declaration that the USFWS and NMFS each violated the ESA and the APA by adopting biological opinions that are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law; that the Services' actions were "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" and "without observance of procedure required by law," 5 U.S.C. § 706(2)(C) and (D); and that Reclamation violated and continues to violate: (1) the ESA and the APA by adopting the 2019 Biological Opinions; and (2) NEPA and the APA by issuing a Record of Decision without adequately considering the environmental impacts.  California also seeks injunctive relief to halt and redress the irreparable injuries caused by these legal violations.

**JURISDICTION**

5.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (actions arising under the laws of the United States), 16 U.S.C. § 1540(c) (ESA), and 5 U.S.C. §§ 701–706 (APA).  An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 705–706.

**VENUE**

6.     Venue lies in this judicial district under 28 U.S.C. § 1391(e)(1) because Plaintiff Attorney General has offices in this judicial district and therefore resides in this judicial district, and real property is not the subject of this action.  Furthermore, significant portions of the critical habitat for the Delta smelt and the winter-run salmon are located in or adjacent to counties located within this judicial district.  59 Fed. Reg. 65,256 (Dec. 19, 1994) (Delta smelt); 58 Fed. Reg. 33,212 (June 16, 1993) (Sacramento River winter-run salmon).  Portions of the critical habitat for

1   the Central Valley steelhead are also located in or adjacent to counties located within this judicial

2   district.  70 Fed. Reg. 52,527 (Sept. 2, 2005).

3                           **INTRADISTRICT ASSIGNMENT**

4          7.     This case involves legal challenges to biological opinions under Section 7 of the ESA

5   that adversely affect the Delta smelt, the winter-run salmon, and the Central Valley steelhead.

6   Assignment of this case to the San Francisco Division or the Oakland Division of this judicial

7   district is proper under Civil L.R. 3-2(c) because a significant portion of the critical habitat for

8   these ESA-listed species is located in or adjacent to counties located within this judicial district.

9                                   **PARTIES**

10         8.     Plaintiff People of the State of California (People) bring this action by and through

11  the Attorney General.  The Attorney General of California is the chief law enforcement officer of

12  the State and has the authority to file civil actions to protect public rights and interests, including

13  environmental protection.  Cal. Const. art. V, § 13; Cal. Gov't Code §§ 12660–12612.  This

14  challenge is brought pursuant to the Attorney General's independent, constitutional, common law,

15  and statutory authority to represent the public interest.  The People have an interest in the use and

16  enjoyment of the fishery resources of the State for, *inter alia*, commercial and sport-fishing

17  purposes, as well as an interest in preserving and protecting these resources in their natural state

18  as part of the State's interrelated watershed ecology.  *Nat'l Audubon Soc'y v. Superior Court*, 33

19  Cal. 3d 419, 434–435 (1983).

20         9.     Plaintiff Resources Agency is one of seven cabinet-level agencies of the California

21  state government.  Cal. Gov't Code § 12800.  It is headed by a Secretary appointed by the

22  Governor and includes the California Department of Fish and Wildlife (CDFW) and the

23  Department of Water Resources (DWR).  Cal. Gov't Code. §§ 12801, 12805.  CDFW has the

24  responsibility, along with the California Fish and Game Commission, of administering and

25  enforcing the California Fish and Game Code.  Cal. Fish & Game Code § 702.  CDFW is

26  California's Trustee Agency for fish and wildlife resources, and holds those resources in trust by

27  statute for all the people of the State.  Cal. Fish & Game Code §§ 711.7 (a), 1802; Cal. Pub. Res.

28  Code § 21070; Cal. Code Regs. tit. 14, § 15386(a).  CDFW, in its trustee capacity, has

jurisdiction over the conservation, protection, and management of fish, wildlife, native plants, and habitat necessary for biologically sustainable populations of those species.  Cal. Pub. Res. Code § 1802.  DWR operates and maintains the State Water Project.  Cal. Water Code §§ 123, 11451, 12931.  Under Section 12850.4 of the California Government Code, the Resources Agency, as a state cabinet agency, "shall exercise the authority vested in the Governor in respect to the functions of each department, office, or other unit within the agency, including the adjudication of conflicts between or among the departments, office, or other units and shall represent the Governor in coordinating the activities of each such department, office, other unit with those of other agencies, federal, state, or local."  Cal. Gov't Code § 12850.4.

10.     Plaintiff CalEPA is one of seven cabinet-level agencies of the California state government.  Cal. Gov't Code § 12800.  It is headed by a Secretary, appointed by the Governor, and consists of, among others, the State Water Resources Control Board (State Water Board) and the California Regional Water Quality Control Boards (Regional Water Boards).  Cal. Gov't Code § 12812.  The State Water Board exercises the adjudicatory and regulatory functions of the state in the field of water resources.  Cal. Water Code § 174.  The State Water Board's mission is "[t]o preserve, enhance, and restore the quality of California's water resources and drinking water for the protection of the environment, public health, and all beneficial uses, and to ensure proper water resource allocation and efficient use, for the benefit of present and future generations."

11.     The ESA specifically envisions a critical role for individual states to protect endangered and threatened species.  16 U.S.C. § 1535(a) ("In carrying out the program authorized by this chapter, the Secretary shall cooperate to the maximum extent practicable with the States."); *see Hughes v. Oklahoma*, 441 U.S. 322, 337 (1979) ("We consider the States' interests in conservation and protection of wild animals as legitimate local purposes similar to the States' interests in protecting the health and safety of their citizens.")

12.     The State of California is the proprietary owner of all the State's fish and wildlife and water resources, which the State holds in trust for the benefit of the State's people.  Cal. Water Code § 102; Fish & Game Code §§ 711.7, 1802; *People v. Truckee Lumber Co*., 116 Cal. 397, 399 (1897); *Betchart v. Cal. Dep't of Fish & Game*, 158 Cal. App. 3d 1104, 1106–07 (1984);

*Nat'l Audubon Soc'y*, 33 Cal. 3d 419.  California has a sovereign and statutorily mandated interest in protecting species and their habitat within the state from harm.  In addition, the State of California has enacted numerous laws concerning the conservation, protection, restoration, and enhancement of the State's fish and wildlife resources, including endangered and threatened species, and their habitat.  As the Supreme Court has recognized, state plaintiffs are entitled to "special solicitude" in seeking to remedy environmental harms.  *See Massachusetts v. Envtl. Prot. Agency*, 549 U.S. 497, 519–22 (2007).

13.    California is uniquely harmed by Defendants' actions, which threaten significant harm to the natural resources of the State.  Defendants' actions described in this complaint will disrupt the coordinated operations of the State Water Project and Central Valley Project, affecting the imperiled species and habitats in the Sacramento River and San Joaquin River watersheds, including the San Francisco Bay/Sacramento-San Joaquin Delta Estuary (Bay-Delta).  This disruption will detract from California's efforts and resources to carry out its own programs and impose significantly increased costs and burdens on the State.  *See, e.g., California v. Azar*, 911 F.3d 558, 571–72 (9th Cir. 2018) (concluding that California had standing in challenge to federal rule due to "economic harm" to the state); *Air All. Houston v. Envtl. Prot. Agency*, 906 F.3d 1049, 1059–60 (D.C. Cir. 2018) ("Monetary expenditures to mitigate and recover from harms that could have been prevented absent the [federal rule] are precisely the kind of 'pocketbook' injury that is incurred by the state itself."); *Texas v. United States*, 809 F.3d 134, 155 (5th Cir. 2015) (finding that impacts on a state's resources provides a basis for the state to establish standing).

14.    Reclamation has harmed California's procedural interests in participating in a legally sound environmental review process that adequately considers the impacts of these operations on California's natural resources and provides appropriate mitigation measures for such impacts.  Specifically, Reclamation failed to take a "hard look" at the environmental impacts of adopting and implementing the 2019 Biological Opinions, failed to sufficiently respond to comments on the Proposed Action, and failed to demonstrate that it fully analyzed and will effectively mitigate the full range of the Proposed Action's effects.

15.     Defendant Wilbur Ross is the Secretary of the Department of Commerce and is sued in his official capacity.  Secretary Ross is responsible for implementing the ESA for species under the Department of Commerce's jurisdiction, including species under the jurisdiction of NMFS. Secretary Ross is also responsible for implementing the consultation process set forth in Section 7 of the ESA for winter-run salmon, spring-run salmon, steelhead, green sturgeon, and the southern resident population of killer whales.  50 C.F.R. § 402.01(a).

16.     Defendant Chris Oliver is the Assistant Administrator for Fisheries at the National Oceanic and Atmospheric Administration and is sued in his official capacity.  By delegation, Mr. Oliver holds the ESA responsibilities described in Paragraph 15.  50 C.F.R. § 402.01(b).

