1
2
3
4
5
6
7

8                           UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE CALIFORNIA NATURAL RESOURCES AGENCY, *et al.*, | No. 1:20-CV-00426-DAD-EPG |
| Plaintiffs, | ORDER GRANTING MOTION FOR PRELMINARY INJUNCTION |
| v. | (Doc. No. 54) |
| WILBUR ROSS, *et al.*, | |
| Defendants. | |
| PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, *et al.*, | No. 1:20-CV-00431-DAD-EPG |
| Plaintiffs, | ORDER GRANTING IN PART AND DENYING IN PART AS MOOT MOTION FOR PRELIMINARY INJUNCTION AND HOLDING CERTAIN ISSUES IN ABEYANCE |
| v. | |
| WILBUR ROSS, *et al.*, | |
| Defendants. | (Doc. No. 81.) |

**INTRODUCTION**

This order addresses motions for preliminary injunction filed in two largely overlapping

cases: *California Natural Resources Agency v. Ross*, No. 1:20-CV-00426-DAD-EPG (*CNRA*),

and *Pacific Coast Federation of Fishermen's Associations v. Ross*, 1:20-CV-00431-DAD-EPG

1

(*PCFFA*).  In *CNRA*, plaintiffs are the People of the State of California, California's Natural Resources Agency, and California's Environmental Protection Agency (collectively, "California").  In *PCFFA*, plaintiffs are a coalition of six environmental organizations led by PCFFA (collectively, "PCFFA").

Both sets of plaintiffs bring claims against the National Marine Fisheries Service (NMFS), the U.S. Fish and Wildlife Service (FWS), the U.S. Bureau of Reclamation (Reclamation), and various official representatives of those agencies.  (*CNRA*, Doc. No. 51, First Amended Complaint (FAC); *PCFFA*, Doc. No. 52, FAC.)  California's first and second claims for relief in *CNRA* challenge the adoption by NMFS and FWS, respectively, of a pair of "biological opinions" (BiOps) issued in 2019 pursuant to the Endangered Species Act (ESA), 16 U.S.C § 1531 *et seq.*, regarding the impact on various ESA-listed species of implementing Reclamation's updated Plan for the long-term operation of the Central Valley Project (CVP) and the State Water Project (SWP) (collectively, "Water Projects" "Plan" or "Proposed Action").  More specifically, in its first and second claims for relief California alleges that NMFS and FWS violated the Administrative Procedure Act (APA), 5 U.S.C. § 706, in various ways by concluding that the Water Projects would not jeopardize the continued existence of the ESA-listed species addressed in each biological opinion.  California also brings claims against Reclamation under the ESA (third claim for relief) for unlawfully relying on the 2019 BiOps in formally adopting and implementing the Proposed Action, and the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, (fourth claim for relief).  Finally, California alleges in its fifth claim for relief that Reclamation has violated the APA by failing to comply with the California Endangered Species Act (CESA), which compliance California alleges is required by various provisions of federal law.  PCFFA's claims are largely identical to California's, although its complaint does not include a CESA-based claim.  (*PCFFA*, Doc. No. 52, First Amended Complaint.)

On March 25, 2020, these cases were transferred to this district from the U.S. District Court for the Northern District of California in light of related cases already pending before the undersigned.  (*CNRA*, Doc. No. 26; *PCFFA*, Doc. No. 112.)

/////

Now pending before the court are inter-related and overlapping motions for preliminary injunction in both cases.  (*PCFFA*, Doc. No. 81 (filed March 5, 2019); *CNRA*, Doc. No. 54 (filed April 21, 2019).)  The briefs, declarations, and attachments submitted in connection with these pending motions make up a lengthy and complex record.  PCFFA and California have urged the court to act expeditiously before certain events take place in May.  Accordingly, the court accelerated the briefing schedule where necessary and set a hearing on the pending motions for May 7, 2020.  All parties made appearances through counsel at an all-day videoconference hearing on that date, as stated on the record.  (*See PCFFA*, Doc. No. 167; *CNRA*, Doc. No. 99). Thereafter, the parties submitted a small number of additional documents referenced at the hearing, which the court has also reviewed.

PCFFA requests that the court issue a broad preliminary injunction order "temporarily setting aside" the 2019 BiOps and prohibiting Federal Defendants from implementing or taking any actions in reliance on those BiOps, including prohibiting Reclamation from implementing the Proposed Action in reliance on those BiOps.  (*PCFFA*, Doc. No. 81-1 at 2–3.)  PCFFA also has requested that the court order Federal Defendants to instead adhere to the **previous** operational regime for the Water Projects authorized pursuant to previously-controlling BiOps issued in 2008 and 2009 by FWS and NMFS, respectively, until this court can resolve the merits of PCFFA's claims asserted in the pending action.  (*Id*. at 2.)  PCFFA's request was accompanied by extensive and wide-ranging briefing challenging numerous aspects of the Proposed Action and the 2019 BiOps, focusing on issues related to operations at the Water Projects' export pumping facilities in the southern portion of the Sacramento-San Joaquin Delta (Delta) as well as instream temperature management planning and protocols for Shasta Dam on the Upper Sacramento River and New Melones Reservoir on the Stanislaus River.  (*See generally PCFFA*, Doc. No. 86.)  The record presented by PCFFA, Federal Defendants, and Defendant Intervenors in *PCFFA* in connection with the pending motions also contains extensive information addressing how the planned operations may, or may not, harm ESA-listed winter-run Chinook salmon (winter-run), spring-run Chinook salmon (spring-run), California Central Valley steelhead (CCV steelhead), and Delta smelt.

California's motion for preliminary injunction is more narrowly focused on the period from now until May 31, 2020. It requests that the current operating regime (i.e., the Proposed Action as approved by the 2019 BiOps) be enjoined from the date of this court's order through and including May 31, 2020, "to the extent that operation is inconsistent with the requirement in ***Reasonable and Prudent Alternative Action IV.2.1***," which was contained within NMFS's 2009 BiOp (2009 NMFS BiOp). (*CNRA*, Doc. No. 60 at 7–8.) (emphasis added). The emphasized text requests imposition of one aspect of the 2009 NMFS BiOp that was not carried forward into the 2019 NMFS BiOp: a restriction on the amount of exports permitted at the CVP and SWP pumping plants in the South Delta that operates by imposing an inflow to export ratio, with the inflow numerator based upon flow in the San Joaquin River measured at Vernalis. California's motion focuses on harm during this narrower period to ESA-listed Delta smelt and CCV steelhead, as well as to CESA-listed Longfin smelt. (*See generally* CNRA, Doc. No. 54.)

These requests for preliminary injunctive relief are not mutually exclusive, since the broader injunction sought by PCFFA's motion encompasses the relief requested by California.

Having considered the papers filed thus far and the parties' arguments, for the reasons explained below, the court will: (a) grants plaintiffs' joint request to enjoin the Proposed Action's export operations in the South Delta and reinstate RPA Action IV.2.1 from the 2009 NMFS BiOp from the date of this order up to and through May 31, 2020, on the specific ground that operations carried out pursuant to the Proposed Action will irreparably harm threatened CCV steelhead; (b) deny California's motion in all other respects as having been rendered moot by this order; (c) deny PCFFA's request to enjoin operations on the Stanislaus River as moot; and (d) hold all other aspects of PCFFA's motion in abeyance with the understanding that the court intends to issue a separate order addressing those remaining requests for injunctive relief in the near future.

## STANDARD OF DECISION

"The proper legal standard for preliminary injunctive relief requires a party to demonstrate 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction

1   is in the public interest.'"   *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting

2   *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *see also Ctr. for Food Safety v.*

3   *Vilsack*, 636 F.3d 1166, 1172 (9th Cir. 2011) ("After *Winter*, 'plaintiffs must establish that

4   irreparable harm is likely, not just possible, in order to obtain a preliminary injunction."); *Am.*

5   *Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).  The Ninth

6   Circuit has also held that an "injunction is appropriate when a plaintiff demonstrates . . . that

7   serious questions going to the merits were raised and the balance of hardships tips sharply in the

8   plaintiff's favor."  *All. for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011)

9   (internal quotation and citation omitted).[1]  For the purposes of injunctive relief,

10
11
12
13
> "serious questions" refers to questions which cannot be resolved one
> way or the other at the hearing on the injunction and as to which the
> court perceives a need to preserve the *status quo* lest one side prevent
> resolution of the questions or execution of any judgment by altering
> the status quo.   Serious questions are substantial, difficult and
> doubtful, as to make them a fair ground for litigation and thus for
> more deliberative investigation.

14   *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (quotations marks and

15   citation omitted).

16      The party seeking an injunction bears the burden of proving these elements.  *Klein v. City*

17   *of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009); *see also Caribbean Marine Servs. Co. v.*

18   *Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (citation omitted) ("A plaintiff must do more than

19   merely allege imminent harm sufficient to establish standing; a plaintiff must demonstrate

20   immediate threatened injury as a prerequisite to preliminary injunctive relief.").  Finally, an

21   injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the

22   plaintiff is entitled to such relief."  *Winter*, 555 U.S. at 22.

23      An injunction must be narrowly tailored to avoid the irreparable identified.  *Nat'l Wildlife*

24   *Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 823 (9th Cir. 2018).  "There must be a

---

25
26
27
28
[1]  The Ninth Circuit has found that this "serious question" version of the circuit's sliding scale approach survives "when applied as part of the four-element *Winter* test."  *All. for the Wild Rockies*, 632 F.3d at 1134.  "That is, 'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."  *Id.* at 1135.

1   sufficient causal connection between the alleged irreparable harm and the activity to be enjoined,

2   but a plaintiff need not further show that the action sought to be enjoined is the exclusive cause of

3   the injury." *Id.* (internal quotation and citation omitted).  Moreover, "[i]t is not an abuse of

4   discretion for a court to issue an injunction that does not completely prevent the irreparable harm

5   that it identifies." *Id.*

6                                **APPLICABLE STATUTORY STANDARDS**

7   **A.      APA**

8           Under the APA, a district court can "set aside only agency actions that are 'arbitrary,

9   capricious, an abuse of discretion, or otherwise not in accordance with law.'" *The Lands Council*

10  *v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc) (citing 5 U.S.C. § 706(2)(A)), *overruled*

11  *on other grounds by Winter*, 555 U.S. 7; *see also Earth Island Inst. v. Carlton*, 626 F.3d 462, 468

12  (9th Cir. 2010).  An agency's "determination in an area involving a 'high level of technical

13  expertise'" is to be afforded deference.  *McNair*, 537 F.3d at 993.  The district court's role "is

14  simply to ensure that the [agency] made no 'clear error of judgment' that would render its action

15  'arbitrary and capricious.'"  *Id.* (citing *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)).