17.     Defendant NMFS shares responsibility with the USFWS in administering the ESA. 50 C.F.R. § 402.01(b).

18.     Defendant David Bernhardt is the Secretary of the Department of the Interior and is sued in his official capacity.  Secretary Bernhardt is responsible for implementing the ESA for species under the Department of the Interior's jurisdiction, including species under the jurisdiction of the USFWS.  Secretary Bernhardt is also responsible for implementing the consultation process set forth in Section 7 of the ESA for Delta smelt.  50 C.F.R. § 402.01(a).

19.     Defendant Aurelia Skipwith is the Director of the USFWS and is sued in her official capacity.  By delegation, Ms. Skipwith holds the ESA responsibilities described in paragraph 18. 50 C.F.R. § 402.01(b).

20.     Defendant USFWS shares responsibility with the NMFS in administering the ESA. 50 C.F.R. § 402.01(b).

21.     Defendant Reclamation is an agency within the United States Department of the Interior.  Reclamation operates the Central Valley Project.

22.     Defendant Brenda Burman is the Commissioner of the United States Bureau of Reclamation, and is sued in her official capacity.

23.     Each defendant named in this action is responsible in whole or in part for the claims alleged in the complaint.

//

## FACTUAL BACKGROUND

**I.    THE CENTRAL VALLEY PROJECT AND THE STATE WATER PROJECT**

24.    The Central Valley Project and the State Water Project are the two largest water projects in California.  The Central Valley Project consists of 20 dams and reservoirs that deliver water to 29 of California's 58 counties for agricultural, municipal, and industrial uses, primarily in the Central Valley and the San Francisco Bay Area.  The Central Valley Project delivers approximately 5.6 million acre-feet of water a year on average to 270 water supply contractors.

25.    DWR operates the State Water Project.  The State Water Project's main storage facilities are Oroville Dam and San Luis Reservoir, which it operates jointly with Reclamation.  DWR operates these facilities along with pumping plants, connecting canals, and aqueducts to deliver water to the Feather River Area, North Bay Area, South Bay Area, San Joaquin Valley, Central Coast, and Southern California for agricultural, municipal, and industrial uses.  The State Water Project delivers on average 2.6 million acre-feet of water a year to 29 public water agencies.

26.    The Central Valley Project harms ESA-listed fish species in the Sacramento River and San Joaquin River watersheds by, for example, directly taking fish at the project's South Delta pumping facility, redirecting fish from their migratory pathways, and altering the species' natural habitat.  Habitat alterations resulting from project operations include changes to river flow, hydrology, salinity, and water temperature.

**II.    SPECIES AFFECTED BY THE CENTRAL VALLEY PROJECT**

27.    The Central Valley Project exports water from "an important habitat for thousands of river and anadromous fish, many of which are endangered." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 980–81 (9th Cir. 2014).

28.    Central Valley Project operations impact several fish species that are listed as threatened and endangered under the ESA, including the Delta smelt (*Hypomesus transpacificus*),

//

//

//

the Central Valley winter-run[2] and spring-run Chinook salmon (*Oncorhynchus tshawytscha*),[3] and

the Central Valley steelhead (*Oncorhynchus mykiss irideus*).[4]

### A.   Delta Smelt

29.    The Delta smelt is a small fish that typically does not exceed 4.5 inches

(approximately 120 mm) in length.  The majority of Delta smelt live only one year.  Delta smelt

generally spawn from February through May in various locations from Suisun Bay and Marsh

and eastward into the Sacramento-San Joaquin Delta.  Smelt larvae hatch and enter the juvenile

life stage by June or early July.  Most of the juvenile fish continue to rear in habitats within

Suisun Bay and Marsh, while smaller subsets of the population rear in more eastward areas,

principally along the Sacramento River-Cache Slough corridor.  The fish develop into maturing

adults in the fall, at which time their spatial distribution expands.

30.    USFWS listed the Delta smelt as a threatened species under the ESA on March 5,

1993.  58 Fed. Reg. 12,854.  USFWS designated critical habitat for the Delta smelt on December

19, 1994.  59 Fed. Reg. 65,256.  As USFWS has acknowledged, the Delta smelt's relative

abundance has reached very low numbers and the species is approaching extinction in the wild.

### B.   Sacramento River Winter-Run Chinook Salmon

31.    Adult winter-run salmon typically migrate upstream through the Sacramento-San

Joaquin Delta from November through July, with the peak presence from February through April.

The winter-run salmon spawn during the spring and summer months in the upper Sacramento

River.  Emigrating juvenile winter-run salmon occur in the Sacramento-San Joaquin Delta

primarily in November through early May.

32.    The ocean life cycle of the Chinook salmon lasts between 1 and 5 years.  Shasta Dam

blocks the winter-run salmon's access to its historical spawning and rearing area in the upper

---

[2] This term refers to the Sacramento River winter-run evolutionarily significant unit of Chinook salmon, described as winter-run populations in the Sacramento River and its tributaries in California.
[3] This term refers to Central Valley spring-run evolutionarily significant unit of Chinook salmon, including populations of spring-run Chinook salmon in the Sacramento River and its tributaries such as the Feather River.
[4] This term refers to the California Central Valley distinct population segment of steelhead, described as inhabiting the Sacramento and San Joaquin Rivers and their tributaries.

1   Sacramento River.  Salmon that had previously spawned upstream of Shasta Dam have been

2   forced to spawn downstream of Keswick Dam on the Sacramento River.  The cold-water

3   management of Shasta Dam presently supports a single winter-run salmon population below the

4   dam.  NMFS listed the winter-run salmon as a threatened species under the ESA on August 4,

5   1989, 58 Fed. Reg. 32,065, and raised its status to endangered on January 4, 1994.  59 Fed. Reg.

6   440.  NMFS designated critical habitat for winter-run salmon on June 16, 1993.  58 Fed. Reg.

7   33,212.  The extinction risk for the winter-run Chinook salmon has increased from moderate to

8   high since 2005.

9       **C.    Spring-Run Chinook Salmon**

10      33.    Adult spring-run salmon typically begin their upstream migration in the Bay-Delta

11  region in January and February and are present in the Sacramento River and its tributaries from

12  March through October.  Spawning occurs in the Sacramento River and its tributaries from mid-

13  August through October.  Juvenile spring-run salmon generally are found in the Bay-Delta region

14  between December and May but can be present year-round.  Like winter-run salmon, the ocean

15  life cycle of the spring-run Chinook salmon lasts between 1 and 5 years.

16      34.    NMFS listed the spring-run salmon as threatened under the ESA on September 16,

17  1999, 64 Fed. Reg. 50,394, and reaffirmed that status on June 28, 2005.  70 Fed. Reg. 37,160.

18  NMFS designated critical habitat for spring-run salmon on September 2, 2005.  70 Fed. Reg.

19  52,488.  The spring-run salmon is at a moderate risk of extinction, although there is concern that

20  certain spring-run salmon strongholds will deteriorate into high extinction risk in the coming

21  years, a fact that NMFS acknowledges.

22      **D.    Central Valley Steelhead**

23      35.    The majority of the Central Valley steelhead originate in the Sacramento River basin,

24  although a small population exists in tributaries to the San Joaquin River.  Spawning adult

25  steelhead generally enter the San Francisco Bay estuary and Delta from August through April.

26  Spawning occurs from December through April.  In the Sacramento River, steelhead generally

27  migrate to the ocean from early winter to early summer, but can be present year round.  In the San

28  Joaquin River, emigration of steelhead generally occurs from February to June.

1    36.   NMFS listed the Central Valley steelhead as threatened on March 19, 1998, 65 Fed.

2    Reg. 13,347, and reaffirmed that status on January 5, 2006, 71 Fed. Reg. 834.  NMFS designated

3    critical habitat for the Central Valley steelhead on September 2, 2005.  70 Fed. Reg. 52,488.  The

4    natural-origin steelhead population is at a high risk of extinction.

5                        **STATUTORY AND REGULATORY FRAMEWORK**

6    **I.    THE ENDANGERED SPECIES ACT**

7    37.   Congress enacted the ESA over 46 years ago in a bipartisan effort "to halt and reverse

8    the trend toward species extinction, whatever the cost."  *Tennessee Valley Auth. v. Hill*, 437 U.S.