16  "Factual determinations must be supported by substantial evidence," and "[t]he arbitrary and

17  capricious standard requires 'a rational connection between facts found and conclusions made.'"

18  *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755,

19  759–60 (9th Cir. 2014) (internal citations omitted).

20                  This requires the court to ensure that the agency has not, for instance,
                    "relied on factors which Congress has not intended it to consider,
21                  entirely failed to consider an important aspect of the problem, offered
                    an explanation for its decision that runs counter to the evidence
22                  before the agency, or [an explanation that] is so implausible that it
                    could not be ascribed to a difference in view or the product of agency
23                  expertise."

24  *McNair*, 537 F.3d at 987 (citing *Motor Vehicle Mfrs. Assn., Inc. v. State Farm Mut. Auto. Ins.*

25  *Co.*, 463 U.S. 29, 43 (1983)).

26  **B.      ESA**

27          "Under the ESA, the Secretary of the Interior and the Secretary of Commerce are charged

28  with identifying threatened and endangered species and designating critical habitats for those

                                                        6

1   species." *Nat. Res. Def. Council v. Jewell*, 749 F.3d 776, 779 (9th Cir. 2014) (*NRDC v. Jewell*)

2   (citing 16 U.S.C. § 1533).  FWS and NMFS administer the ESA on behalf of the Departments of

3   the Interior and Commerce, respectively.  *See* 50 C.F.R. §§ 17.11, 222.101(a), 223.102,

4   402.01(b).  Most pertinent to the present motion is Section 7 of the ESA (Section 7).  16 U.S.C.

5   § 1536.  Section 7(a)(2) imposes a procedural duty on the federal agencies to consult with the

6   FWS or NMFS, depending on the protected species,[2] to "insure that any action authorized,

7   funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of

8   any endangered species or threatened species or result in the destruction or adverse modification"

9   of critical habitats of listed species.  16 U.S.C. § 1536(a)(2).  An agency "action" is defined to

10  mean all activities carried out by federal agencies, including, among other things, the granting of

11  licenses and permits.  *See* 50 C.F.R. § 402.02.  "If a contemplated agency action may affect a

12  listed species, then the agency must consult with the Secretary of the Interior, either formally or

13  informally." *Am. Rivers v. NMFS*, 126 F.3d 1118, 1122 (9th Cir. 1997).

14         Formal consultation results in the issuance of a BiOp by the relevant wildlife agency

15  (FWS or NMFS).  *See* 16 U.S.C. § 1536(b).  If the BiOp concludes that the proposed action

16  would jeopardize the species or destroy or adversely modify critical habitat, *see id*. § 1536(a)(2),

17  then the action may not go forward unless the wildlife agency can suggest a "reasonable and

18  prudent alternative[]" (RPA) that avoids jeopardy, destruction, or adverse modification.  *Id.*

19  § 1536(b)(3)(A).  If a BiOp concludes that the proposed action (or the action implemented in

20  conjunction with actions described in the RPA) will cause incidental taking of protected species,

21  but that despite this taking, the action will not jeopardize the species or threaten critical habitat,

22  the wildlife agency

23  /////

---

24  [2]  Generally, FWS has jurisdiction over species of fish that either (1) spend the major portion of
25  their life in fresh water, or (2) spend part of their lives in estuarine waters, if the remaining time is
    spent in fresh water.  *See Cal. State Grange v. Nat'l Marine Fisheries Serv*., 620 F. Supp. 2d
26  1111, 1120 n.1 (E.D. Cal. 2008), *as corrected* (Oct. 31, 2008).  NMFS is granted jurisdiction over
    fish species that (1) spend the major portion of their life in ocean water, or (2) spend part of their
27  lives in estuarine waters, if the remaining portion is spent in ocean water.  *Id*.  FWS exercises
28  jurisdiction over the delta smelt; NMFS exercises jurisdiction over the winter-run and spring-run
    and the CCV steelhead.

7

shall provide the Federal agency and the applicant concerned, if any with a written statement that—

(i) specifies the impact of such incidental taking on the species,

(ii) specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact,

(iii) . . . , and

(iv) sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both, to implement the measures specified under clauses (ii) and (iii).

*Id*. § 1536(b)(4).  This required written statement, with its "reasonable and prudent measures" "RPM" and associated terms and conditions, is referred to as an "Incidental Take Statement" (ITS), which, if followed, exempts the action agency from the prohibition on takings found in Section 9 of the ESA.  *Id*. § 1536(o); *Aluminum Co. of Am. v. Adm'r, Bonneville Power Admin.*, 175 F.3d 1156, 1159 (9th Cir. 1999).

## FACTUAL BACKGROUND

### A.    The Central Valley Project and the State Water Project

The CVP and the SWP, "operated respectively by [Reclamation] and the State of California, are perhaps the two largest and most important water projects in the United States." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 592 (9th Cir. 2014) (*San Luis v. Jewell*).  "These combined projects supply water originating in northern California to more than 20,000,000 agricultural and domestic consumers in central and southern California." *Id*.  As one part of CVP operations, Reclamation releases water stored in CVP reservoirs in northern California, which then flows down the Sacramento River to the Delta.  *See id*. at 594.  Pumping plants in the southern region of the Delta (South Delta) then divert the water to various users south of the Delta.  *See id*. at 594–95.

"Although the [Water] Projects provide substantial benefits to people and to state agriculture, they arguably harm species native to the Delta by modifying those species' natural habitats." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 986 (9th Cir. 2014) (*San Luis v. Locke*).  This is because the Water Projects pump fresh water out of the "Old and

Middle River" (OMR) branches of the San Joaquin River in volumes sufficient to reverse the flow in the OMR. *Id*. at 996. "Absent pumping, the rivers would flow north into the Delta. Under pumping operations, the rivers flow south to the [CVP's] Jones and [SWP's] Banks pumping plants." *Id*. Listed species—particularly juveniles—are caught in the negative current and drawn towards the pumping facilities. *Id*. Some of these fish are "salvaged" at the pumps, "meaning they are diverted from the fatal pumping plants to fish salvage facilities and into tanks where they are counted, measured, loaded into trucks, driven north, and dumped back into the Delta." *Id*. But even if salvaged, fish that are drawn towards the pumps by the "negative OMR" flow have a lower likelihood of surviving outmigration than their counterpoints that avoid "entrainment"[3] by Water Project operations. *Id*.

The Delta smelt (*Hypomesus transpacificus*) is a "small, two-to-three inch species of fish endemic to the [Delta]." *San Luis v. Jewell*, 757 F.3d at 595. In 1993, FWS concluded the delta smelt's population had declined by ninety percent over the previous twenty years and listed it as a "threatened" species under the ESA. Determination of Threatened Status for the Delta Smelt, 58 Fed. Reg. 12,854, 12,855–56 (Mar. 5, 1993). FWS further determined that "Delta water diversions," including those resulting from operations of the CVP and SWP, are a significant "synergistic cause[ ]" of the decline in the delta smelt population. *Id*. at 12,859.

Longfin smelt (*Spirinchus thaleichthys*) "range from the fresh waters of the Delta during their spawning season from January through March down to the coastal waters outside the Golden Gate." (*CNRA*, Doc. No. 55, Declaration of Bruce Herbold (Herbold Decl.) at ¶ 31.) Longfin smelt "generally live for two years and have almost always been more abundant than Delta Smelt." (*Id*.) Nonetheless, Longfin smelt populations "have been in severe decline since the drought of the mid-1980s." (*Id*. at ¶ 32.) Longfin smelt are listed under CESA but not the ESA. (*See id*. at ¶ 19.)

/////

---

[3]  As the court in *San Luis v. Locke* roughly described "[a] fish is 'entrained' when it follows diverted water rather than the natural course of a river, stream, pond, or lake. The danger with entrainment is that fish can become stranded in irrigation canals or killed when they are trapped in pumps." 776 F.3d at 996.

The winter-run and spring-run (*Oncorhynchus tshawytscha*), and CCV steelhead (*Oncorhynchus mykiss*), are "anadromous" fish, meaning that they live most of their lives in salt water, but "are born, mature, lay eggs, and often die in inland freshwater lakes and rivers." *San Luis v. Locke*, 776 F.3d 986–87.

> After they grow from fry (baby fish) to smolts (juvenile fish) in fresh water, anadromous salmon outmigrate through rivers and deltas into the oceans and seas where they will spend most of their adult lives. When it is time to reproduce, these salmon migrate back through the deltas to the rivers and lakes in which they were born to lay eggs. During this migration, salmon must pass impediments in inland rivers such as locks, dams, channels, and pumps.

*Id*. at 987.  Notable for purposes of the pending motions, NMFS divides CCV steelhead into three "diversity groups" for management purposes: the basalt and porous lava diversity group, the northern Sierra Nevada diversity group, and the southern Sierra Nevada diversity group.  (*See PCFFA*, Doc. No. 85-2 (2019 NMFS BiOp) at 769.)

Because the remainder of the discussion in this Order focuses on impacts to CCV steelhead, the court will briefly review only the development of regulatory regimes designed to protect the listed salmonid species in the region impacted by the Water Projects, and will largely skip over the roughly parallel developments related to the smelt species.

**B.      2004 Operations and Criteria Plan & Resulting BiOps**

On June 30, 2004, Reclamation prepared an operational plan, dubbed the "Operations Criteria and Plan" (OCAP), to provide, among other things, a basis for renewing various long-term water contracts. *NRDC v. Jewell*, 749 F.3d at 780.  Pursuant to Section 7, Reclamation initiated consultation with NMFS over the impact of the 2004 OCAP on listed species under NMFS's jurisdiction.  NMFS issued an initial "no jeopardy" BiOp in October 2004.  (*See* 2019 NMFS BiOp at 10 (describing consultation history).)  That BiOp became the subject of numerous lawsuits, ultimately resulting in a finding that the October 2004 no jeopardy BiOp was unlawful. *Pac. Coast Fed'n of Fishermen's Ass'n v. Gutierrez*, 606 F. Supp. 2d 1122 (E.D. Cal. 2008) (*PCFFA v. Gutierrez*).