9    153, 184 (1978).  The ESA constitutes "the most comprehensive legislation for the preservation

10   of endangered species ever enacted by any nation."  *Id*. at 180.  The ESA's fundamental purposes

11   are to "provide a means whereby the ecosystems upon which endangered species and threatened

12   species depend may be conserved, [and] to provide a program for the conservation of such

13   endangered species and threatened species . . . ."  16 U.S.C. § 1531(b).  The ESA declares "the

14   policy of Congress" to be "that all Federal departments and agencies shall seek to conserve

15   endangered species and threatened species and shall utilize their authorities in furtherance of the

16   purposes of [the ESA]."  *Id.* § 1531(c)(1).  The ESA defines "conserve" broadly as "to use and

17   the use of all methods and procedures which are necessary to bring any endangered species or

18   threatened species to the point at which the measures provided pursuant to this chapter are no

19   longer necessary."  *Id.* § 1532(3).  In pursuing these goals, the ESA further declares "the policy of

20   Congress" to be "that Federal agencies shall cooperate with State and local agencies to resolve

21   water resource issues in concert with conservation of endangered species."  *Id.* § 1531(c)(2).

22   38.   Section 9 of the ESA prohibits any "person" from "taking" any endangered fish or

23   wildlife species.  *Id.* § 1538(a)(1)(B), (G).  "Person" is defined in the ESA to include "any officer,

24   employee, agent, department, or instrumentality of the Federal Government . . ." and therefore

25   includes federal agencies such as Reclamation.  *Id*. § 1532(13).  "Take" is defined as to "harass,

26   harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect or attempt to engage in any such

27   conduct."  *Id*. § 1532(19).  "Harass" means "an intentional or negligent act or omission which

28   creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly

                                              11

disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. § 17.3. "Harm" means "an act which actually kills or injures wildlife," and may include "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." *Id.*

39.  Section 7 of the ESA requires all federal agencies to "utilize their authorities in furtherance of the purposes of [the ESA] by carrying out programs for the conservation of endangered species and threatened species . . . ." 16 U.S.C. § 1536(a)(1). It also requires all federal agencies to ensure that any actions they authorize, fund, or carry out are "not likely to jeopardize the continued existence of any listed species or destroy or adversely modify their designated critical habitat." *Id.* § 1536(a)(2).

40.  "Jeopardize the continued existence of" an endangered species "means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.

41.  "Destruction or adverse modification means a direct or indirect alteration that appreciably diminishes the value of critical habitat for the conservation of a listed species. Such alterations may include, but are not limited to, those that alter the physical or biological features essential to the conservation of a species or that preclude or significantly delay development of such features." Interagency Cooperation—Endangered Species Act of 1973, as Amended; Definition of Destruction or Adverse Modification of Critical Habitat, 81 Fed. Reg. 7,214-01 (Feb. 11, 2016).[5]

42.  In practice, any federal agency proposing an action that may affect a listed species must consult with either NMFS or USFWS, depending on the species involved. The relevant Service then reviews the proposed action and prepares a biological opinion that evaluates whether

---

[5] On August 27, 2019, the Services published a final rule (84 Fed. Reg. 44,976-01) to revise portions of the regulations that implement Section 7 of the ESA. The rule became effective on October 28, 2019, a week after the 2019 Biological Opinions were issued on October 21, 2019. *See* 84 Fed. Reg. 50,333-01 (2019). The relevant version of the regulations is the version that was in effect when the opinions were issued.

and how the action will impact the species.  *Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 878 F.3d 725 (9th Cir. 2017) (citing 16 U.S.C. § 1536(b); 50 C.F.R. § 402.12).  If the opinion finds species jeopardy or adverse habitat modification, then the opinion must include additional species-protective measures known as reasonable and prudent alternatives.  16 U.S.C. § 1536(b)(3).  If the biological opinion finds that the proposed action would not jeopardize the listed species' continued existence, the Services can issue a statement permitting the incidental "taking" of a certain number of protected animals.  16 U.S.C. § 1536(b)(4).  The incidental take statement must specify the impact of the incidental take on the species and include protective measures to minimize those impacts as the Services deem necessary or appropriate.  16 U.S.C. § 1536(b)(4)(C).

## II.   THE NATIONAL ENVIRONMENTAL POLICY ACT

43.    The National Environmental Policy Act (NEPA), 42 U.S.C. § 4321, et seq. "is our basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a).  Congress enacted NEPA in 1969 "to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans."  42 U.S.C. § 4331(a).  NEPA has two fundamental purposes: (1) to guarantee that, before taking an action, federal agencies take a "hard look" at the consequences of those actions, ensuring that "the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts;" and (2) to ensure that "the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349–50 (1989).

44.    To achieve these dual purposes, NEPA requires the preparation of a detailed environmental impact statement for any "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  NEPA's implementing regulations broadly define such actions to include "new or revised agency rules, regulations, plans, policies, or procedures."  40 C.F.R. § 1508.18(a).  In preparing environmental impact statements, federal agencies must consider all of the direct, indirect, and cumulative impacts of their proposed

1   actions.  40 C.F.R. §§ 1502.16, 1508.7, 1508.8(a), (b); *City of Carmel-By-The-Sea v. U.S. Dep't*

2   *of Transp.*, 123 F.3d 1142, 1162 (9th Cir. 1997); *Neighbors of Cuddy Mountain v. U.S. Forest*

3   *Serv.*, 137 F.3d 1372, 1378 (9th Cir. 1998).

4        45.    The "heart of the environmental impact statement" is its analysis of alternatives to the

5   agency's proposed action.  42 U.S.C. § 1502.14.  Agencies must "[r]igorously explore and

6   objectively evaluate all reasonable alternatives," including by presenting "the environmental

7   impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues

8   and providing a clear basis for choice among options by the decisionmaker and the public."  40

9   C.F.R. § 1502.14; *League of Wilderness Defs./Blue Mountains Biodiversity Project v. U.S. Forest*

10  *Serv.*, 689 F.3d 1060, 1069 (9th Cir. 2012) (*Wilderness Defs. 2012*).

11       46.    NEPA also requires agencies to consider measures to "mitigate adverse

12  environmental impacts."  40 C.F.R. § 1502.16(h).  An environmental impact statement must

13  discuss such mitigation measures "'with sufficient detail to ensure that environmental

14  consequences have been fairly evaluated,'" including by addressing whether the measures "can be

15  effective" at reducing environmental impacts.  *S. Fork Band Council of W. Shoshone of Nev. v.*

16  *U.S. Dep't of Interior*, 588 F.3d 718, 727 (9th Cir. 2009) (quoting *Robertson*, 490 U.S. at 348).

17       47.    NEPA also requires an agency, when preparing an environmental impact statement,

18  to include a discussion of "[p]ossible conflicts between the proposed action and the objectives of"

19  state and local laws, plans, and policies.  40 C.F.R. §§ 1502.16(c), 1506.2(d); *see also* 43 C.F.R.

20  § 1610.3-2.

21  **III.   THE ADMINISTRATIVE PROCEDURE ACT**

22       48.    The APA governs the procedural requirements for agency decisionmaking and

23  provides the standard of review for a federal agency's compliance with NEPA and the ESA.

24  Under the APA, a "reviewing court shall … hold unlawful and set aside" agency action, findings,

25  or conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in

26  accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of

27  statutory right," or "without observance of procedure required by law."  5 U.S.C. § 706.  An

28  agency action is arbitrary and capricious under the APA when the agency (1) has relied on factors

which Congress has not intended it to consider; (2) entirely failed to consider an important aspect of the problem; (3) offered an explanation for its decision that runs counter to the evidence before the agency; or (4) is so implausible that it could not be ascribed to a difference of view or the product of agency expertise.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

49.     "Agencies are free to change their existing policies," but they must "provide a reasoned explanation for the change."  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (citing *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981–82 (2005)).  While an agency need not show that a new policy is "better" than the rule it replaced, it still must demonstrate that "it is permissible under the statute, that there are good reasons for it, and that the agency *believes it* to be better, which the conscious change of course adequately indicates."  *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis in original).  Further, an agency must "provide a more detailed justification than what would suffice for a new policy created on a blank slate" when "its new policy rests upon factual findings that contradict those which underlay its prior policy," "or when its prior policy has engendered serious reliance interests that must be taken into account."  *Id.*  Any "[u]nexplained inconsistency" in agency policy is "a reason for holding an interpretation to be an arbitrary and capricious change from agency practice."  *Nat'l Cable & Telecomms. Ass'n*, 545 U.S. at 981.

## THE 2019 USFWS AND NMFS BIOLOGICAL OPINIONS

### I.   CONSULTATION HISTORY OF THE BIOLOGICAL OPINIONS

50.     Reclamation's ordinary operation of the Central Valley Project results in incidental take of listed species, which is illegal without incidental take authorization.  Reclamation and DWR have obtained incidental take authorization through the consultation process set forth in ESA Section 7 for the coordinated operation of the Central Valley Project and the State Water Project.  *See* 16 U.S.C. § 1536.