Starting in 2006, NMFS and Reclamation engaged in renewed consultation.  *See San Luis v. Locke*, 776 F.3d at 988.  On June 4, 2009, NMFS issued, and Reclamation accepted, a BiOp

that concluded that "the long-term operations of the CVP and SWP are likely to jeopardize the continued existence" of and "destroy or adversely modify" critical habitat for winter-run, spring-run, and CCV steelhead.  (*See PCFFA*, Doc. No. 85-18 (2009 NMFS BiOp) at 575.)  As required by law, the BiOp included an RPA designed to allow the projects to continue operating without causing jeopardy to the species or adverse modification to its critical habitat.  (*Id*. at 575–671.)  The RPA was "composed of numerous elements for each of the various project divisions and associated stressors" which, according to the BiOp, "must be implemented in its entirety to avoid jeopardy and adverse modification."  (*Id*. at 578.)  The 2009 NMFS BiOp provided a succinct overview of the RPA, pertinent parts of which provide helpful background here:

> There are several ways in which water operations adversely affect listed species that are addressed in this RPA.  We summarize the most significant here:
>
> ***
>
> The effects analysis [in the 2009 NMFS BiOp] shows that juvenile steelhead migrating out from the San Joaquin River Basin have a particularly high rate of loss due to both project and non-project related stressors. The RPA mandates additional measures to improve survival of San Joaquin steelhead smolts, including both increased San Joaquin River flows and export curtailments.  Given the uncertainty of the relationship between flow and exports, the RPA also prescribes a significant new study of acoustic tagged fish in the San Joaquin Basin to evaluate the effectiveness of the RPA and refine it over the lifetime of the project.
>
> ***
>
> On the Stanislaus River, project operations have led to significant degradation of floodplain and rearing habitat for steelhead.  Low flows also distort cues associated with out-migration.  The RPA proposes a year-round flow regime necessary to minimize project effects to each life-stage of steelhead, including new spring flows that will support rearing habitat formation and inundation, and will create pulses that cue out-migration.

(*Id*. at 576–78.)

Both the 2009 NMFS BiOp and a parallel 2008 FWS BiOp addressing impacts to Delta smelt were subject to legal challenges but were ultimately upheld by the Ninth Circuit. *San Luis v. Jewell*, 747 F.3d 581; *San Luis v. Locke*, 776 F.3d 971.

/////

11

1    **C.      Reconsultation Request & Issuance of New BiOps & NEPA Document**

2            In 2016, after years of drought and concerns over extremely low population numbers of

3    winter-run, FWS and NMFS reinitiated consultation under the ESA.  (*PCFFA*, FAC at ¶ 6; *see*

4    *also PCFFA*, Doc. No. 86-4 (8/2/16 reinitiation request letter from NMFS to Reclamation).)  In

5    January 2019, Reclamation issued a biological assessment (BA)[4] for the Proposed Action.  (*See*

6    2019 NMFS BiOp at 12.)  Pursuant to the ESA, Reclamation again consulted with FWS and

7    NMFS.  (*See id.*)

8            In July 2019, NMFS prepared a draft BiOp in which the agency concluded that, absent

9    constraints, the Reclamation's proposed plan as set forth in the January 2019 BA **was** likely to

10   jeopardize the continued existence of and destroy or adversely modify the critical habitat of the

11   listed salmonid species.  (*PCFFA*, Doc. No. 85-13 (NMFS July 2019 Draft BiOp).)  Thereafter,

12   Reclamation and DWR incorporated changes to the proposed plan, including additional

13   commitments to address impacts to listed species.  (*See* 2019 NMFS BiOp at 12–14.)

14           A few months later, however, on October 21, 2019, Reclamation issued a revised, Final

15   BA describing a revised operating plan for the Water Projects (*PCFFA*, Doc. No. 85-12 (BA)),

16   which constituted the final Proposed Action.  On the same day, NMFS issued a BiOp that

17   concluded Reclamation's revised proposed plan **was not** likely to jeopardize the existence of

18   winter-run and spring-run salmon and Central Valley steelhead beyond that permitted under its

19   2009 opinion.  (*See generally* 2019 NMFS BiOp.)  Following a very similar consultation

20   pathway, FWS issued an opinion that Reclamation's proposed plan was not likely to jeopardize

21   the continued existence of the Delta smelt or modify its habitat.  (*PCFFA*, Doc. No. 85-1 (2019

22   _____

23   [4]  Under the ESA, an agency proposing to take an action (often referred to as the "action agency")
     must first inquire of FWS and/or NMFS whether any threatened or endangered species "may be
24   present" in the area of the proposed action.  *See* 16 U.S.C. § 1536(c)(1).  If endangered species
     may be present, the action agency may prepare a BA to determine whether such species "is likely
25   to be affected" by the action.  *Id.*; 50 C.F.R. § 402.12(b).  "An agency may avoid the consultation
     requirement only if it determines that its action will have 'no effect' on a listed species or critical
26   habitat."  *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1027 (9th Cir. 2012) (en banc)
     (internal citation omitted). If the BA determines that a threatened or endangered species is "likely
27   to be affected," the agency must formally consult with FWS and/or NMFS.  *See* 16 U.S.C.
     § 1536(a)(2); 50 C.F.R. 402.14.

28

1  FWS BiOp).)  Having found no jeopardy, the BiOps imposed no additional protective conditions

2  on the Proposed Action, which was allowed to proceed as described in Reclamation's Final BA.[5]

3  On February 18, 2020, Reclamation issued its Record of Decision on the Coordinated Long-Term

4  Operation of the Central Valley Project and State Water Project (ROD), thereby approving the

5  Proposed Action.  (*PCFFA,* Doc. No. 85-14 (ROD)).

6  　　　These lawsuits followed close on the heels of the issuance of the challenged BiOps and

7  ROD.

8  　　　　　　　　　　　　　　　**DISCUSSION**

9  　　　As the court explained at the May 7, 2020 hearing, it has divided its evaluation of the

10  pending motions according to the broad geographic regions addressed therein.  Roughly speaking,

11  those regions are: (1) the upper Sacramento River below Shasta Dam; (2) the Stanislaus River

12  below New Melones Dam; and (3) the Delta.  The court will soon address the issues raised in

13  PCFFA's briefs regarding the upper Sacramento River by way of a separate order.  The remainder

14  of this order will address the pending motions with respect to the second and third geographic

15  areas in turn.

16  **A.　　　Request for Injunctive Relief Regarding Stanislaus River Operations**

17  　　　The briefing submitted in connection with PCFFA's preliminary injunction motion raises

18  merits challenges to, and discusses the potential harms flowing from, the Proposed Action's

19  alleged weakening of requirements for minimum Stanislaus River flows below New Melones

20  Dam.  In particular, PCFFA alleges and has attempted to prove that CCV steelhead spawning and

21  rearing in the Stanislaus will be harmed by reduced releases from New Melones in the coming

22  weeks and months between now and this court's ruling on the merits of the action.  (*See PCFFA*,

23  Doc. No. 86 at 15.)

24  　　　At the hearing on the pending motions, however, Kristen White, the Operations Manager

25  of Reclamation's Central Valley Operations Office, forthrightly testified that it is anticipated

26  operations at New Melones will largely be controlled by factors other than the 2019 NMFS BiOp,

27

28  [5]  Overlapping with this process, Reclamation conducted a NEPA review.  Because that process is not relevant to the resolution of the pending motions, the court does not discuss it in detail here.

13

1    resulting in flows in May and at least part of June that will be at least as protective for CCV

2    steelhead as conditions would have been under the 2009 NMFS BiOp.  (*See* May 7, 2020 Rough

3    Hearing Transcript (Tr.) 125–32.)  The court interprets Ms. White's hearing testimony and related

4    statements by counsel to be a commitment to meet or exceed instream flows that would have been

5    provided under the 2009 NMFS BiOp through May and at least a portion of June.  Given that

6    commitment, the court will also accept counsel for PCFFA assurance provided at the hearing (*id.*

7    at 127:10-14) that this commitment resolves PCFFA's request for injunctive relief as to Stanislaus

8    operations, at least through that time period.

9           The court further finds that the evidence presented by PCFFA as to irreparable harm on

10   the Stanislaus is largely confined to the March through June timeframe.  (*See PCFFA*, Doc. No.

11   82, Declaration of Dr. Jonathan Rosenfeld (Rosenfeld Decl.), at ¶ 128.)  The parties have not

12   highlighted any evidence in the record currently before the court that suggests irreparable harm to

13   CCV steelhead in the Stanislaus river is likely to occur for the remaining months of this year.

14   Accordingly, PCFFA's motion for a preliminary injunction will be denied as moot as to their

15   assertions regarding instream flow requirements below New Melones Dam.  This ruling,

16   however, will not foreclose any future motion for injunctive relief premised upon a renewed

17   showing of likely harm.

18   **B.    Request for Injunctive Relief Regarding Delta Operations**

19          1.    Likelihood of Success Re: ESA Claims Against NMFS

20          The motions of both sets of plaintiffs focus at least in part on impacts to salmonids in the

21   South Delta.  Among many other complaints, plaintiffs assert that operations under the Proposed

22   Action in April and May of 2020 are not sufficiently protective of the listed salmonids (winter-

23   run and spring-run Chinook, and/or CCV steelhead)—juveniles of each of which pass through the

24   Delta during the spring.  Plaintiffs emphasize the 2019 NMFS BiOp's omission of a particular

25   protective measure required by the 2009 NMFS BiOp.  As mentioned, the 2009 NMFS BiOp

26   imposed limits on exports by way of a requirement that San Joaquin River inflow be balanced

27   against exports according to pre-determined ratios (I:E Ratio) set according to the category of

28   water year (designated as critically dry, dry, above normal, or wet).  (2009 NMFS BiOp at 644–

1   45.)  For a critically dry year, the 2009 NMFS BiOp imposed a ratio of San Joaquin River inflow

2   to combined exports of 1:1, while in a dry year, the ratio was 2:1, with increasingly large (3:1,

3   4:1) ratios being imposed as conditions become wetter.  (*Id*.)  The Ninth Circuit previously

4   reviewed one specific aspect of this I:E Ratio—the imposition of a 4:1 ratio in wet years—and

5   found this "conservative threshold" to be "traceable to the record" and therefore within NMFS's

6   discretion to implement.  *San Luis v. Locke*, 776 F.3d at 1004.