51.     On December 15, 2008, USFWS issued a biological opinion on the coordinated operation of the Central Valley Project and the State Water Project.  The 2008 USFWS opinion

1  found that the proposed project operations would likely jeopardize the continued existence of the

2  Delta smelt and would adversely modify Delta smelt critical habitat.

3       52.    On June 4, 2009, NMFS also issued a biological opinion on the coordinated

4  operations of the Central Valley Project and the State Water Project.  The 2009 NMFS opinion

5  found that the proposed project operations would likely jeopardize the continued existence of the

6  federally listed Sacramento River winter-run salmon, the Central Valley spring-run salmon, the

7  Central Valley steelhead, the North American green sturgeon, and the Southern Resident killer

8  whales, and would adversely modify the critical habitat for the winter-run salmon, the spring-run

9  salmon, and the steelhead.

10      53.    In light of these findings, and in an attempt to avoid ongoing jeopardy to these listed

11  species and destruction or adverse modification of designated critical habitat resulting from the

12  coordinated operations of the Central Valley Project and the State Water Project, both the 2008

13  USFWS opinion and the 2009 NMFS opinion contained reasonable and prudent alternatives that

14  imposed new fishery protection measures on the Central Valley Project and State Water Project

15  that were not part of the projects' original plan of operations.

16      54.    As discussed above, populations of the affected listed species have continued to

17  decline since 2008 and 2009, prompting Reclamation and DWR to request reinitiation of Section

18  7 consultation pursuant to 50 C.F.R. § 402.16.

19      55.    On August 2, 2016, Reclamation and DWR requested reinitiation of consultation with

20  both USFWS and NMFS on the coordinated operations of the Central Valley Project and the State

21  Water Project due to new information related to the ongoing drought and recent data showing

22  extremely low population levels of Delta smelt and winter-run Chinook salmon.  New

23  information was also then available based on the ongoing work of collaborative science

24  processes.

25      56.    On August 3, 2016, the USFWS accepted Reclamation's request to reinitiate

26  consultation regarding operations of the Central Valley Project and State Water Project under the

27  2008 USFWS biological opinion.  USFWS's acceptance letter stated, "We recognize that this new

28  information is demonstrating the increasingly imperiled state of the Delta Smelt and its

16

designated critical habitat, and that emerging science shows the importance of outflows to all life stages of Delta Smelt and to maintaining the primary constituent elements of designated critical habitat."

57.     On August 17, 2016, NMFS accepted Reclamation's request to reinitiate consultation regarding project operations under the 2009 NMFS biological opinion.  NMFS's acceptance letter stated, "We agree that reinitiation is required under the terms of the 2009 Biological Opinion and ESA regulations (50 CFR 402.16).  Reasons for the reinitiation include new information related to the effects of multiple years of drought, recent data demonstrating extremely low abundance levels for endangered Sacramento River winter-run Chinook salmon and threatened Central Valley spring-run Chinook salmon, and new information resulting from ongoing scientific collaboration."

58.     In an August 30, 2016 memorandum, Interior Secretary Sally Jewell stated, "The reinitiation process will likely lead to new or amended biological opinions that will increase protections for" the Delta smelt and winter-run Chinook salmon.  She further stated, "The timeframe being contemplated should allow the new Administration to establish itself before new biological opinions are issued that could lead to further reductions in water availability south of the Delta."  In Secretarial Order No. 3343, issued on January 3, 2017, Secretary Jewell confirmed the decline in listed species in the Delta, stating: "The population of Delta Smelt, an annual species found only in the Delta, is at an all-time low.  The Spring Kodiak Trawl Index for Delta Smelt has continued a downward slide and is 90 percent lower in 2016 than the previous historic low."  Order No. 3343 further states: "Winter-run Chinook salmon populations are also at very low levels.  Over the last 10 years of available data (2003–2013), the abundance of spawning Winter-run Chinook salmon adults ranged from a low of 738 in 2011 to a high of 17,197 in 2007, with an average of 6,298.  This is in stark contrast to an average abundance of 87,000 spawning adults in the late 1960s."

59.     Order No. 3343 further notes that in 2016, Reclamation released the "Sacramento and San Joaquin Rivers Basin Study" (Basin Study) assessing the potential effects of climate change on the Delta.  Order No. 3343 identifies the following three key findings in the Basin Study: (1)

temperatures are projected to increase steadily during the century, with changes generally

increasing from about 1.6 degrees Fahrenheit (°F) in the early 21st century to almost 4.8°F in the

Sierra Nevada Mountains late in the 21st century; (2) snowpack will likely decline considerably

due to warming, particularly in the lower elevations of the mountains surrounding the Central

Valley, affecting timing and amount of runoff; and (3) sea levels are expected to rise.

60.     On December 29, 2017, Reclamation published in the Federal Register a Notice of

Intent to Prepare a Draft Environmental Impact Statement, Revisions to the Coordinated Long-

Term Operation of the Central Valley Project and State Water Project, and Related Facilities,

noting that it "propose[d] to evaluate alternatives that maximize water deliveries and optimize

marketable power generation."  82 Fed. Reg. 61,789.

61.     On October 19, 2018, President Donald J. Trump issued a presidential memorandum

entitled "Presidential Memorandum on Promoting the Reliable Supply and Delivery of Water in

the West."  83 Fed. Reg. 53,961.  The memorandum directed the Secretary of the Interior and the

Secretary of Commerce to take steps "to minimize unnecessary regulatory burdens and foster

more efficient decision-making so that water projects are better able to meet the demands of their

authorized purposes" and urged the expedited completion of the reinitiation of consultation under

the 2008 and 2009 biological opinions.  The memorandum required completion of the final

biological opinions for the long-term coordinated operations of the Projects by June 15, 2019.  *Id.*

62.     On January 31, 2019, Reclamation issued a "Biological Assessment for the

Reinitiation of Consultation on Coordinated Long-Term Operation of the Central Valley Project

and State Water Project," which set forth Reclamation's Proposed Action.  Subsequent revisions

to the Proposed Action occurred in April, July, and October 2019.

63.     On or about June 6, 2019, USFWS completed its draft biological opinion for the

Delta smelt.  On or about July 1, 2019, NMFS completed its draft biological opinion for the

salmonid species.  The draft NMFS biological opinion found jeopardy and adverse modification

of critical habitat for winter-run Chinook salmon, spring-run Chinook salmon, Central Valley

steelhead, and southern resident killer whales, and included "reasonable and prudent alternatives"

designed to avoid jeopardizing the species.

1  64.    On July 12, 2019, Reclamation issued a Draft Environmental Impact Statement (Draft

2  EIS), which set forth Reclamation's analysis of the potential effects associated with long-term

3  operations of the Central Valley Project and State Water Project.  Reclamation received

4  approximately 1,030 comments on the Draft EIS.

5  65.    On August 21, 2019, CDFW submitted its "Comments on the Reinitiation of

6  Consultation on the Coordinated Long-Term Operation of the Central Valley Project and State

7  Water Project Draft Environmental Impact Statement."

8  66.    CDFW's comments described key concerns regarding Reclamation's Draft EIS.

9  These included, but were not limited to, that the Draft EIS: (1) performed no quantitative analysis

10  to support its conclusion that increased flows in the Sacramento River under Alternative 1 may

11  offset the impacts associated with increased entrainment risk of Sacramento River origin fall-run

12  Chinook salmon; (2) did not recognize the effects of reduced Keswick Dam flows downstream of

13  Shasta Dam on incubating fall- and spring-run Chinook salmon eggs and embryos due to

14  increased water temperatures near redds, lowered velocities resulting in lower dissolved oxygen,

15  and de-watering of redds resulting in suffocation of eggs and stranding of emergent alevins/fry in

16  the Sacramento River; (3) proposed temperature management in the upper Sacramento River that

17  did not protect the winter-run or spring-run Chinook salmon; (4) assigned final decisionmaking

18  authority over real-time operations of Old and Middle River flows not to the agencies responsible

19  for issuing take authorization under the federal and state endangered species acts, USFWS,

20  NMFS and CDFW, but to the project operators; and (5) acknowledged that reduced winter-spring

21  Delta outflow and increased entrainment risk associated with Alternative 1 may impact the

22  CESA-listed longfin smelt, but included no proposed minimization or mitigation measures to

23  avoid or minimize such adverse environmental impacts.