7        The 2019 NMFS BiOp eliminated this requirement, leaving no I:E Ratio in place for April

8   and May, instead imposing alternative protective measures built into the Proposed Action,

9   centered in the near term around certain "performance measures."  Of particular importance here

10  is a provision that limits "losses"[6] at the export facilities in any single year to 90% of the greatest

11  annual loss recorded since the implementation of the 2009 BiOp (2010 to 2018).  (2019 NMFS

12  BiOp at 528, 534–35.)  The "loss" limit for CCV steelhead, calculated based on historically

13  observed salvage at the export facilities is subdivided into two time periods in order to help

14  protect the "San Joaquin [River]-origin fish" that make up the southern Sierra diversity group,

15  resulting in two separate single-year loss thresholds: 1,414 between December 1 and March 31,

16  and 1,552 between April 1 and June 15.  (2019 NMFS BiOp at 534, 547).  If in any year, 50%

17  and 75% of the annual loss thresholds are exceeded, CVP and SWP exports will be managed in

18  such a way so as to limit OMR reverse flow to -3,500 cubic feet per second (cfs) and -2,500 cfs,

19  respectively.  (*Id*.; *see also PCFFA*, Doc. No. 130-1, Declaration of Chandra Chilmakuri

20  /////

21  /////

22  /////

23  /////

24  /////

25

26  [6]  "Loss" is a term of art in this context that uses a "methodology for calculating salvage and loss,
    based on expansion of observed salvaged fish and using [] current loss multipliers."  (2019 NMFS

27  BiOp at 507.)  The details of the underlying calculations do not appear to be placed at issue by the
    pending motions.

28

15

1   (Chilmakuri Decl.), ¶ 32.)[7]  In other words, if the loss thresholds are met (i.e., triggered),

2   Reclamation and DWR will collectively manage export pumping to ensure that reverse flows in

3   OMR are less negative (i.e., more positive) than -2,500 or -3,500 respectively.  In short, if those

4   management limits are triggered, the hydrodynamic situation in the region of the Delta influenced

5   by the export pumps would tend to be more natural than it otherwise would be without those

6   management limits.

7       Plaintiffs vigorously argue that, for a variety of reasons, the replacement of the I:E Ratio

8   with the performance measures, including the single-year loss thresholds described above, renders

9   the 2019 NMFS BiOp irrational/arbitrary under the APA.  In early April 2020, before briefing on

10   the pending preliminary injunction motions was complete, PCFFA brought this particular issue

11   before the court as part of an application for a temporary restraining order (TRO Motion) based

12   upon information suggesting that, contrary to Federal Defendants' earlier assertions, operations

13   under the Proposed Action in early April would likely permit export pumping significantly above

14   and beyond that which would have been permissible had the I:E Ratio been in place.  (*See*

15   *generally PCFFA*, Doc. No. 131.)  At issue in the TRO Motion was a very short window of time

16   between the motion's filing and the imposition on April 10, 2020, of a so-called "pulse flow"

17   protective action that closely resembles the I:E Ratio.  (Tr. 59:8–2.)  After a hearing, the court

18   denied *PCFFA's* TRO Motion, finding that the showing of irreparable harm was insufficient on

19   the then-presented record, particularly in light of the brief period of time at issue.  (*PCFFA*, Doc.

20   No. 142 at 11 (TRO Order).)

21   /////

22

---

23   [7]  The 2019 NMFS BiOp also imposes a baseline limit, layered on top of the -3,500 and -2,500
     cfs limits triggered by the loss thresholds, that prohibits OMR reverse flows from being more

24   negative than -5,000 cfs.  (2019 NMFS BiOp at 16.)  Generally, this -5,000 cfs limit operates
     from January through June.  (*Id*.)  But, that -5,000 cfs limit is subject to a potentially large

25   exception in the form of a provision in the Proposed Action that would allow reverse flows to
     exceed -5,000 cfs during certain kinds of storm events.  (*Id*. at 16, 60.)  Exactly when that

26   provision could be invoked is unclear on the present record before the court, although the
     negative OMR limits associated with the single year loss thresholds, if triggered, would preclude

27   invocation of the storm event provision.  (*Id*. at 479.)  The parties discussed the storm event
     provision in their papers and at oral argument on, but the court finds it unnecessary to address this

28   matter in detail as its reasoning in resolving the pending motions is grounded elsewhere.

1    Nothing has been presented to the court to cause it to depart from its conclusion expressed

2    in the TRO Order that plaintiffs have raised serious questions on the merits with respect to the I:E

3    Ratio issue.  The court still believes that the record before it supports, at least preliminarily, a

4    finding that NMFS's decision to not impose an I:E Ratio going forward amounts to a change of

5    position that triggers certain obligations under the APA.  Specifically, where an agency departs

6    from its previous findings, the bedrock principle that an agency "must examine the relevant data

7    and articulate a . . . rational connection between the facts found and the choice made," means that

8    the agency must examine its own "prior factual findings [and] conclusions," and "'articulate a

9    satisfactory explanation' when it changes its mind." *Defs. of Wildlife v. Zinke*, 856 F.3d 1248,

10   1262 (9th Cir. 2017) (quoting *Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1051 (9th Cir.

11   2010)).  Here, for the reasons explained below, the court again concludes plaintiffs have raised

12   serious questions about whether NMFS has articulated a satisfactory explanation for its

13   dramatically changed approach.[8]

14   NMFS's July 2019 Draft BiOp concluded that the approach advocated in an early version

15   of the Proposed Action was "considerably less protective" than that contained in the 2009 NMFS

16   BiOp "which provided substantial export reductions in the April and May periods to protect San

17   Joaquin River basin CCV steelhead."  (Doc. No. 140-3 at 405.)  The final 2019 NMFS BiOp

18   reiterates in various places that the originally-framed Proposed Action would be detrimental to

19   fish populations.  For example, in discussing the results of at least one flow modeling exercise,

20   NMFS acknowledged that the proposed regulatory regime would result in flows that are "more

21   negative" than under the 2009 NMFS BiOp which in turn will "be more negative to fish."  (2019

22   NMFS BiOp at 483.)  After undergoing revisions, the final version of the Proposed Action

23   _____

24   [8]  At oral argument on the TRO Motion, counsel for Defendant Intervenors San Luis & Delta
     Mendota Water Authority and Westlands Water District suggested, at least indirectly, that this

25   might not be the appropriate standard to be applied because, here, NMFS has not technically
     changed its position.  Rather, they suggested, only the Water Project proposed by Reclamation

26   has changed.  As the court noted in its TRO Order, this is a distinction without a difference.
     "Either way, NMFS's obligations under the APA would require it to explain why a protective

27   measure it previously thought was crucial enough to impose upon operations is no longer

28   necessary either as part of the project itself or as a condition of its implementation."  (TRO Order
     at 6 n. 3.)

1   included the performance measures and loss targets described above.  Although NMFS leans

2   heavily on the performance objectives as a mechanism for reaching its "no jeopardy" conclusion

3   even in light of these recognized negative impacts, it does not appear to be prepared to conclude

4   those measures are <u>entirely</u> sufficient to make up for the lost ground it acknowledges.

5   Particularly with respect to impacts to San Joaquin-origin CCV steelhead, NMFS has stated:

6   
7   
8   > Reclamation's proposed action could create conditions that would reduce steelhead survival to Chipps Island[9] for the Southern Sierra Nevada Diversity Group, further exacerbating the already diminished status of this diversity group.

9   
10  
11  
12  
13  
14  > During the consultation process, NMFS and Reclamation worked to develop actions that might ***partially offset*** the effects to San Joaquin basin steelhead related to not having [an] I:E ratio or Head of Old River Barrier in plan.  Delta Performance Objectives including a Cumulative Loss Threshold and a Single-year Loss Threshold with two time periods (December through March and April through June) that are intended to provide protections for both San Joaquin basin and Sacramento basin CCV steelhead. Reclamation also proposed the CCV steelhead Lifecycle Monitoring Program, in part to help improve CCV steelhead science [that] can be used to protect San Joaquin Basin steelhead and inform actions such as water operations.

15  (2019 NMFS BiOp at 777) (emphasis added).  Federal Defendants have directed the court's

16  attention to a lengthy section of the 2019 NMFS BiOp that attempts to integrate and synthesize

17  the impacts of all of the various changes incorporated into the Proposed Action relative to the

18  2009 NMFS BiOp.  (*Id.* at 747–96.)  Among other things, the 2019 NMFS BiOp imposes various

19  conservation measures and limits on negative flows in the Old and Middle River channels of the

20  San Joaquin River.  The court has thoroughly reviewed that entire section of the 2019 NMFS

21  BiOp with a particular focus on the discussion of CCV steelhead (*id.* at 769–86), keeping in mind

22  the deference the court must give the agency's expert opinion.  The key lessons from this review

23  are as follows:

24  - First, as mentioned, the CCV steelhead are divided into three "diversity groups": the

25   basalt and porous lava diversity group, the northern Sierra Nevada diversity group, and the

26   southern Sierra Nevada diversity group.  (*Id.* at 769.)  Watersheds utilized by the four

27  
28  ---
    9   Chipps Island is a location at the western edge of the Delta; if a juvenile makes it to Chipps Island, they are considered to have "successfully migrated" past the primary dangers of the Delta. (*See* 2019 NMFS BiOp at 149.)

1   diversity groups were prioritized into three categories (Core 1, Core 2 and Core 3).  (*Id*. at

2   777.)

3         Core 1 watersheds possess the known ability or potential to support
          a viable population.  Core 2 populations meet, or have the potential
4         to meet, the biological recovery standard for moderate risk of
          extinction.  Although Core 2 watersheds are lower priority, they
5         remain important because they provide increased life history
          diversity [listed populations] and are likely to buffer against local
6         catastrophic occurrences that could affect other nearby populations.

7   (*Id*.)

8   •  Many watersheds in the Central Valley "are experiencing decreased abundance of CCV

9      steelhead."  While some habitat restoration efforts have helped to some extent,

10        adult numbers are still low, a large percentage of the historical
          spawning and rearing habitat is lost or degraded, and smolt
11        production is dominated by hatchery fish.  Many planned restoration
          and reintroduction efforts have yet to be implemented or completed.
12        Most natural origin CCV steelhead populations are not monitored
          and may lack the resiliency to persist for protracted periods if
13        subjected to additional stressors, particularly widespread stressors
          such as climate change and drought.
14

15    (*Id*. at 770.)