24  67.    On September 25, 2019, the State Water Board submitted to Reclamation its

25  "Comments on Draft Environmental Impact Statement for the Reinitiation of Consultation on the

26  Coordinated Long-Term Operation of the Central Valley Project and State Water Project."  The

27  State Water Board's comments included, but were not limited to, the following: (1) the Proposed

28  Project increases water deliveries and exports, increases reverse flows, and decreases Delta

1   outflows, but available scientific knowledge indicates that decreasing freshwater flows in the

2   Bay-Delta watershed and increasing exports and associated reverse flows in the interior Delta is

3   expected to have a negative impact on the survival and abundance of native fish species,

4   including threatened and endangered species; (2) the science supporting the State Water Board's

5   updated flow objectives in the Bay-Delta Plan supports not reducing existing (baseline) spring,

6   winter, and fall flows as proposed in the Preferred Alternative, but increasing them; (3) the

7   Preferred Alternative proposes changes to operations that would require changes to Reclamation's

8   existing water right requirements or the implementation of those requirements contained in State

9   Water Board Decision 1641, Decision 1422, and Order 90-5; (4) the Preferred Alternative

10  proposed Sacramento River operations, including Shasta Dam operations affecting the

11  Sacramento River, that appear to further degrade conditions for listed species; and (5) operations

12  under the Preferred Alternative would reduce Delta outflows, which are important to all life

13  cycles of Delta smelt, with the result that the Preferred Alternative would adversely affect the

14  Delta smelt population through increased predation and entrainment, decreased food availability,

15  and decreased size and location of low salinity habitat.

16      68.    On October 21, 2019, USFWS issued the USFWS Biological Opinion at issue in this

17  litigation in response to an August 2, 2016, request for reinitiation of consultation.  Contrary to

18  the 2008 USFWS biological opinion, the new USFWS opinion now concludes that the proposed

19  operations of the Central Valley Project and the State Water Project are not likely to jeopardize

20  the continued existence of the Delta smelt and are not likely to destroy or adversely modify the

21  Delta smelt's critical habitat.

22      69.    On October 21, 2019, NMFS issued the NMFS Biological Opinion at issue in this

23  litigation, also in response to Reclamation's August 2, 2016 request for reinitiation of

24  consultation.  Also contrary to the 2009 NMFS biological opinion, the new NMFS Biological

25  Opinion now concludes that the proposed operations of the Central Valley Project and the State

26  Water Project are not likely to jeopardize the continued existence of the Sacramento River winter-

27  run salmon, the Central Valley spring-run salmon, the Central Valley steelhead, the North

28  American green sturgeon, and the Southern Resident killer whales, and is not likely to destroy or

1    adversely modify the critical habitat for the winter-run salmon, the spring-run salmon, and the

2    steelhead.

3        70.    On December 19, 2019, Reclamation issued its final environmental impact statement

4    proposing to adopt the 2019 Biological Opinions.

5        71.    On January 17, 2020, the Attorney General, the Resources Agency, and CalEPA

6    submitted a joint comment letter to Reclamation regarding the Final EIS.  These comment letters

7    incorporated the comment letters submitted by CDFW and the State Water Board and noted that

8    the Final EIS did not adequately respond to the comments submitted on the Draft EIS.  The

9    January 17, 2020 comment letter also noted a number of defects that appeared in the Final EIS

10   that the public was afforded no previous opportunity to comment on, including but not limited to

11   that: (1) Reclamation's Final EIS presents a revised Proposed Action and Preferred Alternative

12   that is not within the range of alternatives described in the Draft EIS.  Critically, although

13   Alternative 1 is the Proposed Action described in the January 2019 Biological Assessment, the

14   Final EIS introduces a revised Alternative 1 that is based on a revised Proposed Action presented

15   in the final October 2019 Biological Assessment without including either a comprehensive

16   summary of the modifications to the Proposed Action and Alternative 1 or a meaningful

17   discussion of how these modifications affect the environmental analysis and proposed mitigation;

18   (2) Appendix F1, which includes the revised Alternative 1 sensitivity analysis, contains over

19   2,500 pages of information that was not available to the public commenting on the Draft EIS; and

20   (3) the public and other agencies have also not had a chance to comment on the updated climate

21   change modeling included in the Final EIS.

22       72.    On or about February 19, 2020, Reclamation issued its final Record of Decision on

23   the Coordinated Long-Term Operation of the Central Valley Project and State Water Project

24   (Record of Decision), adopting the 2019 Biological Opinions.

25   **II.    DEFICIENCIES IN THE 2019 BIOLOGICAL OPINIONS**

26       73.    The 2016 request for reinitiation sought to update the operating criteria for the entire

27   Central Valley Project/State Water Project coordinated system to account for new information

28   regarding both impacts to the listed species and designated critical habitat and available measures

to avoid, minimize, and mitigate those impacts.  Given those purposes, an updated biological opinion might reasonably have included a prominent role for expert fish agencies in guiding updated coordinated project operations, clear guardrails for those operations, and definite measures to enhance species health.  Instead, the 2019 Biological Opinions are heavily caveated and include many unbounded off-ramps, making it impossible to know how, if at all, project operations will avoid further harm to the species.

74.     The 2019 Biological Opinions are also fatally defective in numerous other regards. The following is a non-comprehensive list of those deficiencies.

75.     First, the analysis of effects of the Proposed Action in the 2019 Biological Opinions violates Section 7 of the ESA by failing to evaluate whether the Proposed Action will jeopardize the continued existence of the species or adversely affect their critical habitat.  The opinions instead improperly compare the effects of the Proposed Action to the Current Operating Scenario under the 2008 and 2009 biological opinions.  This is not the proper standard.  The law requires the Services to evaluate whether the Proposed Action is likely to jeopardize the listed species' survival and recovery or destroy or adversely modify designated critical habitat, not to simply compare the effects of the Proposed Action to the effects of the Current Operating Scenario.  In addition, this analysis fails to account for the existing baseline when evaluating the effects of the Proposed Action, as expressed in the August 3, 2016 USFWS response to the request for reinitiation of consultation (including that "new information is demonstrating the increasingly imperiled state of the Delta Smelt and its designated critical habitat, and that emerging science shows the importance of outflows to all life stages of Delta Smelt and to maintaining the primary constituent elements of designated critical habitat") and the August 17, 2016, NMFS response to the request for reinitiation of consultation (including "recent data demonstrating extremely low abundance levels for endangered Sacramento River winter-run Chinook salmon and threatened Central Valley spring-run Chinook salmon . . . .").

76.     Second, the 2019 Biological Opinions fail to "articulate a satisfactory explanation" of how the comparative modeling and other analyses in the Biological Opinions support the opinions' no-jeopardy conclusion as required by the APA.  *See Greenpeace v. Nat'l Marine*

1    *Fisheries Serv.*, 80 F. Supp. 2d 1137, 1147 (W.D. Wash. 2000).  "[E]ven where baseline

2    conditions already jeopardize a species, an agency may not take action that deepens the jeopardy

3    by causing additional harm."  *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917,

4    930 (9th Cir. 2008).  The opinions' no-jeopardy conclusions are unlawful because they are not

5    based on an analysis of the Proposed Action in its "actual context" of a decade-long decline in the

6    listed species.  *See id.*

7         77.    Third, in numerous significant respects, the 2019 Biological Opinions do not consider

8    the relevant factors, and "entirely fail to consider … important aspect[s] of the problem."  *Motor*

9    *Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43.  For example, the NMFS Biological Opinion

10   acknowledges the high extinction risk for winter-run Chinook salmon.  NMFS, however, then

11   permits changes in South Delta exports and Old and Middle River (OMR) flows that will

12   indisputably result in more entrainment and other harm to listed salmon.  NMFS allows this

13   activity and result based solely on an unsupported finding that this increased pumping presents

14   risks comparable to the risks faced by the species under the 2009 opinion.  Not only is this an

15   improper comparison, for the reasons described above, but the conclusions based on that

16   comparison are unsupported by scientific evidence and run counter to the scientific evidence that

17   was before the agencies.  The USFWS Biological Opinion suffers from the same deficiencies,

18   concluding without basis that entrainment impacts on Delta smelt resulting from increased

19   reverse OMR flows are minimal because the risks are purportedly no greater than the risks that

20   would occur under the 2008 Biological Opinion.  But even putting aside, once again, the

21   improper comparison with the Current Operating Scenario, this conclusion ignores the severe

22   decline in Delta smelt abundance that has occurred since 2008, which USFWS acknowledges is a

23   "relevant" factor in determining whether the Proposed Project will jeopardize the continued

24   existence of the Delta smelt, as required under Section 7 of the ESA.  Failing to consider this

25   material decline in the development of measures in the 2019 Biological Opinion thus does not

26   consider "all relevant" factors.