16  •  Among the numerous threats to steelhead is entrainment (*see*  note 3 above), which **initial**

17     modeling expected to be more pronounced in dry years and greatest in April and May:

18        Delta export actions at both State and Federal Facilities can create
          near- and far-field effects on emigrating fish in the Delta including
19        decreased transit times, increase risk of predation and direct salvage
          and loss (entrainment) at the facilities . . . . Reclamation proposes to
20        increase south Delta water exports relative to a current operations
          scenario and results from the [initial modeling] indicate that losses
21        of CCV steelhead would increase under the proposed action in the
          winter and spring months. The effects of these changes on the
22        relative flow conditions in the Delta are more pronounced in drier
          year types. ***Loss increases are expected to be greatest during April***
23        ***and May***, coinciding with the peak of juvenile outmigration of CCV
          steelhead from the San Joaquin Basin.
24

25    (*Id*. at 773) (emphasis added) (citations omitted).

26  •  Loss estimates described in the 2019 NMFS BiOp "do not include loss due to [fish

27     screening equipment] cleaning, predation observed to occur on the upstream side of the

28     trash racks, or far-field predation associated with altered hydrodynamics, and therefore

19

1    *underestimate mortality* associated with south Delta pumping and fish salvage

2    operations." (*Id*. at 774) (emphasis added).

3    • In response to initial loss modeling, Reclamation revised its proposed action to include the

4    cumulative loss thresholds and single year loss thresholds (cumulatively referenced as

5    "performance objective thresholds"). (*Id*.) In light of these revisions, NMFS concluded:

6    "While loss is expected to occur under the final proposed action, performance objective

7    thresholds are expected to limit loss to levels similar [to] what has been observed over the

8    past 10 years." (*Id*.) <u>A critical question arises in the context of this conclusion:  How can</u>

9    <u>a "similar" amount of loss be justified in relation to a species that even the BiOp</u>

10   <u>recognizes  has been in decline?</u>  Put into legal parlance:  How can NMFS reach a "no

11   jeopardy" conclusion after acknowledging that "similar" impacts will continue given the

12   evidence of record suggesting that the species cannot withstand those ongoing, "similar"

13   impacts?  For example, the 2019 NMFS BiOp itself indicates that "natural-origin CCV

14   steelhead have continued to decrease in abundance and in the proportion of natural-origin

15   to hatchery-origin fish over the past 25 years" and that "the long-term trend remains

16   negative." (*Id*. at 108.) In short, according to the 2019 NMFS BiOp itself, the listed

17   population "is likely to become endangered within the foreseeable future throughout all or

18   a significant portion of its range." (*Id*.)

19   • The BiOp provides some clues as to NMFS's reasoning:

20       ○ NMFS expects that the operation of the loss thresholds themselves, if they trigger

21          reductions in the magnitude of reverse OMR flows, "will maintain survival rates of

22          juvenile CCV steelhead as they move through the Delta."[10] (*Id*.)

---

23   [10] NMFS also reasons that "turbidity management" and "managing for Delta Smelt entrainment"

24   are expected to provide additional protections for CCV steelhead migrating through the Delta.
     (*Id*. at 774.)  The court does not believe it is necessary or expedient to delve into all of the details

25   of those issues here, but notes that both sets of plaintiffs have raised significant questions about
     the efficacy of the referenced Delta smelt protections.  For example, many of those purportedly

26   protective actions are triggered by (or have exceptions that may be triggered by) the application
     of a life cycle model that had not been finalized by the time the 2019 FWS BiOp issued. (*See*

27   PCFFA Doc. No. 85-1 (2019 FWS BiOp) at 42–43, 151).  Moreover, the 2019 FWS BiOp relies
     in a number of ways on real-time monitoring even though by all accounts Delta smelt are so rare

28   that monitoring is largely unreliable (*id*. at 394 (discussing how it is "impossible to accurately

o   Conservation actions are planned as part of the Proposed Action, including actions specifically targeting CCV steelhead habitat

> The proposed conservation measures are expected to help CCV steelhead withstand adverse effects of the proposed action and improve the science that can be used to protect CCV steelhead from adverse effects associated with CVP and SWP water operations. NMFS expects that these measures maintain the abundance, survival and productivity metrics of populations throughout the action area.

> (*Id*. at 776.)

- The BiOp acknowledges that the Proposed Action "will continue or increase juvenile entrainment in CVP/SWP pumping projects, and is expected to impede migration for adult and juvenile CCV steelhead from the Sacramento and San Joaquin basins migrating through the Delta." (*Id*. at 779). Nonetheless, the BiOp appears to conclude these impacts are acceptable, in part because the CCV steelhead populations impacted by export pumping—those in the Stanislaus and Tuolumne Rivers[11]—are considered "Core 2" rather than "Core 1" populations. NMFS appears to engage in the following rough math regarding the overall impacts to these types of populations:

> In total, three of six Core 1 populations and three of 15 Core 2 populations are expected to be affected by the CVP. NMFS expects that despite ongoing adverse effects of the Central Valley Project on individuals and their respective populations, and the continued and significant adverse effects that are part of the environmental baseline (such as the loss of historical habitat related to the physical presence

---

quantify and monitor the amount or number of individuals that are expected to be incidentally taken" as a result of the Proposed Action")). Even in light of the applicable deferential APA standard, the court is hesitant to give significant weight to a reference to this provision, which is not formally incorporated into the 2019 NMFS BiOp.

[11]   Three populations make up the southern Sierra Nevada diversity group: the Calaveras River population (Core 1), the Stanislaus River population (Core 2), and the Tuolumne River population (Core 2). (*See id*. at 780.) At one point in the 2019 NMFS BiOp, NMFS indicates only one of the three populations that make up this diversity group—the Stanislaus River population—would be impacted by export pumping. (*Id*. at 779–80.) This seems illogical at first blush because, while the Calaveras River (and therefore CCV steelhead emerging therefrom) merges with the San Joaquin River <u>downstream</u> of the export pumping facilities, the Tuolumne River merges with the San Joaquin <u>upstream</u> of the Stanislaus River. (*Compare* 2019 NMFS BiOp at 3 (Figure 1 (showing CVP dams and facilities), *with id*. at 109 (Figure 24 (showing CCV steelhead critical habitat and associated waterways); *see also PCFFA*, Doc. No. 82 (Declaration of Jonathan Rosenfeld) at 41 n. 13 (noting the same)).

of Keswick and Shasta Dams), the proposed action includes conservation measures and other actions intended to maintain the abundance, productivity, spatial structure, and/or diversity of the DPS in those populations potentially impacted by the proposed action.

(*Id*. at 781.) First, as previously mentioned, *see* note 6 above, it is not clear that this tallying is correct or meaningful. Second, absent more detailed discussion/justification, the logic underpinning this reasoning seems to be at odds with other statements made elsewhere in the 2019 NMFS BiOp, including the general acknowledgement that "[a]lthough Core 2 watersheds are lower priority, they remain important because they provide increased life history diversity to the ESU/DPS and are likely to buffer against local catastrophic occurrences that could affect other nearby populations." (2019 NMFS BiOp at 777.)

Based upon its review of the 2019 NMFS BiOp, the court concludes that the evidence before it continues to support the basic findings of the TRO Order regarding plaintiffs' likelihood of success on the merits. The record is too mixed for the court to conclude at this time that plaintiffs are clearly likely to be able to show that NMFS has violated the APA. However, plaintiffs have certainly raised serious questions as to whether NMFS has justified its changed position as to elimination of the San Joaquin River I:E Ratio generally. At a bare minimum, plaintiffs have raised at least the following serous question: Even after Reclamation incorporated the new performance measures/loss limits into its Proposed Action, NMFS was only able to conclude that harms would be "similar" to those experienced in the past. Given that it appears to be undisputed that CCV steelhead are declining, the court has serious concerns as to whether this reasoning satisfies NMFS's obligations under the ESA to evaluate whether the Proposed Action would jeopardize the species or destroy or adversely modify critical habitat. 16 U.S.C. § 1536(a)(2). These concerns are "substantial, difficult and doubtful," so as to "make them a fair ground for litigation and thus for more deliberative investigation," and thereby constitute "serious questions" on the merits established by plaintiffs. *Republic of the Philippines*, 862 F.2d at 1362.

/////

/////

22

2.      Likelihood of Success Re: ESA Claims Against Reclamation

Because the requested injunctive relief would apply directly to Reclamation, the court finds it necessary to also address, briefly, plaintiffs' associated ESA claims against Reclamation.

a.   *Threshold Jurisdictional Challenge*

The ESA contains a citizen suit provision that permits "any person" to commence a civil action to, among other things, "enjoin any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the Eleventh Amendment to the Constitution), who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof."  16 U.S.C. § 1540(g).  The ESA's citizen suit provision contains a requirement that notice be provided to the alleged violator (e.g., Reclamation), as well as to the Secretary of the Interior and/or Commerce, sixty days prior to the filing of any citizen suit.  *Id*. § 1540(g)(2)(A)(i).

Here, PCFFA provided a notice of intent to sue on November 23, 2019, to all the appropriate persons/agencies.  (*PCFFA*, Doc. No. 52-1.)  Although the notice was sent <u>after</u> the 2019 BiOps were adopted by NMFS and FWS, on October 21, 2019, the notice was sent <u>before</u> Reclamation formally decided to adopt the terms and conditions contained within those BiOps, a determination Reclamation made on February 18, 2020.  (*PCFFA*, Doc. No. 85-14.)  Federal Defendants argue here that the court therefore lacks jurisdiction over PCFFA's third claim for relief because plaintiffs' notice was sent too early.  (*PCFFA*, Doc. No. 119 at 30.)

Although the court's review of the caselaw suggests Federal Defendants may be advocating for an overly strict interpretation of this provision, *see All. for the Wild Rockies v. U.S. Dep't of Agric.*, 772 F.3d 592, 602–03 (9th Cir. 2014) (permitting non-ESA claims to commence before notice and allowing amendment of a complaint after the notice period expired), the court finds it unnecessary to resolve this issue.  This is because Federal Defendants do not argue that the court lacks jurisdiction over California's claim against Reclamation, likely because California alleges it gave notice to Reclamation on February 20, 2020.  (*CNRA*, FAC at ¶ 6.)