27         78.    Fourth, to avoid a jeopardy determination, the 2019 Biological Opinions rely on

28   operational criteria and conservation measures that are not reasonably certain to occur, or which

1    significantly post-date implementation of the Proposed Action.  For example, the Proposed

2    Action does not offer any certainty on whether the Delta Cross-Channel gates will be open or

3    closed in the event that fish are outmigrating but the interior Delta water quality is too low.

4    Instead, NMFS relies on the project operator's "risk assessment" of certain measures with only a

5    minimal role for expert fish agencies in that assessment.  Further, the approach to managing water

6    temperatures from Shasta Dam in the NMFS Biological Opinion eliminates previously required

7    measures designed to preserve cold water storage for downstream fish flows, substituting

8    measures that are uncertain while also eliminating carryover storage targets that would otherwise

9    assist in preserving cold water necessary for winter-run Chinook salmon reproduction in the

10   Sacramento River below Shasta Dam.  The USFWS Biological Opinion is similarly defective,

11   allowing essentially unlimited pumping during undefined "storm-related events" and relying on

12   an untested, uncertain smelt supplementation program.

13       79.    Sixth, the 2019 Biological Opinions fail to analyze important components of the

14   Proposed Action, specifically a proposal to raise the height of Shasta Dam, which violates the

15   Section 7 requirement that the scope of the proposed agency action to be analyzed in a biological

16   opinion must be broadly defined, and that a biological opinion must consider both the short-term

17   and long-term effects of a proposed action.  *See Conner v. Burford,* 848 F.2d 1441, 1457 (9th Cir.

18   1988); *see also Wild Fish Conservancy v. Salazar,* 628 F.3d 513, 522–23, 525 (9th Cir. 2010).

19       80.    Seventh, the 2019 Biological Opinions do not adequately consider the listed species'

20   recovery as well as survival prospects.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.02.  For species

21   on the brink of extinction, as here, the agency must determine "when the tipping point precluding

22   recovery . . .  is likely to be reached," and then determine whether it will be reached "as a result"

23   of the proposed action.  *Wild Fish Conservancy*, 628 F.3d at 527.  Given the undisputed fact that

24   the affected listed species are on the brink of extinction and that even the Current Operating

25   Scenario is failing to adequately protect these species and their critical habitat, it is virtually

26   certain that this tipping point will be reached as a result of the far less restrictive Proposed Action.

27

28

24

# FIRST CLAIM FOR RELIEF

**Violation of the ESA, 16 U.S.C. § 1531 *et seq*., and the APA, 5 U.S.C. § 706**
**(By all Plaintiffs Against Defendants Wilbur Ross, Chris Oliver, and the National Marine Fisheries Service)**

81.     California realleges, as if fully set forth here, each and every allegation contained in the preceding paragraphs.

82.     The NMFS Biological Opinion is a final agency action that is subject to judicial review under Section 704 of the APA.

83.     Defendants Ross, Oliver, and NMFS are responsible for the issuance of the NMFS Biological Opinion as described in paragraphs 15–17 above.

84.     Despite acknowledging that the populations of listed species are perilously close to extinction or extirpation, the NMFS Biological Opinion concludes that Reclamation's Proposed Action will not jeopardize the continued existence of winter-run and spring-run Chinook salmon and Central Valley steelhead and will not result in the destruction or adverse modification of the species' critical habitat.  These conclusions, and NMFS's decision to adopt the NMFS Biological Opinion, are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

85.     The NMFS Biological Opinion fails to analyze whether the effects of the Proposed Action as a whole, when added to baseline conditions, would or would not tip one or more of the listed species into extinction or further deepen the jeopardy to those species, contrary to Section 7(a)(2) of the ESA and the applicable implementing regulations and controlling case law.  The Ninth Circuit has explained that "even when baseline conditions already jeopardize a species, an agency may not take action that deepens the jeopardy by causing additional harm." *Nat'l Wildlife Fed'n*, 524 F.3d at 930.

86.     The NMFS Biological Opinion fails to articulate the required "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962).  Even assuming the proper effects analysis is a comparison with the Current Operating Scenario, modeling in the NMFS Biological Opinion indicates a higher risk of

extinction under the Proposed Action than under the Current Operating Scenario; in other words, the NMFS Biological Opinion itself contains information indicating that Reclamation's Proposed Action will jeopardize the continued existence of the listed species and destroy or adversely modify their critical habitat, and thus contradicts the "no jeopardy" and "no adverse modification" conclusions in the opinion.  In this and other ways, these conclusions are contradicted by the evidence before NMFS, are not rationally connected to facts, and are not supported by reasoned explanations.

87.   The NMFS Biological Opinion also does not consider all relevant factors, and "entirely failed to consider … important aspect[s] of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43.  For example, the Proposed Action will result in OMR flows that are significantly more negative than observed under the Current Operating Scenario, which poses a significant risk to the survival and recovery of the listed species.  The Biological Opinion does not include measures, or otherwise provide evidence, to explain how allowing substantially more negative flows would not lead to jeopardy.

88.   The NMFS Biological Opinion further does not "use the best scientific and commercial data available" as required by Section 7(a)(2) of the ESA.  The opinion violates the statutory requirement to use such data in numerous ways, including but not limited to, failing to take into account the decline in listed species' abundance in the last ten to twelve years.  16 U.S.C. § 1536(a)(2).

89.   The NMFS Biological Opinion also impermissibly relies on operational criteria and other conservation measures that are not reasonably certain to occur, are of questionable effectiveness, or significantly post-date implementation of the Proposed Action, contrary to the requirements of Section 7(a)(2) and controlling case law.  *See, e.g., Nat'l Wildlife Fed'n*, 524 F.3d at 935–36 n.17.  Operations related to the Shasta Cold Water Pool, including the elimination of carryover storage targets, and the Delta Cross Channel Gates are not reasonably certain to occur and are not coupled with any other measures that are certain to occur and would protect the species.  Therefore, these actions cannot be relied on by NMFS as enforceable measures that will reduce the adverse effects of the Proposed Action on listed species and designated critical habitat.

90.     The NMFS Biological Opinion fails to analyze key components of the Proposed

Action, including its short-term and long-term and site-specific and watershed-level

consequences, such as its proposal to raise the Shasta Dam, in contravention of the requirement

that a biological opinion assess all aspects of a project.  *See, e.g., Conner v. Burford*, 848 F.2d at

1457; *Wild Fish Conservancy*, 628 F.3d at 521–22, 525; *Pac. Coast Fed'n of Fishermen's Ass'n*

*v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1036–37 (9th Cir. 2001).

91.     The NMFS Biological Opinion ignores the requirement that a biological opinion must

consider not just impacts to the continued survival of listed species, but also the potential to

reduce appreciably the likelihood of their recovery.  *Nat'l Wildlife Fed'n*, 524 F.3d at 917.

92.     The NMFS Biological Opinion's incidental take statement also violates the

requirements of Section 7(b)(4) of the ESA and is arbitrary and capricious under the APA

because those statements allow take at levels that would jeopardize listed species.  As a result, the

take statement cannot provide a reasoned explanation why those levels would not jeopardize

listed species, and does not require reinitiation of consultation until the listed species would be

nearly—if not totally—extinct.

93.     In these and other ways, the analysis, reasoning, and conclusion of the NMFS

Biological Opinion, and the actions of Defendants Ross, Oliver, and NMFS described here, are

arbitrary, capricious, an abuse of discretion, not in accordance with law, in excess of statutory

authority, and without observance of procedure required by law, in violation of the ESA and its

implementing regulations and the APA.  5 U.S.C. § 706.

94.     The Court has the authority to issue the requested declaratory and injunctive relief.

28 U.S.C. §§ 2201–2202; 5 U.S.C. §§ 705–706; Fed. R. Civ. P. 65.

95.     The challenged agency actions are final and subject to judicial review.  5 U.S.C.

§§ 702, 704, 706.

//

//

//

//

**SECOND CLAIM FOR RELIEF**

**Violation of the ESA, 16 U.S.C. § 1531 *et seq.*, and the APA, 5 U.S.C. § 706**
**(By all Plaintiffs Against Defendants David Bernhardt, Aurelia Skipwith, and the U.S. Fish and Wildlife Service)**

96.     California realleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

97.     The USFWS Biological Opinion is a final agency action subject to judicial review.

98.     Defendants Bernhardt, Skipwith, and USFWS are responsible for the issuance of USFWS Biological Opinion, as described in paragraphs 18–20 above.