/////

/////

23

1

            b.      *Merits of ESA Claim Against the Reclamation*

2

        Plaintiffs claim that Reclamation, as the action agency, unjustifiably relied on and

3

accepted the 2019 NMFS BiOp.  The relevant inquiry is not whether the BiOp itself is flawed, but

4

rather whether the action agency's reliance on the BiOp was arbitrary and capricious.  *City of*

5

*Tacoma, Wash. v. FERC*, 460 F.3d 53, 75–76 (D.C. Cir. 2006); *see also Defs. of Wildlife v. Zinke*,

6

856 F.3d at 1265.  While reliance on a "fatally flawed" BiOp is likely to be found arbitrary and

7

capricious, "the action agency need not undertake a separate, independent analysis of the issues

8

addressed in the BiOp."  *Tacoma*, 460 F.3d at 75 (citing *Aluminum Co. of Am. v. Adm'r*

9

*Bonneville Power Admin*., 175 F.3d 1156, 1160 (9th Cir. 1999)) (internal quotations omitted).

10

11

12

13

> [I]f the law required the action agency to undertake an independent analysis, then the expertise of the consultant agency would be seriously undermined.  Yet the action agency must not blindly adopt the conclusions of the consultant agency, citing that agency's expertise.  Rather, the ultimate responsibility for compliance with the ESA falls on the action agency.

14

*Id*. at 76 (internal citations omitted).

15

        In some circumstances, if a BiOp is based on information, the action agency would only

16

be found to have acted unlawfully in relying on that opinion if the challenging party can point to

17

"new information—i.e., information the consultant agency did not take into account—which

18

challenges the opinion's conclusions."  *Id*.; *see also PCFFA v. Gutierrez*, 606 F. Supp. 2d at

19

1189.  Even if that "new information" standard is not triggered, the action agency must, whether

20

through the BiOp or some other document, "consider all the relevant factors," *Ctr. for Biological*

21

*Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1157 (D. Ariz. 2002), and "offer[ ] an explanation

22

for its decision that is both plausible and internally coherent," *Defs. of Wildlife v. EPA*, 420 F.3d

23

946, 959 (9th Cir. 2005), *reversed on other grounds by Natl. Ass'n of Home Builders v. Defs. of*

24

*Wildlife*, 551 U.S. 644 (2007).

25

        Here, PCFFA points out that it provided Reclamation with a detailed notice letter prior to

26

Reclamation's issuance of the ROD (representing Reclamation's decision to proceed with

27

Proposed Action in light of the reasoning in and conclusions of the 2019 BiOps), identifying

28

numerous issues with the 2019 NMFS BiOp.  Yet, Reclamation took no action to remedy those

1    flaws.  Moreover, given the extensive incorporation into the NMFS BiOp of reasoning and

2    modeling generated by Reclamation and set forth in Reclamation's BA, it is apparent that

3    Reclamation "embraced" (if not generated itself) much of the reasoning of the 2019 NMFS BiOp.

4    *Nat'l Wildlife Fed'n v. NMFS*, No. CV 01-640-RE, 2005 WL 1398223, *3 (D. Or. June 10, 2005)

5    (finding the action agency liable where it embraced the same fundamental legal flaws set forth in

6    the applicable environmental document).  For these reasons, the court finds that the serious

7    questions plaintiffs have raised with respect to NMFS's liability under Section 7 extend to their

8    claims challenging Reclamation's acceptance of the 2019 NMFS BiOp and therefore raise serious

9    questions as to Reclamation's liability as well.

10            3.    Irreparable Harm

11                  a.    *Applicable Standard*

12            "Environmental injury, by its nature, can seldom be adequately remedied by money

13    damages and is often permanent or at least of long duration, *i.e.,* irreparable." *Amoco Prod. Co.*

14    *v. Vill. of Gambell*, 480 U.S. 531, 545 (1987).  In the context of the ESA, "Congress has spoken

15    in the plainest of words, making it abundantly clear that the balance has been struck in favor of

16    affording endangered species the highest of priorities . . . ." *Tenn. Valley Auth. v. Hill*, 437 U.S.

17    153, 194 (1978).  To show irreparable harm in the context of the ESA, plaintiffs do not need to

18    demonstrate an "extinction level" threat.  *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries*

19    *Serv.*, 886 F.3d 803, 818–19 (9th Cir. 2018) (*NWF III*) (permitting without specifying that some

20    "lesser magnitude" of harm will suffice); *see also Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries*

21    *Serv.*, 524 F.3d 917, 930 (9th Cir. 2008) (*NWF II*) (finding an agency "may not take action that

22    deepens [pre-existing/baseline] jeopardy by causing additional harm").  Thus, for example,

23    impeding a listed species' progress toward recovery may suffice to satisfy the irreparable harm

24    requirement.  *Wishtoyo Found. v. United Water Conservation Dist*., No. CV 16-3869-DOC

25    (PLAx), 2018 WL 6265099, at *65 (C.D. Cal. Sept. 23, 2018), aff'd, 795 F. App'x 541 (9th Cir.

26    /////

27    /////

28    /////

1  2020); *see also PCFFA v. Gutierrez*, 606 F. Supp. 2d at 1207–10, 1249.[12]

2        The court also notes that, while its analysis of likelihood of success in the context of an

3  injunctive relief request is governed by the deferential APA's arbitrary and capricious standard,

4  *see Lands Council*, 537 F.3d at 987; *Ranchers Cattlemen Action Legal Fund United Stockgrowers*

5  *of Am. v. U.S. Dep't of Agric.*, 415 F.3d 1078, 1093 (9th Cir. 2005), as amended (Aug. 17, 2005),

6  Ninth Circuit authority suggests that the court does not necessarily owe deference to federal

7  agencies' positions concerning irreparable harm, balance of hardships, or public interest.  The

8  decision in *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161 (9th Cir. 2011) is instructive.  There,

9  in the context of a motion for a post-judgment permanent injunction, the Ninth Circuit held that a

10  district court "abused its discretion by deferring to agency views concerning the equitable

11  prerequisites of an injunction."  *Sherman*, 646 F.3d 1186.  The Ninth Circuit reasoned that

12  "[e]cology is not a field within the unique expertise of the federal government," and remanded for

13  analysis by the district court "without deference" to the agency's experts "simply because of their

14  relationships with the agency."  *Id*.  In doing so the court observed that if government experts

15  "were always entitled to deference concerning the equities of an injunction, substantive relief

16  against federal government policies would be nearly unattainable."  *Id*.

17              b.    *Record Evidence of Harm to CCV Steelhead*

18        In assessing plaintiffs' showing with respect to irreparable harm, the first question the

19  court must address is a practical one:  whether operational actions in the Delta in coming weeks

20  and months will be any different as a result of the shift from the old regime (under the 2009

21  NMFS BiOp and related 2008 FWS BiOp) to the new one (under the Proposed Action and the

22  2019 BiOps).  As was the case with the Stanislaus River, the primary focus of the harms evidence

23

---

24  [12] PCFFA points out, correctly, that in the course of permitting an injunction based upon some
   "lesser magnitude of harm" than an "extinction level threat," the Ninth Circuit has indicated that
25  "the fact that section 7(a)(2) permits some incidental take of listed species does not establish that
   harm to individual members of a species cannot be irreparable."  *NWF III*, 886 F.3d at 819.  To
26  the extent PCFFA is attempting to argue that harm to individual members of the species at issue
   in this case will suffice to justify irreparable harm, the court finds it unnecessary to go that far
27  since the record presently before the court demonstrates a magnitude of harm that is cognizable
   via the more traditional pathway.
28

1   presented in connection with the pending motions regarding South Delta operations for the

2   remainder of the year concerns the remainder of the month of May.[13]  (*See CNRA*, Doc. No. 60

3   (California requesting relief only through May 31); Doc. No. 55, Declaration of Bruce Herbold

4   (Herbold Decl.) at ¶ 55 (California's fisheries expert discussing predominantly concerns to larval

5   Delta smelt and Longfin smelt up to and through May, noting that most of the Delta smelt will

6   arrive in the more favorable Low Salinity Zone (not in the South Delta) in the last three weeks of

7   May, and that "[a]ny Delta smelt that do not reach this habitat by approximately mid-June

8   generally do not survive").)  At the May 7, 2020 hearing, Reclamation's technical expert Ms.

9   White testified that as we move into June, operations are "likely" to be governed by state law

10  requirement that would dictate exports to be at "minimum" levels.  (Tr. 50.)  Moreover, all parties

11  before the court agree that because we are in a period of relatively dry hydrology (*see* Tr. 25:7–9,

12  60:18–19, 61:20), certain "habitat actions" set forth in the respective FWS BiOps aimed at

13  improving Delta smelt habitat conditions—the "Fall X2" action set forth in the 2008 FWS BiOp

14  and the "Summer-Fall Habitat Action" set forth in the 2019 FWS BiOp—are not in play this year,

15  since they would only take place in a relatively wet year (Tr. 66).  Accordingly, the court finds

16  there has been a lack of proof by plaintiffs as to the need for any injunctive relief with respect to

17  Delta export operations past the end of May.

18          Turning to the May 11 to May 31 timeframe, the operational picture is less clear.  During

19  her testimony at the recent hearing, Ms. White could not definitively indicate what particular

20  regulatory control would govern Delta export operations.  (*Id*. at 50.)  Evidence has been

21  presented indicating that, at least generally in a dry year like this one, OMR flows will be more

22  negative in the coming weeks under the 2019 BiOps than would have been the case under the

23  previous regulatory regime.  (*See* 2019 FWS BiOp at 152 (plot of modeled mean OMR flows

24  showing that flows under the Proposed Action will be more negative than under the previous

25  regulatory regime).)  No defendant seriously disputes this conclusion.  In fact, Defendant

26  Intervenors San Luis & Delta Mendota Water Authority and its member agency Westlands Water

27

28  [13]  Obviously, given the date of this Order, the focus of the court's analysis will be on the
    likelihood of harm from May 11, 2020 onward.

1   District (collectively, "San Luis") have presented counter-harms evidence indicating that

2   implementing California's proposed injunction through May 31 would "result in a loss of CVP

3   water supply to areas south of the Delta of approximately 52,000 acre-feet." (*CNRA*, Doc. No.