99.     Despite acknowledging that the populations of listed species are perilously close to extinction or extirpation, Defendants Bernhardt, Skipwith, and USFWS conclude in the USFWS Biological Opinion that Reclamation's Proposed Action will not jeopardize the continued existence of Delta smelt, and will not result in the destruction or adverse modification of the species' critical habitat.  These conclusions, and Defendants Bernhardt, Skipwith, and USFWS's decision to adopt the USFWS Biological Opinion, are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

100.   The USFWS Biological Opinion fails to provide actual analysis of whether the effects of the Proposed Action added to baseline conditions would or would not tip a species into extinction.  The Ninth Circuit has explained that "even when baseline conditions already jeopardize a species, an agency may not take action that deepens the jeopardy by causing additional harm."  *Nat'l Wildlife Fed'n*, 524 F.3d at 930.

101.   The USFWS Biological Opinion fails to articulate the required "rational connection between the facts found and the choice made."  *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962).  The "no jeopardy" conclusion is contradicted by the evidence before the agencies, is not rationally connected to facts, and is not support by reasoned explanations.  For instance, the capability of the proposed Delta Fish hatchery to supplement wild fish populations in a timely manner is uncertain.  The USFWS Biological Opinion fails to consider the likely increase in entrainment of Delta smelt resulting from the increase in water exports planned in the

28

Proposed Action, and fails to articulate why it made a "no jeopardy" conclusion despite acknowledged reduction of the Delta smelt's critical habitat.

102.   The USFWS Biological Opinion does not consider the relevant factors, and "entirely failed to consider … important aspect[s] of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The USFWS Biological Opinion essentially fails to consider the material decline of the Delta smelt.

103.   The USFWS Biological Opinion does not "use the best scientific and commercial data available" in the Biological Opinion, including but not limited to in the Summer-Fall Habitat Action and in its management of Fall X2.  16 U.S.C. § 1536(a)(2).

104.   The USFWS Biological Opinion impermissibly relies solely on operational criteria and other conservation measures that are not reasonably certain to occur, are of questionable effectiveness, or significantly post-date implementation of the Proposed Action.  *See, e.g.*, *Nat'l Wildlife Fed'n*, 524 F.3d at 936 n.17.  For example, the limitations on storm-related flexibility and smelt population supplementation plan are not reasonably certain to occur nor are they coupled with any other measures that are certain to occur and would protect the species.

105.   The USFWS Biological Opinion fails to analyze key components of the proposed action, including but not limited to a proposal to raise the height of Shasta Dam, in contravention of the requirement that a biological opinion assess all aspects of a project.  *See Conner v. Burford*, 848 F.2d at 1457.

106.   The USFWS Biological Opinion improperly ignores the requirement that a biological opinion consider not just impacts to the continued survival of listed species, but also the potential to reduce appreciably the likelihood of species recovery.  *Nat'l Wildlife Fed'n*, 524 F.3d at 931–32.

107.   The USFWS Biological Opinion's incidental take statement also violates the requirements of the Endangered Species Act and is arbitrary and capricious under the APA because those statements self-evidently allow take at levels that would jeopardize listed species.  As a result, the take statement cannot provide a reasoned explanation why those levels would not jeopardize listed species.

108.  In these and other ways, the analysis, reasoning, and conclusion of the USFWS

Biological Opinion, and the actions of Defendants Bernhardt, Skipwith, and USFWS described

here, are arbitrary, capricious, an abuse of discretion, not in accordance with law, in excess of

statutory authority, and without observance of procedure required by law, in violation of

Endangered Species Act Section 7, its implementing regulations, and the standards of the

Administrative Procedure Act, 5 U.S.C. § 706.

### THIRD CLAIM FOR RELIEF

**Violation of NEPA, 42 U.S.C. § 4321 et seq.;**
**and the APA, 5 U.S.C. § 706**
**(By all Plaintiffs Against Brenda Burman and the Bureau of Reclamation)**

109.  California realleges, as if fully set forth herein, each and every allegation contained in

the preceding paragraphs.

110.  Plaintiffs Resources Agency, CalEPA, and the Attorney General jointly commented

on Reclamation's Final Environmental Impact Statement; CDFW, a department within the

Resources Agency, and the State Water Board, a board within CalEPA, also commented on

Reclamation's Draft Environmental Impact Statement, raising the issues addressed below.

Plaintiffs Resources Agency, CalEPA, and the Attorney General incorporated by reference those

comments by CDFW and the State Water Board.  California has thus exhausted all available

administrative remedies.

111.  Defendants Burman and Reclamation are responsible for complying with NEPA,

they have breached that duty.  Reclamation's Draft EIS and Final EIS violate NEPA and the

APA, and Reclamation also failed to comply with NEPA and the APA before adopting its Record

of Decision, in at least the following ways.

112.  Reclamation violated NEPA by failing to prepare and circulate a supplement to the

EIS after making substantial changes to its proposed action and including significant new

information in the Final EIS.  *See* 42 U.S.C. § 4332(2)(C); *Robertson*, 490 U.S. at 349; *State of*

*California v. Block*, 690 F.2d 753, 770 (9th Cir. 1982).  NEPA required Reclamation to circulate

for public comment a supplement to the EIS that adequately informs decisionmakers and the

1    public of how changes to the Proposed Action and new modeling information included for the

2    first time in the Final EIS affect the analysis of project impacts.  40 C.F.R. § 1502.9(c); *see*

3    *Wilderness Defs*, 752 F.3d at 760–67(*Wilderness Defs. 2014*).

4         113.   Reclamation's Final EIS presents a revised Proposed Action  (Alternative 1) that

5    includes "substantial changes . . . relevant to environmental concerns."  40 C.F.R.

6    § 1502.9(c)(1)(i).  The Draft EIS analyzes as Alternative 1 a Proposed Action described in the

7    January 2019 Biological Assessment.  But the Final EIS introduces a substantially revised

8    Alternative 1 based on the revised Proposed Action set forth in the October 2019 Biological

9    Assessment and which was analyzed in the 2019 Biological Opinions.  The changes to the

10   Proposed Action from the Draft to the Final EIS are not minor and are not explained clearly to the

11   public in the Final EIS.

12        114.   The Final EIS also includes thousands of pages of additional modeling that amounts

13   to "significant new . . . information relevant to environmental concerns," triggering NEPA's

14   requirement to circulate a supplement to the EIS.  40 C.F.R. § 1502.9(c)(1)(ii).  Because this new

15   modeling of climate change scenarios and of the Fall X2 action for Delta smelt "raises substantial

16   questions" regarding the project's impacts, further analysis is required "before allowing the

17   project to proceed."  *Wilderness Defs. 2014*, 752 F.3d at 760; *Klamath Siskiyou Wildlands Ctr. v.*

18   *Boody*, 468 F.3d 549, 562 (9th Cir. 2006).

19        115.   Reclamation failed to provide the public with a meaningful opportunity to comment

20   on relevant information about the Proposed Action and potential impacts in direct disregard of

21   NEPA's informational goal.  *See* 42 U.S.C. § 4332(2)(C); *Robertson*, 490 U.S. at 349; *Block*, 690

22   F.2d at 770.  Reclamation's failure to disclose the details of the Proposed Action before issuance

23   of the Final EIS "defeats NEPA's goal of encouraging public participation in the development of

24   information during the decision making process."  *Half Moon Bay Fishermans' Mktg. Ass'n v.*

25   *Carlucci*, 857 F.2d 505, 508 (9th Cir. 1988).  The public and other agencies have also not had a

26   chance to comment on the updated modeling included in the Final EIS.

27        116.   The analysis of environmental impacts in Reclamation's EIS—including, but not

28   limited to, its analysis of impacts to endangered fish and aquatic resources—is inadequate and

1    unlawful.  *See*, *e.g.*, *City of Carmel-By-The-Sea*, 123 F.3d at 1160.  Reclamation's EIS (1)

2    minimizes the findings of expert scientific wildlife agencies, (2) arbitrarily adds limitations to its

3    modeling assumptions that are not contained in the project description and which directly affect

4    the scope and extent of the impact analysis on listed fish species and designated critical habitat;

5    and (3) considers protective measures that are infeasible, while refusing to analyze the impacts of

6    harmful measures that Reclamation itself identified as likely to occur.  First, the EIS's analysis of

7    fish impacts minimizes recent findings by the Services supporting the conclusion that the impacts

8    of the Proposed Action on listed fish species and their critical habitat will be more severe than

9    indicated in the Final EIS.  Reclamation instead focuses on the "uncertainty" of the possible

10   effects of the Proposed Action and discounts the potential impacts associated with the Proposed

11   Action, such as the impact that reduced Delta outflow, will have on the listed fish species and

12   their critical habitat.  By failing to provide a rational justification for its failure to address these

13   findings, the EIS violates NEPA.