4   74-4, Declaration of Thomas Boardman (Boardman Decl.) at ¶ 3.)  Such evidence serves to

5   confirm that the general trends warned of in the BiOp itself (more export pumping under the new

6   regulatory regime) likely would occur in the absence of the granting of an injunction.

7          The next question that must be answered in assessing irreparable harm is whether a not-

8   insignificant percentage of CCV steelhead will be in a location where they may likely be

9   negatively impacted by Delta export operations.  Dr. Rosenfeld testified at the May 7 hearing that

10  the 2019 NMFS BiOp identifies the largest migration of steelhead from the San Joaquin side of

11  the system to occur in April and May.  (Tr. 173:3–5.)  Other documents  before the court, such as

12  the most recent (May 5, 2020) "notes" of the Salmon Monitoring Team, indicate 35-55% of

13  natural origin steelhead were then "in the Delta."  (*PCFFA*, Doc. No. 168-2 (5/5/20 SMT Notes)

14  at 111.)  On the other hand, San Luis' fisheries expert Dr. Charles Hanson opined that as of April

15  30, 2020, a "typical seasonal pattern of declining salvage risk" was being exhibited.  (*CNRA*,

16  Doc. No. 74-1, Declaration of Charles Hanson (Hanson Decl.) at ¶ 4.)  Dr. Hanson also stated that

17  by the end of April, "[h]istorically, an estimated 93% of juvenile steelhead have migrated

18  downstream past Chipps Island, and an estimated 81.9% of steelhead salvage has [already]

19  occurred."  (*Id*. at ¶ 13.)  This general statistic does not, however, take into consideration the

20  distinct life history of the southern Sierra Nevada diversity group, which the BiOp acknowledges

21  migrates through the Delta on a relatively later schedule.  (2019 NMFS BiOp at 102 ("In the San

22  Joaquin River basin, CCV steelhead smolts are expected to appear in the southern Bay-Delta

23  regional waterways as early as January, based on observations in tributary monitoring studies on

24  the Stanislaus River, but in very low numbers.  The peak emigration in the lower San Joaquin

25  River, as determined by the Mossdale trawls near the Head of Old River, occurs from April to

26  May, but with presence of fish typically extending from late February to late June.").)

27          The primary question therefore becomes the extent to which operations over the coming

28  weeks will harm CCV steelhead in a material way, remembering that the proof of harm need not

28

1    approach an "extinction level" to show irreparable harm in the context of the ESA.  *NWF III*, 886

2    F.3d at 818–19.  Here, it is undisputed that "salvage" and "loss" of CCV Steelhead continues to

3    occur at (or as a result of) the export pumping facilities.  The court observes that its denial of

4    PCFFA's TRO Motion appears to have resulted in increased export pumping which was

5    associated with increased CCV steelhead salvage, as depicted in the chart provided by Dr.

6    Hanson in his declaration in the CNRA case.  (Hanson Decl. at 6.)  As exports declined due to the

7    "pulse flow" operation implemented from April 10 through May 10, so too did CCV steelhead

8    salvage.  Dr. Hanson opines that this was due to seasonal trends (*id*. at ¶ 13), but California's

9    fisheries expert, Dr. Herbold, suggests Dr. Hanson's opinion ignores the distinct nature of the San

10   Joaquin-origin steelhead population, of which approximately 34% will be out-migrating in the

11   last 21 days of May.  (*See* Herbold Decl. ¶ 62.)

12          Dr. Herbold also opines that "[f]rom mid-March through the date of his declaration on

13   April 21, 2020, [CCV] steelhead salvage has been sharply increasing."  (*Id*. at ¶ 46.)  Finally, he

14   declares that many of those salvaged in the days just prior to his declaration were "wild produced

15   fish . . . essential to the survivability and recovery of [s]teelhead in the isolated populations in the

16   San Joaquin watershed."  (*Id*.)

17          As mentioned, the 2019 NMFS BiOp set two separate loss thresholds for CCV steelhead:

18   1,414 between December 1 and March 31, and 1,552 between April 1 and June 15.  (2019 NMFS

19   BiOp at 534, 547).  Operationally, the first "trigger" under the loss threshold approach is set at

20   50% of that threshold.  For April 1 through June 1, therefore, 50% is 776 fish.  (*CNRA*, Doc. No.

21   73-1, Declaration of Joshua Israel (Israel Decl.) at ¶ 15.)  Federal Defendants' declarant Joshua

22   Israel, a Supervisory National Resource Specialist with Reclamation, reports that natural

23   steelhead "loss" from April 1 through April 28 was calculated to be 244.8 fish, which was, as of

24   that date, 31.5% of the way toward the 776 fish 50% loss threshold "trigger" that would require

25   reductions in export pumping.  As of May 5, 2020, updated records put the total as of that date at

26   253 (or 33% of the 50% loss threshold).  (5/5/20 SMT Notes at 114.)

27          In light of the above, defendants emphasize that actual loss numbers have not yet

28   approached the 50% loss threshold, suggesting that this fact is dispositive of the court's

29

1   irreparable harm analysis.  (*See generally* Israel Decl.; Chilmakuri Decl. ¶ 39.)  The court does

2   not agree.  For one thing, the evidence indicates it is possible that losses will "accumulate

3   toward" the 50% loss threshold.  (*See id*. at 114 (5/5/20 SMT Notes plotting out whether observed

4   loss and potential future loss (based on historic salvage data) could cause the 50% loss threshold

5   to be exceeded and concluding that such a scenario is possible "depending on the magnitude of

6   loss observed" in coming weeks.); *but see* Israel Decl. at ¶ 15 (stating his opinion that

7   approximately 132 more natural steelhead would be lost between April 29 and June 15 this year

8   based on historical timing, which would accumulate to 49% of the 50% loss threshold).)

9        In addition, the court is persuaded by many of the arguments advanced by plaintiffs that

10   the loss threshold approach is not sufficiently protective.  For example, as mentioned, NMFS

11   contends in the 2019 NMFS BiOp that, despite the fact that initial modeling indicated that CCV

12   steelhead loss would increase markedly in May under the Proposed Action, this potential harm

13   would be mediated by the addition of the loss threshold triggers.  Dr. Herbold opines, however,

14   that due to declining numbers of CCV steelhead, particularly those in the Stanislaus River that are

15   part of the southern sierra Nevada Diversity Group, the loss limits will "almost certainly never be

16   limiting or protective."  (*Id*. at ¶ 63.)

17        The BiOp itself indicates that the loss threshold approach is anticipated to provide roughly

18   the same amount of protection as was created by the measures enacted under the 2009 NMFS

19   BiOp.  As recognized in the court's likelihood of success on the merits analysis set forth above,

20   despite Reclamation's inclusion in its revised Proposed Action of performance objective

21   thresholds that include the loss limits, NMFS was only able to conclude that the "performance

22   objective thresholds are expected to limit loss to levels similar [to] what has been observed over

23   the past 10 years."  (2019 NMFS BiOp at 774.)  The court has questioned above how a "similar"

24   amount of loss could be justified (i.e., would not contribute to jeopardy) with respect to a species

25   that NMFS concedes has already been in decline.  Here in the harm context, a related question

26   cannot be escaped:  How can these loss limits effectively function to avoid irreparable harm to a

27   declining steelhead population if those loss limits are "expected to" do no more than "limit loss to

28   levels similar what has been observed over the past 10 years?"  As the 2019 NMFS BiOp itself

1    indicates, this steelhead population is in serious peril:

2           An important aspect of the analysis for CCV steelhead concerns the
       status of the Southern Sierra Nevada Diversity Group, which is
3       critical to preserving spatial structure of the CCV steelhead DPS.
       This diversity group, consisting of extant populations in the
4       Calaveras, Stanislaus, Tuolumne, Merced and upper mainstem San
       Joaquin rivers, is very unstable due to the poor status of each
5       population.  This status is due to both project-related and non-project
       related stressors.

6

7    (2019 NMFS BiOp at 674.)

8           Unlike the then-seemingly-nominal loss levels presented in the context of the TRO

9    Motion, the present cumulative losses are considerably higher and continue to occur.  Given the

10   extremely precarious situation faced by the San Joaquin-origin CCV steelhead, the court

11   concludes plaintiffs have established irreparable harm in the absence of the granting of injunctive

12   relief.

13          Plaintiffs have also established that the requested injunction is likely to alleviate at least

14   some of this harm.  Through Dr. Rosenfeld, plaintiffs have presented evidence that recent

15   research demonstrates the imposition of an I:E Ratio improves survival of salmonids migrating

16   through the Delta.  (Rosenfeld Decl. at ¶ 120–21 (discussing 2018 research and concluding that it

17   "found that survival of [CCV] steelhead juveniles emigrating from the San Joaquin Valley was

18   better predicted by a measure that considers Project exports in the context of San Joaquin River

19   flows into the Delta (San Joaquin I:E) than it was by either export rates or river inflows alone –

20   this finding strongly supports the use of the San Joaquin I:E ratio to protect migrating juvenile

21   Central Valley Steelhead").)  According to testimony provided by Ms. White, operational

22   uncertainties make it impossible to determine at this time whether a re-instituted I:E Ratio will

23   even control operations.  (*See* Tr. 49.)  Nonetheless, the record certainly suggest imposition of the

24   I:E Ratio will reduce export pumping to the detriment of water users.  (*See* Boardman Decl. at ¶

25   3.)  This evidence supports a finding of irreparable harm.

26          The court further finds that imposing the I:E Ratio is a narrowly tailored form of

27   injunctive relief.  It will last through the end of this month of May; was specifically designed to

28   assist out-migrating steelhead from the San Joaquin river; and may not even result in as much

1    detriment to water users as feared by Defendant Intervenors, depending on the extent to which

2    other operational constraints control export pumping this month.

3            4.      Balance of the Harms.

4                    a.      *General Legal Standard*

5            In cases arising under the ESA, Congress has "removed from the courts their traditional

6    equitable discretion in injunction proceedings of balancing the parties' competing interests."

7    *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 793–94 (9th Cir. 2005) (*NWF*

8    *I*) (internal quotation marks omitted).  Thus, it is a "fundamental principle" that, when courts are

9    "confronted with requests for injunctive relief in [ESA] cases," the third and fourth prongs of the

10   preliminary injunction standard—the equities and public interest factors—"always tip in favor of

11   the protected species."  *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1091

12   (9th Cir. 2015).