14          117.  Second, Reclamation's modeling relies on assumptions that do not match the project

15   description.  For example, while the description of Alternative 1 allows for a combined export

16   rate of 14,900 cubic feet per second, without a time limit during a storm-related flexibility event,

17   Reclamation's modeling assumes an OMR index of 6,000 cubic feet per second for 7 days in each

18   of January and February during wet, above normal and below normal water years.  This

19   unreasonable assumption results in modeling results that do not reflect the permitted operations of

20   the projects and unlawfully minimizes the impacts to aquatic resources that will result from

21   Reclamation's proposed action.

22          118.  Third, Reclamation's Final EIS improperly credits reductions in the Proposed

23   Action's impacts to infeasible conservation measures while failing to account for the reasonably

24   foreseeable negative impacts that will result from waivers of conservation measures.  For

25   example, the EIS's assessment of Alternative 1's impacts on Delta smelt includes the potential

26   benefit from the Fish Conservation and Culture Laboratory's reintroduction of hatchery-grown

27   smelt that is part of the Proposed Action.  As noted by commenters including CDFW, however,

28   the Fish Conservation and Culture Laboratory's reintroduction program is unlikely to be able to

32

1    capture sufficient numbers of wild Delta smelt to support the genetic diversity needed for a

2    supplementation program, and may not be able to produce smelt in sufficient numbers soon

3    enough to serve the mitigation effect attributed to it by Reclamation.  The Final EIS's

4    characterization of the reintroduction efforts for Delta smelt as a beneficial measure with

5    appreciable positive effects without acknowledging the uncertain efficacy of the measure is

6    arbitrary and capricious.

7         119.   Reclamation's EIS fails to analyze the impacts of temporary urgency change petitions

8    that the State Water Board may grant that adjust requirements in Reclamation's water right

9    permits during a prolonged or extreme drought.  The EIS acknowledges that climate change will

10   increase the frequency and magnitude of extreme climate events like droughts but fails to take a

11   hard look at the consequences of such events, including the environmental consequences.

12        120.   Reclamation's EIS fails to evaluate all reasonable alternatives to the Proposed

13   Action.  40 C.F.R. § 1502.14; *see Wilderness Defs. 2012*, 689 F.3d at 1071 ("The existence of a

14   viable but unexamined alternative renders an environmental impact statement

15   inadequate.").  Reclamation's scoping exercise unreasonably excluded components that would

16   have provided for a reduction in the environmental impacts of the coordinated operations of the

17   Central Valley Project and State Water Project.   Of the alternatives that Reclamation did include,

18   the EIS fails to objectively evaluate these alternatives as demonstrated by the inadequacies in the

19   analysis identified in comments on the Draft EIS filed by CDFW and the State Water Board.  *See*

20   40 C.F.R. § 1502.14; *see also Wilderness Defs. 2012*, 689 F.3d at 1071 ("NEPA regulations

21   require that an EIS rigorously explore and objectively evaluate all reasonable alternatives.").

22        121.   Reclamation's EIS further fails to meaningfully evaluate the cumulative impacts of

23   Reclamation's new management direction for the Central Valley Project (the Proposed Action)

24   with the impacts of other projects in the region.  Rather than evaluate and disclose such

25   cumulative impacts, Reclamation's EIS merely provides a list of past, present, and reasonably

26   foreseeable projects in the Central Valley and Bay-Delta and frequently states that the combined

27   impacts of these projects are unknown.  *See* Final EIS, Appendix Y.  This analysis does not

28

comply with NEPA.  *See City of Carmel-By-The-Sea*, 123 F.3d at 1160 (holding cumulative impacts analysis unlawful where EIS failed "to provide any useful analysis" of such impacts).

122.   Reclamation's EIS also fails to discuss in meaningful detail mitigation measures that might avoid, minimize, or mitigate the significant environmental effects of the Proposed Action, or adequately assess whether the proposed mitigation measures will or are likely to be effective. *See Robertson*, 490 U.S. at 351; *S. Fork Band Council* , 588 F.3d at 727.  For example, as CDFW pointed out in its comments on the Draft EIS, the EIS does not propose mitigation measures to avoid or minimize potential adverse impacts to longfin smelt due to reduced Delta outflow and increased entrainment risk.  Reclamation's EIS acknowledges that "[r]eductions in winter/spring Delta outflow under Alternatives 1 through 3 have the potential to negatively affect the population abundance of Longfin Smelt."  Final EIS at 5-72.  But the EIS only proposes to *monitor the presence of* longfin smelt in mitigation measure (MM) AQUA-16, which will do nothing to avoid or minimize the harm to the species from reduced outflows and entrainment caused by the Proposed Action.  And Reclamation's response to CDFW's suggestion of a more substantive mitigation measure is inadequate because it merely points to MM AQUA-16.  NEPA requires Reclamation to consider and evaluate the effectiveness of such mitigation measures.  *See S. Fork Band Council*, 588 F.3d at 727 (holding EIS was unlawful where agency failed to "assess the effectiveness of mitigation measures relating to groundwater").  Further, in its impact analysis, the EIS makes no good faith effort to quantify or otherwise reasonably evaluate the degree of significance of these adverse effects.

123.   Reclamation's action would take species that are listed as threatened or endangered under CESA.  Reclamation's EIS does not comply with the requirement of 40 C.F.R. § 1502.16(c) that Reclamation address the inconsistency between, on the one hand, its take of endangered or threatened species, and, on the other hand, California's statutory protections for endangered species and California's policy of conserving, protecting, restoring, and enhancing endangered or threatened species and their habitats.  Cal. Fish & Game Code § 2052.  This failure is arbitrary and capricious and therefore contrary to the requirements of NEPA and the APA.

124.   The Final EIS also does not adequately respond to the comments submitted on the Draft EIS.  The purpose of public issuance of an environmental impact statement is to "provid[e] a springboard for public comment," *Dept. of Transp. v. Public Citizen*, 541 U.S. 752, 768 (2004) (alteration in original), which the agency must respond to in accordance with 40 C.F.R. § 1503.4(a).  Here, Reclamation undermined that purpose by arbitrarily limiting its analysis so as to avoid serious consideration of comments that raised significant scientific uncertainties and offered reasonable support for the existence of those uncertainties.  In doing so, Reclamation has failed to provide the full and fair discussion of environmental impacts that NEPA requires.  *Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008), *overruled on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008).

125.   In these and other ways, the analysis, reasoning, and conclusion of Reclamation's EIS are arbitrary, capricious, an abuse of discretion, not in accordance with law, in excess of statutory authority, and without observance of procedure required by law, in violation of NEPA and the APA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs California Natural Resources Agency, California Environmental Protection Agency, and the People of the State of California respectfully request that this Court enter a judgment:

1.   Declaring that the Biological Opinions are arbitrary and capricious, an abuse of discretion, and not in accordance with law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2);

2.   Holding unlawful and setting aside the Biological Opinions, including their Incidental Take Statements so that the prior regulatory regime is immediately reinstated;

3.   Ordering the Defendants to comply with the law by reinitiating consultation with respect to Reclamation's operation of the Central Valley Project;

4.   Declaring that Reclamation's Final EIS and Record of Decision violate the National Environmental Policy Act, and are arbitrary and capricious, an abuse of discretion, and not in accordance with law, in violation of the Administrative Procedure Act;

5.     Holding unlawful and setting aside Reclamation's Final EIS and Record of Decision;

6.     Granting a preliminary and permanent injunction prohibiting the Bureau of Reclamation, its agents, and any other federal officers from taking any other actions in reliance on Reclamation's EIS and Record of Decision until the Bureau of Reclamation has complied with the National Environmental Policy Act as ordered by this Court;

7.     Granting a preliminary and permanent injunction prohibiting the Defendants, their agents, and any other federal officers, from taking any other actions in reliance on the Biological Opinions until the Defendants have complied with the Endangered Species Act;

8.     Retaining jurisdiction over this matter until such time as the Secretaries and their agents have fully complied with the Court's order;

9.     Awarding Plaintiffs costs, expenses, and reasonable attorneys' fees; and

10.     Awarding Plaintiffs such other relief as the Court deems just and proper.

Dated:  February 20, 2020                      Respectfully submitted,

XAVIER BECERRA
Attorney General of California
TRACY L. WINSOR
Supervising Deputy Attorney General


*/S/ Sara Van Loh*
SARA VAN LOH
Deputy Attorney General
*Attorneys for Plaintiffs California Natural Resources Agency and People of the State of California by and Through Attorney General Xavier Becerra*

SA2019300725
14447836.docx

Complaint for Declaratory and Injunctive Relief