13           In light of these authorities, the court finds that the irreparable harm identified above tips

14   the balance strongly in favor of the imposition of an injunction.  Although plaintiffs have not

15   demonstrated those harms to be "extinction-level" in the near term, the harms are real, ongoing

16   and are likely to have enough of a population level impact to warrant an injunction.  As discussed

17   above, there are serious issues with the application of the loss threshold approach adopted in the

18   2019 BiOp.  Defendants near exclusive reliance on that loss threshold approach in the near term

19   (since other actions are being planned for the future), undermines the effective use of that

20   approach as an adequate protective measure.

21                   b.      *Public Interest Underpinning the WIIN Act*

22           San Luis argues that the 2016 Water Infrastructure Improvements for the Nation Act

23   (WIIN Act), Title III, Subtitle J, § 4002(a), Pub. L. No. 114-322, 130 Stat. 1628, 1855 (2016),

24   should be taken into consideration by the court in conducting the public interest balance.  (*CNRA*,

25   Doc. No. 74 at 6.)  In assessing the impact of the WIIN Act in this regard, one must be mindful of

26   both the 2008 FWS BiOp, which imposed an outer limit on reverse OMR flows of -5,000 with

27   more stringent limitations coming into play depending on conditions, fish monitoring, and the

28   time of year (see 2008 FWS BiOp at 280–82), and the 2009 FWS BiOp which, as discussed

                                                    32

1    above, imposed various provisions that constrained export pumping, including the I:E Ratio.

2    Some viewed the approaches taken in these BiOps as more cautionary (and therefore more

3    restrictive to water supply) than justified by the then-available science, but ultimately the Ninth

4    Circuit found the restrictions to be lawful and supported by the record. *See San Luis v. Jewell*,

5    747 F.3d at 607–15; *San Luis v. Locke*, 776 F.3d at 1004.

6            In the WIIN Act, Congress instructed Reclamation to maximize export pumping, but to do

7    so within the sideboards of the applicable biological opinions and state law requirements. Thus,

8    WIIN Act § 4002(a) requires Reclamation to

9            manage reverse flow in Old and Middle Rivers ***at the most negative***
             ***reverse flow rate allowed under the applicable biological opinion***
10           to maximize water supplies for the Central Valley Project and the
             State Water Project, unless that management of reverse flow in Old
11           and Middle Rivers to maximize water supplies would cause
             additional adverse effects on the listed fish species beyond the range
12           of effects anticipated to occur to the listed fish species for the
             duration of the applicable biological opinion, or would be
13           inconsistent with applicable State law requirements, including water
             quality, salinity control, and compliance with State Water Resources
14           Control Board Order D–1641 or a successor order.

15   (*Id.*) (emphasis added); *see also* WIIN Act § 4001(a) ("The Secretary of the Interior and Secretary

16   of Commerce shall provide the maximum quantity of water supplies practicable to Central Valley

17   Project [contractors], by approving, in accordance with applicable Federal and State laws

18   (including regulations), operations or temporary projects to provide additional water supplies as

19   quickly as possible, based on available information."). Reclamation is required under the WIIN

20   Act to document in writing the reasons why it constrains reverse flows to a level not as negative

21   as the most negative flow permitted. *Id.* at § 4002(b).[14] The WIIN Act directs Reclamation to

22   move toward an approach that "increase[s] monitoring to inform real-time operations," *id.*

23   § 4010(a), and then "use[s] all available scientific tools to identify any changes to the real-time

24   operations . . . that could result in the availability of additional water supplies." *Id.* at

25   § 4001(b)(1)(B). However, nothing in the WIIN Act modifies (or even bends) any of Federal

26   ───────────────
     [14]  The court notes that the WIIN Act does not appear to contemplate the scenario presented by
27   the 2019 FWS BiOp's storm event flexibility provisions, which do not impose any limit on
     reverse flows when that provision is found to be applicable. Nonetheless, the overall tenor of the
28   WIIN Act endorses the maximizing of exports while remaining in compliance with the mandates
     of the ESA and other applicable laws.

1    Defendants' obligations under the ESA.

2      While the WIIN Act perhaps expresses a Congressional preference for a balanced

3    approach to managing OMR flows, its plain language does not modify the scope or application of

4    the ESA in any way.  Here, plaintiffs have raised serious questions as to the validity of the

5    applicable NMFS BiOp.  The WIIN Act does nothing to alter the well-established jurisprudence

6    regarding the balance of the harms in an ESA case such as this one.

7      Having concluded that plaintiffs have established that they are entitled to the granting of a

8    preliminary injunction, the court now turns to the specific terms and requirements of that relief.

9    **C.    Bond Requirement**

10     Federal Rule of Civil Procedure 65(c) provides

11
12   > Security. The court may issue a preliminary injunction or a
     > temporary restraining order only if the movant gives security in an
     > amount that the court considers proper to pay the costs and damages
13   > sustained by any party found to have been wrongfully enjoined or
     > restrained. The United States, its officers, and its agencies are not
     > required to give security.
14

15   "Rule 65(c) invests the district court with discretion as to the amount of security required, if any."

16   *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009).  Courts "routinely impose either no

17   bond or a minimal bond in public interest environmental cases."  *City of South Pasadena v.*

18   *Slater*, 56 F. Supp. 2d 1106, 1148 (C.D. Cal. 1999); *see also Save Strawberry Canyon v. DOE*,

19   613 F.Supp.2d 1177, 1190 (N.D. Cal. 2009) (waiving a Rule 65(c) bond in a NEPA case where

20   "[p]laintiff is a small nonprofit organization and has indicated that it would have difficulty

21   posting the bond").  Moreover, the Ninth Circuit has held that "special precautions to ensure

22   access to the courts must be taken where Congress has provided for private enforcement of a

23   statute."  *People of State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d

24   1319, 1325–26 (9th Cir.), *amended*, 775 F.2d 998 (9th Cir. 1985).  Where "the proposed bond

25   requirement would effectively deny access to judicial review," it is to be waived by the court.  *See*

26   *Save Strawberry Canyon*, 613 F. Supp. 2d at 1191.

27     Here, however, neither set of plaintiffs have directly addressed the issue of the posting of

28   a bond or security.  California does suggest in its proposed order granting relief that the court

34

1   should entirely waive the bond requirement here but provides no evidence or authority in support

2   of such a determination.  (*See CNRA*, Doc. No. 60 at 8.)  There is authority suggesting that even

3   parties such as the plaintiffs now before this court must make a showing to justify the setting of

4   only a nominal bond amount or no bond at all.  *See W. Watersheds Project v. Zinke*, 336 F. Supp.

5   3d 1204, 1246–47 (D. Idaho 2018).  In the context of prior challenges to the 2009 NMFS BiOp,

6   in the absence of comment or evidence on this issue, the court reasoned that "[b]ecause [the] case

7   involve[d] the management of public resources, wholly under the control of the action agency,

8   Reclamation, and because the injunctive relief is of limited duration, [the water agency plaintiff]

9   was required to post a bond in the amount of $5,000 to secure the relief provided by law in the

10  event it is determined injunctive relief was improvidently issued."  *San Luis & Delta-Mendota*

11  *Water Auth. v. Locke*, No. 1:09-CV-01053-OWW-DLB, 2010 WL 500455, at *8 (E.D. Cal. Feb.

12  5, 2010)

13       Here, based on the present record and given that the plaintiffs include a coalition of

14  environmental organizations of various sizes and the independent sovereign State of California,

15  the court concludes a slightly lesser total bond amount is appropriate.  Accordingly, each set of

16  plaintiffs will be required to post a $1,000 bond.

17                                    **CONCLUSION**

18       For the reasons set forth above the court:

19       (1) grants plaintiffs' joint request to enjoin the Proposed Action's export operations in the

20            south Delta to the extent that those operations do not comply with RPA Action IV.2.1

21            from the 2009 NMFS BiOp from the date of this order up to and through May 31,

22            2020, on the specific ground that such operations will irreparably harm threatened

23            CCV Steelhead;

24       (2) denies California's motion in all other respects as moot;

25       (3) denies PCFFA's request to enjoin operations on the Stanislaus River as moot subject

26            to renewal; and

27       (4) holds all other aspects of PCFFA's motion in abeyance with the intention of

28            addressing those remaining matters in a separate order.

1

**PRELIMINARY INJUNCTION ORDER**

2      IT IS HEREBY ORDERED that Defendant U.S. Bureau of Reclamation, its officers,

3 agents, servants, employees and attorneys, and those in active concert or participation with

4 Defendant U.S. Bureau of Reclamation, are hereby preliminarily enjoined, from the effective date

5 of this order through and including May 31, 2020, pursuant to Federal Rule of Civil Procedure 65,

6 from operating the Central Valley Project in the manner described in the Final Biological

7 Assessment for Reinitiation of Consultation on the Coordinated Long-Term Operation of the

8 Central Valley Project and State Water Project issued by the U.S. Bureau of Reclamation on

9 October 17, 2019, and the Final Environmental Impact Statement on the Reinitiation of

10 Consultation on the Coordinated Long-Term Operation of the Central Valley Project and State

11 Water Project, to the extent that operation is inconsistent with the requirement in Reasonable and

12 Prudent Alternative Action IV.2.1, which appears on pages 642–44 of the Biological Opinion and

13 Conference Opinion on the Long-Term Operations of the Central Valley Project and State Water

14 Project issued by the National Marine Fisheries Service on June 4, 2009.  The court recognizes

15 that Defendant U.S. Bureau of Reclamation will require time to operationalize this change and it

16 and its agents are therefore excused from compliance for no more than 24 hours from the date of

17 entry of this order, so long as they are taking all reasonable steps during that period of time

18 toward implementation.

19      IT IS FURTHER ORDERED that, absent subsequent waiver by the court, on or before

20 Friday, May 15, 2020, plaintiffs in *California Natural Resources Agency v. Ross*, No. 1:20-CV-

21 00426-DAD-EPG, must post a $1,000 bond; likewise, on or before Friday, May 15, 2020,

22 plaintiffs in *Pacific Coast Federation of Fishermen's Associations v. Ross*, 1:20-CV-00431-

23 DAD-EPG must post a $1,000 bond.  Both bonds must be deposited into the court registry.

24 IT IS SO ORDERED.

25      Dated:  __May 11, 2020__                                    _____

26                                                                              UNITED STATES DISTRICT JUDGE

27

28