ROB BONTA, State Bar No. 202668
Attorney General of California
TRACY L. WINSOR, State Bar No. 186164
Supervising Deputy Attorney General
COLLEEN R. FLANNERY, State Bar No. 297957
DANIEL M. FUCHS, State Bar No. 179033
SARA D. VAN LOH, State Bar No. 264704
Deputy Attorneys General
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
Telephone: (916) 210-7827
Fax: (916) 327-2319
E-mail: Daniel.Fuchs@doj.ca.gov
*Attorneys for Plaintiffs*
*California Natural Resources Agency,*
*California Environmental Protection Agency, and*
*People of the State of California, ex rel. California*
*Attorney General Rob Bonta*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **THE CALIFORNIA NATURAL RESOURCES AGENCY, ET AL.**<br><br>Plaintiffs,<br><br>**v.**<br><br>**GINA RAIMONDO, ET AL.,**<br><br>Defendants. | 1:20-cv-00426-DAD-EPG<br><br>**CALIFORNIA PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR INTERIM INJUNCTIVE RELIEF AND TEMPORARY STAY OF LITIGATION**<br><br>Date: February 1, 2022<br>Time: 9:30 a.m.<br>Dept: 5<br>Judge: The Honorable Dale A. Drozd<br>Trial Date: TBD<br>Action Filed: February 20, 2020 |

## TABLE OF CONTENTS

**Page**


Introduction ..... 1

Argument ..... 1

I. Intervenors' Arguments on the 2019 BiOps Incorrectly Apply a Heightened Standard and Lack Merit ..... 2

II. Adoption of the IOP Through Water Year 2022 Will Prevent Irreparable Harm ..... 3

A. Operations Under the 2019 BiOps Will Cause Irreparable Harm ..... 3

1. Winter-run and spring-run Chinook salmon have suffered serious losses under the 2019 BiOps ..... 3

2. The 2019 BiOps failed to provide sufficient cold water ..... 4

a. CVP operations under the BiOps provide too little cold water ..... 5

b. Intervenors' arguments are inconsistent with the level of care required under the Endangered Species Act ..... 5

c. Intervenors' arguments are based on faulty science ..... 6

3. Winter-run and spring-run Chinook salmon will suffer additional serious losses if the 2019 BiOps remain in effect ..... 7

4. The threat of harm to winter-run Chinook salmon is imminent ..... 8

B. The IOP Will Reduce Harm to the Listed Species ..... 9

1. Intervenors mischaracterize the IOP ..... 9

2. Intervenors misunderstand or understate the IOP's scientific support ..... 10

a. Intervenors misunderstand the uses of modeling ..... 10

b. Evidence supports the IOP ..... 10

3. TUCPs and the IOP are distinct and important tools ..... 11

C. The IOP Does Not Avoid Administrative Processes ..... 12

III. The Balance of the Equities and Public Interest Support the IOP ..... 12

A. Settlement Contracts Do Not Weigh against Adoption of the IOP ..... 12

B. Intervenors' Remaining Arguments Do Not Demonstrate that the Equities Weigh in Favor of the 2019 BiOps over the IOP ..... 14

Conclusion ..... 15

## TABLE OF AUTHORITIES

**Page**

**CASES**

*California v. United States*
438 U.S. 645 (1978) .......... 13

*Daubert v. Merrell Dow Pharm.*
509 U.S. 579 (1993) .......... 14

*Diviero v. Uniroyal Goodrich Fire Co.*
114 F.3d 851 (9th Cir. 1997) .......... 14

*Fed. Trade Comm'n v. Enforma Nat. Prod., Inc.*
362 F.3d 1204 (9th Cir. 2004) .......... 2

*Garcia v. Google, Inc.*
786 F.3d 733 (9th Cir. 2015) (en banc) .......... 2

*Hernandez v. Sessions*
872 F.3d 976 (9th Cir. 2017) .......... 3

*Idaho Rivers United v. U.S. Army Corps of Eng'rs*
156 F. Supp. 3d 1252 (W.D. Wash. 2015) .......... 14

*In re Consol. Salmonid Cases*
791 F. Supp. 2d 802 (E.D. Cal. 2011) .......... 13

*Joslin v. Marin Mun. Water Dist.*
67 Cal. 2d 132 (1967) .......... 13

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*
752 F.3d 755 (9th Cir. 2014) .......... 14

*Nat. Res. Def. Council v. Patterson*
333 F. Supp. 2d 906 (E.D. Cal. 2004) .......... 14

*Nat'l Audubon Soc'y v. Superior Ct.*
33 Cal. 3d 419 (1983) .......... 13

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*
524 F.3d 917 (9th Cir. 2008) .......... 5

*People v. Rinehart*
1 Cal. 5th 652 (2016) .......... 13

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*San Luis & Delta-Mendota Water Auth. v. United States*
672 F.3d 676 (9th Cir. 2012) .......... 13

*Sierra Club v. North Dakota*
868 F.3d 1062 (9th Cir. 2017) .......... 2

*Sierra Club v. U.S. Forest Serv.*
843 F.2d 1190 (9th Cir. 1988) .......... 7

*Stanley v. University of Southern California*
13 F.3d 1313 (9th Cir. 1994) .......... 2

*Tennessee Valley Auth. v. Hill*
437 U.S. 153 (1978) .......... 14

*United States v. State Water Res. Control Bd.*
182 Cal. App. 3d 82 (1986) .......... 14

*Winter v. Nat. Res. Def. Council, Inc.*
555 U.S. 7 (2008) .......... 1, 2

**STATUTES**

United States Code, Title 43
§ 383 .......... 13

California Endangered Species Act .......... 2, 5, 14

Central Valley Project Improvement Act .......... 13

Reclamation Act of 1902 .......... 13

**CONSTITUTIONAL PROVISIONS**

California Constitution Article X
§ 2 .......... 13

**COURT RULES**

Federal Rules of Evidence
Rule 702 .......... 14

**INTRODUCTION**

California and the Federal Defendants, the original parties to this case, carefully negotiated an Interim Operations Plan (IOP), with input from the expert agencies in fish and wildlife protection as well as water rights and water supply, to ensure meaningful interim protections for vulnerable native at-risk fish species recognized as in danger of extinction or threatened with extinction under federal and state law; and consistent operations between the Central Valley Project (CVP) and State Water Project (SWP). Under the IOP, these actions would remain in place for the remainder of this water year while Federal Defendants continue reinitiated consultations on the defective 2019 Biological Opinions. California and the Federal Defendants have each requested that the Court issue an order adopting the IOP, staying the case, and requiring the parties to provide status updates and to submit new operations plans until the consultation is complete, likely in 2024.

Dissatisfied with the IOP, Intervenors oppose California's and Federal Defendants' requests for an order governing interim CVP and SWP operations. Intervenors suggest that the Court should leave the defective 2019 BiOps in effect, ignoring that Federal Defendants have reinitiated consultation and that this Court has ordered parties to "engage[] in the serious task of determining how the projects will be operated during any interim period if ESA-consultation is re-initiated." ECF 194 at 5:23–28. Intervenors likewise fail to engage with the cases California cited in its moving papers establishing that the Court is empowered to adopt precisely the type of interim operations that California and Federal Defendants have now negotiated. In effect, Intervenors ask the Court to disregard the mutually held scientific opinions of the state and federal agencies that are responsible for protecting these endangered species and operating the projects, and instead default to biological opinions that all other parties agree are inadequate to protect species this water year. The Court should decline to do so.

**ARGUMENT**

As set forth in the moving papers, the four *Winter* factors for a preliminary injunction favor this Court's adoption of the IOP as an interim measure to govern certain limited but critical aspects of Project operations for the balance of this water year, pending completion of new

biological opinions. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 33 (2008). Specifically, California has shown that: (1) it is likely to prevail on the merits, or the facts and law support imposition of the injunction; (2) irreparable harm is likely in the absence of relief; (3) the balance of equities favors California; and (4) an injunction is in the public interest.

## I. INTERVENORS' ARGUMENTS ON THE 2019 BIOPS INCORRECTLY APPLY A HEIGHTENED STANDARD AND LACK MERIT

Intervenors argue that because California seeks a "mandatory injunction," it bears a "heightened burden to show that there is *no doubt* it will prevail on the merits," rather than demonstrating a simple likelihood of success under *Winter*. ECF 233 at 10:26–11:9, 12:2–3 (emphasis added). Mistakenly relying on *Stanley v. University of Southern California*, 13 F.3d 1313, 1320 (9th Cir. 1994), Intervenors overstate California's burden. *Stanley* simply notes that, although mandatory injunctions are disfavored, they are still appropriate where "the facts and law clearly favor" them. *Id*. California need not show "no doubt" that it will prevail.

Unlike a typical mandatory injunction case, California and Federal Defendants not only consent to, but support, the proposed relief. As a result, the IOP is akin to a temporary settlement of the case by the main parties, which requires greater deference. *See Fed. Trade Comm'n v. Enforma Nat. Prod., Inc.*, 362 F.3d 1204, 1218 (9th Cir. 2004) (requiring notice and an opportunity to be heard before entering a preliminary injunction that differed from the parties' joint proposal). Moreover, an intervenor cannot prevent the original parties from reaching a settlement. *Sierra Club v. North Dakota*, 868 F.3d 1062, 1067 (9th Cir. 2017). In addition, because the parties to be enjoined have agreed to the IOP, the concerns that motivate a higher standard for a mandatory injunction are not present. *See Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc) (higher standard needed because a mandatory injunction "orders a responsible party to take action").

California's opening brief summarized the reasons it would likely prevail if this Court were to reach the merits. *See* ECF 220 at 15:17–17:21.[1] The legal infirmities in the 2019 BiOps are

[1] The Court has held in abeyance Federal Defendants' motion to dismiss California's claim under the California Endangered Species Act. *See* ECF 169, 175, 182.

clear and known to the Court and all parties. As shown below in section II.A, operations under the 2019 BiOps have contributed to precipitous declines in listed species, supporting the Court's May 2020 finding of a "serious question" about the validity of the 2019 BiOps and Reclamation's Record of Decision. *See* ECF 106 at 17–25. Indeed, Federal Defendants have impliedly conceded that the 2019 BiOps are inadequate to protect the species by reinitiating consultation, and by arguing for the IOP as a condition of remand. ECF 219 at 17:3–22:13. Mandatory injunctions "are most likely to be appropriate when 'the status quo . . . is exactly what will inflict the irreparable injury.'" *Hernandez v. Sessions*, 872 F.3d 976, 999–1000 (9th Cir. 2017). Continuing to operate under the 2019 BiOps will cause irreparable harm by pushing extremely vulnerable species closer to extinction. This fact required the parties to take on "the serious task" described by the Court. ECF 194 at 5:23–28.

## II. ADOPTION OF THE IOP THROUGH WATER YEAR 2022 WILL PREVENT IRREPARABLE HARM

California demonstrates below that: (A) operations under the 2019 BiOps will cause irreparable harm; and (B) the IOP will address that harm.

### A. Operations Under the 2019 BiOps Will Cause Irreparable Harm

Listed fish species have already suffered under the 2019 BiOps. Continuing those operations will compound the existing harm, threatening the viability of listed species, as discussed below. ECF 220 at 18:4–19:20.

#### 1. Winter-run and spring-run Chinook salmon have suffered serious losses under the 2019 BiOps

Intervenors rely on the Cavallo declaration to argue that winter-run salmon have not experienced a substantial decline under the 2019 BiOps. ECF 233 at 12:19–15:16. As shown in California's response to Intervenors' evidentiary objections and objections to Intervenors' evidence, Cavallo makes numerous scientifically unsound and unsupported assertions. Even so, Cavallo also confirms California's showing of a precipitous and dangerous decline in the abundance of winter-run and spring-run Chinook salmon under the 2019 BiOps. The science thus

demonstrates a decline in winter-run in each of the four key indicators of population health—egg-to-fry survival, juvenile production estimates, juvenile production index, and adult abundance.

- The egg-to-fry survival rate of only 2.6% in 2021 is the lowest recorded since 2003, and survival in 2020 was also low. ECF 240 ¶ 46; Suppl. Herbold Decl. ¶ 27. Importantly, egg-to-fry survival is an important measure of Shasta Dam impacts, and low survival here indicates high impacts in 2021. Suppl. Herbold Decl. ¶ 5. Cavallo himself stated publicly that egg-to-fry survival was "not good." Reply Flannery Decl. Ex. 3 at P_CAVALLO_00119.
- The juvenile production index (estimate of the total number of juvenile winter-run Chinook salmon arriving at Red Bluff) and the juvenile production estimate (estimate of juvenile production entering the Delta) estimate the number of adults that returned and the number of eggs they laid and fertilized, respectively. Suppl. Herbold Decl. ¶ 8. Dismal egg-to-fry survival rates in 2020 and 2021 presage low future adult abundance and fewer juveniles in future, even if the estimates were high this year as a result of more adult fish from 2019. Suppl. Herbold Decl. ¶ 23.
- As shown in Cavallo's Figure 1, adult abundance estimates indicate that the winter-run have not fully recovered from the drought of 2014–2015, and the low survival rates in 2020 and 2021 likely predict a downward trend in adult returns. Suppl. Herbold Decl. ¶ 19.

For spring-run salmon, Intervenors provide new evidence of peril, noting that the three major creeks that provide spring-run spawning habitat all suffered extreme survival and pre-spawning mortality challenges. ECF 240 ¶ 53. While these creeks are not fed by Shasta Dam, Shasta operations influence flows that affect spring-run migration and survival. Suppl. Herbold Decl. ¶¶ 30–31. Intervenors do not rebut California's evidence that any spring spawning setbacks would have an outsized impact on all listed species. ECF 55, Herbold Decl. ¶¶ 24, 27, 65.

**2. The 2019 BiOps failed to provide sufficient cold water**

Intervenors defend the 2019 BiOps by blaming any declines in salmon abundances on factors unrelated to Project operations. They single out "an uncertain combination of continued thiamine deficiency, density dependence, and elevated water temperatures that occurred after approximately 50% of WR Chinook eggs had already hatched and emerged from the gravel." ECF 233 at 14:22–25. This argument is: (a) self-defeating since CVP operations do influence

water temperatures in ways that, under the 2019 BiOps, hurt winter-run; (b) inconsistent with the level of care required under the Endangered Species Act; and (c) based on faulty science.

**a. CVP operations under the BiOps provide too little cold water**

The maximum Sacramento River water temperature allowed by the 2019 BiOps—which Intervenors favor—is insufficient to protect the species. A wealth of peer-reviewed, published literature supports the winter-run Chinook salmon's need for temperatures below 56°F. Suppl. Herbold Decl. ¶ 38. Intervenors argue that Project operations have limited effects because the Martin model, one basis for temperature effects analysis, is flawed. ECF 233 at 14:3–20. They contend that the 2019 BiOps' 56°F threshold is adequate. But even if they were correct about the Martin model, Intervenors' own untested, unreviewed, and inadmissible evidence supports managing to temperatures lower than 56°F. Cavallo's Figure 9 predicts the top temperature-dependent mortality rate at 54°F would be 73%, and at 55°F would be 87%. Reply Flannery Decl. Ex. 2 (Cavallo Dep.) at 77:3–78:1. But at 56.5°F, up to 99% of eggs could die from temperature effects—and, at 57°F, after a sharp drop-off in the error bar, mortality would range from 85% to 99%. *Id.* at 8:22–79:8 (56.5°F); 79:10–80:9 (57°F); *see also id.* at 99:6–99:15.

**b. Intervenors' arguments are inconsistent with the level of care required under the Endangered Species Act**

Intervenors' suggestion that this Court should order Reclamation to manage to the very upper bound of the species' heat tolerance, as the 2019 BiOps allow, is inconsistent with the statutorily required care to avoid causing jeopardy to these species and to aid their recovery. *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 931–32 (9th Cir. 2008) (concluding jeopardy provision requires the agency to consider both recovery and survival impacts). It is undisputed that colder instream flows allow a larger margin for error; if Reclamation were to continue to operate according to the BiOps and Cavallo's Figure 9, there would be essentially no margin for error, and the species could see catastrophic losses once again. Extreme drought conditions tested this approach in 2015, when high temperatures in the Sacramento River resulted in egg-to-fry mortality near 95%. ECF 240, Fig. 10. Moreover, water at 56°F at Clear Creek means that temperatures below Clear Creek, where winter-run Chinook

also spawn (Reply Flannery Dec. Ex. 6, NMFS 2019 BiOp at 173), will be even warmer, which Intervenors' own evidence shows could cause mortality of 85–100%. Cavallo Dep. at 79:10-80:9.

**c. Intervenors' arguments are based on faulty science**

Intervenors rely on science that is flawed in three key respects: (1) it does not conform to standards of scientific rigor; (2) it wrongly assumes that thiamine deficiency is the primary cause of salmon mortality; and (3) it incorrectly interprets density-dependent mortality.

*First*, while aspects of Cavallo's work actually support California's position, it should not be accepted because it does not conform to standards of scientific rigor. In several places, the Cavallo declaration points to unpublished data and new analyses as an attempt to discredit published literature. As just two examples, Cavallo refers to independent, unreviewed observations of spawning gravel (ECF 240 at 6:13–16), and his Figure 4, which purports to show a relationship between egg-to-fry survival and number of female spawners, lacks any source, peer-reviewed or not.[2] *Id.* at 18:3–22. In the absence of that review, the Court should not rely on Cavallo's untested work but instead on the Martin model. Suppl. Herbold Decl. ¶ 2. Indeed, even the 2019 NMFS BiOp, which Intervenors alone defend, itself relied on the Martin model because it is peer-reviewed. *See, e.g.*, Reply Flannery Decl. Ex 6, NMFS 2019 BiOp at 49.

As context, before the Martin model, fish scientists relied on laboratory studies to inform temperature management. ECF 240 ¶ 65. Martin et al. identified the shortcomings of these earlier studies, and showed that managing for temperatures about three degrees cooler than laboratory temperatures is necessary for egg survival. Suppl. Herbold Decl. ¶ 36. Even the 2019 NMFS BiOp supported by Intervenors concur with this more recent thinking, and describes temperatures above 53.5°F as "lethal." Reply Flannery Decl., NMFS 2019 BiOp at 761. In contrast, the substantial body of peer-reviewed published literature indicates that 56°F is not adequate to prevent substantial mortality. For example, U.S. EPA suggests 55°F for a seven-day average daily maximum for salmon egg incubation and fry emergence. Suppl. Herbold Decl. ¶ 38.

[2] The declaration also devotes much attention to a 1999 study by USFWS that has subsequently been questioned, including in the Martin et al. papers. Suppl. Herbold Decl. at 34.

*Second*, Intervenors' hypothesis that thiamine deficiency is not only *a* cause, but *the main cause*, of salmon mortality (ECF 233 at 14:21–23 and n.13, 15:1–3 ("thiamine deficiency was the primary culprit"), 15 n.14) is not supported by the evidence. While thiamine deficiency may have contributed to some mortality, it is not currently thought to be the main contributor. Suppl. Herbold Decl. ¶ 43. Asserting that thiamine deficiency is the main cause of salmon mortality goes far beyond existing data, contradicts Mr. Cavallo's own assertion earlier in his declaration that thiamine deficiency played an "uncertain" role in mortality, and is not a conclusion currently established in the scientific community. *Id.*; ECF 240 ¶ 6.

*Third*, Cavallo refers to density-dependent mortality as a contributing factor for low egg-to-fry survival in 2021 (ECF 240 at 19:7–9), but rather than prove density dependence in this instance, he simply describes the interaction of adult abundance with juvenile survival. Additionally, effects Cavallo attributed to density dependence could better be attributed to flow and temperature, which he omitted from his analysis of this issue and which are much more strongly correlated with survival than is density. Suppl. Herbold Decl. ¶15. In any event, the lower temperatures at Clear Creek that would be required by the IOP will improve temperatures along a longer stretch of river, creating more spawning habitat and resulting in less density-dependence mortality.

**3. Winter-run and spring-run Chinook salmon will suffer additional serious losses if the 2019 BiOps remain in effect**

Intervenors assert that California's opening brief focused only on past harm. ECF 233 at 12:20–21. Not so. California showed that not only have the last two years of operations under the 2019 BiOps left the listed species in peril, but also that continued operations under the 2019 BiOps would not provide adequate cold water to prevent irreparable harm to the survival and recovery of multiple species in the event of another dry or critically dry year. ECF 220 at 19:3–6 (quoting ECF 223, Grober Decl.¶ 52), 19:14–16 (citing ECF 223, Grober Decl.¶ 76; ECF 224, Herbold Decl.¶ 65). Regardless, even if California focused only on past harm, such harms are predictive of future harms when the operations that caused past harms are still underway. *See Sierra Club v. U.S. Forest Serv.*, 843 F.2d 1190, 1195 (9th Cir. 1988).

Numerous peer-reviewed, published papers support the conclusion that Shasta operations affect the survival of juvenile salmon as they emigrate downstream in fresh water. Suppl. Herbold Decl. ¶ 38. But the 2019 BiOps' inadequate provisions for temperature management planning allowed the Shasta cold water pool to drop over the summer of 2020 so much that it could not provide enough cold water to protect the salmon. ECF 220 at 19:7–13. Then, early releases and commitments for releases from Shasta in early 2021 led to an even greater deficiency in cold water available to protect the listed species, with catastrophic consequences for both winter-run and spring-run salmon. *Id.* The 2019 BiOps would allow this same series of events to occur in 2022 as the species also face other stressors; Intervenors' evidence of the dire condition of spring-run salmon also indicates that Sacramento River operations must be managed to ensure optimal flows for their outmigration survival.

**4. The threat of harm to winter-run Chinook salmon is imminent**

Intervenors argue that future harm is speculative and not imminent. Intervenors highlight the Herbold declaration's concern that "the potential for [storm flex in the 2019 BiOps] has created the possibility of injury to listed species, especially as regards to the risk of fish entrainment in the Delta." *Id.* at 7–10. Intervenors do not dispute—because they cannot—that the 2019 BiOps contain a largely unbounded storm flex provision that could result in significant levels of entrainment. Reply Flannery Decl. Ex. 6, NMFS 2019 BiOp at 531. Nor is it speculative that the IOP storm flex terms incorporate measures to reduce risks, which is an improvement over the 2019 BiOps' storm flex provision, and that the IOP incorporates other conditions that would reduce entrainment risks to species should real-time conditions require their implementation. ECF 224, Herbold Decl. ¶ 62–63.

Similarly, Intervenors argue both that releasing their preferred volume of water from Shasta in the spring, before temperature management plans are in place, would not affect temperatures later, and that even if early releases do affect later temperatures, that effect is not "imminent" enough to warrant an injunction now. ECF 233 at 20:22–21:24. As the Grober declaration explains, because Shasta draw-down decisions made in March, April, and May affect summer and fall water temperature, those planning decisions are imminent. ECF 223, Grober 2021 Decl. ¶¶

45, 62. Equally important, those spring planning decisions help determine end-of-September reservoir levels and associated carryover storage, with critical consequences for the following water year. Suppl. Grober Decl. ¶6. Intervenors' evidence confirms that even though conditions were wetter leading up to and through 2021 than 2015, end-of-September storage in 2021 was only 1.07 million acre-feet after operating for two years under the 2019 BiOp, compared to 1.60 maf in 2015. ECF 238, Bergfeld Decl.; Suppl. Grober Decl. ¶ 22. This water year, the fall was wet, but January has been dry, creating uncertainty about the hydrology for future months. Suppl. Grober Decl. ¶ 15. Given this uncertainty and the existential threat to the listed species, the CVP must be operated to ensure sufficient water remains in storage to protect the listed species. The IOP would accomplish this. The 2019 BiOps would not. *Id*.

**B. The IOP Will Reduce Harm to the Listed Species**

Intervenors argue that even if salmon abundances have declined and will decline, and even if the declines are attributable to Project operations under the 2019 BiOps, the IOP will not mitigate the declines because: California cannot be sure its proposed measures will improve instream temperatures; reducing Shasta drawdown may not improve future reservoir conditions; the Shasta carryover storage provisions will not address "imminent" harm; and the IOP's Delta measures do not address irreparable harm. California shows above the extent to which the high instream temperatures and excessive drawdown allowed under the 2019 BiOps have harmed the species. The IOP was designed to address these concerns.

**1. Intervenors mischaracterize the IOP**

As an initial matter, Intervenors misapprehend three critical aspects of the IOP: the temperature standards, the carryover storage provisions, and the timing of diversions. First, rather than rigid standards, the IOP's temperature elements provide criteria for water temperatures from May 15 through October 31 of critical, dry, or below normal years; if they cannot be met for the entire period, then the agencies will agree on operations to provide sufficient habitat for the longest period possible. Suppl. Grober Decl. ¶ 53. Second, the "final carryover storage planning goal" will appear in the temperature management plan approved by NMFS; the numbers in the IOP are "potential . . . carryover storage volumes based on preliminary modeling." ECF 221,

Proposed Order with IOP ¶¶ 12(i)(b); 16(i). This will also be based on attainability and the actual availability of water. *Id*. Third, Intervenors assert that the IOP will not allow them to divert water until June; the provisions clearly allow diversion as early as April, provided that they are consistent with the terms of the IOP. ECF 221 ¶¶ 13, 16(i).

**2. Intervenors misunderstand or understate the IOP's scientific support**

**a. Intervenors misunderstand the uses of modeling**

A key feature of the IOP is that deliveries from Shasta may not occur, except for health and safety, before a temperature management plan is developed and approved. ECF 223, Grober 2021 Decl. ¶ 48; ECF 221 ¶ 12.i.9. ("Reclamation will not schedule nor make deliveries of stored water from Shasta for any reason other than specified in g.i.1.a. above until Reclamation receives approval of a temperature management plan from NMFS that shows Reclamation will meet winter run Chinook salmon habitat criteria and end of September carryover storage . . . ." *Id.*).

Intervenors argue that California and the Federal Defendants should have modeled all types of water year hydrologies. ECF 233 at 19:9–20:4. But "[c]onducting complicated modeling of all possible future outcomes under a range of all possible future conditions before the nature of the specific hydrologic conditions is better known serves little purpose given the interim nature of the elements in the IOP." Suppl. Grober Decl. ¶ 14. Because the IOP prevents premature decisions before all available hydrological options are known, it reduces the amount of uncertainty in making water allocation and cold-water pool decisions. *Id.* ¶ 26. And the IOP process allows the Shasta Planning Group to consider information as it becomes available, potentially including further planning modeling based on more certain conditions. ECF 221 ¶¶ 13, 17.

**b. Evidence supports the IOP**

The IOP will address ongoing harm or potential for harm under the 2019 BiOps. Unlike the 2019 BiOps, the IOP contains a plan to delay deliveries until temperature management planning takes place—as soon as April 2022. ECF 221 ¶ 12(b). This delay saves water when more cool water is available and will make more cold water available for fish. Suppl. Grober Decl. ¶ 20. Had this planning requirement been in place in 2021, there would have been more flows, and more cold water, for fish. *Id.* ¶ 18–20. Second, the IOP calls for a lower temperature criteria than

likely would occur in a critically dry, dry, or below normal year under the 2019 BiOps. ECF 221 ¶ 15(b). In contrast, under the 2019 BiOp, temperatures would be managed within the range known to cause harm to the fish—which resulted in extremely low survival rates of winter-run Chinook salmon in 2020 and 2021. Suppl. Herbold Decl. ¶ 23.

In addition, by reconciling CVP operations with the ITP, the IOP incorporates the scientific support for the Export Curtailments for Spring Outflow condition of approval in the ITP. The Export Curtailments for Spring Outflow were imposed "to augment Delta outflow during a critical time in the life history" of the smelt and salmon. ECF 225, Fuchs Decl. Ex. 2. at 104. Improved outflow also improves the food web of the species during a critical time. *Id.* Separately, these conditions also protect San Joaquin steelhead leaving the Delta in late April and early May. ECF 224, Herbold Decl. ¶ 18. Indeed, this Court in May 2020 selectively imposed an injunction to protect the San Joaquin steelhead. The Cavallo declaration includes multiple references to steelhead studies but does not directly refute the need to protect San Joaquin steelhead. This omission implies that no refuting evidence exists. ECF 240 ¶¶ 39–42.

**3. TUCPs and the IOP are distinct and important tools**

Finally, the Intervenors argue that the IOP may make no difference in Delta operations as compared to the 2019 BiOps because Temporary Urgency Change Orders (TUCO) or D-1641 could be controlling instead. ECF 233 at 21:24–22:7. This is irrelevant because the Projects are always subject to layered regulatory authorizations and operational issues that may control the Projects at different times, but those authorizations do not supplant one another or obviate the need for the IOP's conditions to apply in certain circumstances. As the California agencies explained in their amicus brief in the *PCFFA* case (*PCFFA* ECF 343-1), the State Water Board has independent authority over and discretion to grant or deny any Temporary Urgency Change Petition (TUCP) submitted by Reclamation and DWR. This state law process does not alleviate Federal Defendants of their ESA obligations. PCFFA ECF 324-3. Moreover, on January 18, 2022, the TUCP was withdrawn based on recently hydrology, mooting Intervenors' argument. Reply Flannery Decl. Ex 5.

### C. The IOP Does Not Avoid Administrative Processes

Intervenors complain that the Federal Defendants are "shifting decision-making authority for the IOP to the Court" and that the IOP is an "end-run" around statutory obligations to undertake environmental review. ECF 235 at 1, 20. On the contrary, the State Plaintiffs and Federal Defendants took seriously this Court's admonition to plan for interim operations during consultation on new biological opinions. ECF 194 at 5. Moreover, this Court suggested that such operations would be appropriately adopted as injunctive relief. ECF 206. Following the Court's instruction, the federal and state agencies have now presented the Court with a workable temporary plan that balances multiple interests, including water supply and species protection. This plan covers the remaining eight months of this water year to address very serious drought conditions while the agencies develop more permanent and durable operating rules in an updated set of biological opinions in compliance with administrative law.

## III. THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST SUPPORT THE IOP

California has previously demonstrated the public interest in implementing the interim species protections afforded by the IOP, and the acute imbalance of equities where the species' conditions are so precarious. ECF 220 at 24:4–25:16. Intervenors argue that the IOP would be counter to the public interest because of its effects to their contracts and water rights, which they claim are inviolable, or because if the IOP does go into effect, it would harm their agricultural practices or other species. Intervenors' arguments reflect the interests of particular stakeholders; the IOP was the result of careful deliberations by the federal and state sovereigns, aided by expert federal and state agencies, taking account and balancing the needs of the public at large.

### A. Settlement Contracts Do Not Weigh against Adoption of the IOP

Intervenors argue that the IOP cannot be implemented because it would interfere with their contractual rights for deliveries from Reclamation. This argument lacks merit. First, any reduction in deliveries to Intervenors is highly speculative, and would depend on the hydrology, the temperature management plan, and the relevant temperature and storage targets under the IOP, planning which incorporates coordination among the Project operators as well as with state and federal regulatory agencies. Indeed, the IOP builds in numerous collaborative processes,

including ongoing coordination with parties to this litigation. ECF 221 ¶¶ 12(i)(b), 13, 17(ii)(b). For example, the IOP requires Reclamation to ensure that technical input into temperature planning includes consideration of options put forth by the Sacramento River Temperature Task Group and Upper Sacramento Scheduling Team, both of which include Intervenor representatives. *Id.* ¶ 17(ii). Intervenors allege only one concrete alleged conflict, relating to timing—that the IOP impermissibly interferes with "Reclamation's obligation to furnish water under the Settlement Contracts in April, May, and June." ECF 233 at 20; *see also id.* at 9. But the IOP expressly authorizes deliveries as early as April 1, 2022. ECF 221 ¶ 13 ("Reclamation may make releases . . . for deliveries as early as April 1, 2022"); ¶ 16(i).

Second, the water rights underlying the SRS Contracts are subject to the California water law doctrines of reasonable use and the public trust. The SRS Contracts are signed "pursuant to the applicable authority" of the Reclamation Act of 1902 and the CVPIA. *See, e.g.*, *PCFFA* ECF 75-3 at 121. Section 8 of the Act expressly requires Reclamation projects to be operated in accordance with state laws "relating to the control, appropriation, use, or distribution of water." 43 U.S.C. § 383.[3] The CVPIA defines CVP water as that which is developed, diverted, stored, or delivered "in accordance with the terms and conditions of water rights acquired pursuant to California law." CVPIA § 3403(f), Pub. L. No. 102-575, 106 Stat. 4706, 4714 (1992).[4]

Under California law, the exercise of water rights must be reasonable. Cal. Const. art. X, § 2; *Joslin v. Marin Mun. Water Dist.*, 67 Cal. 2d 132, 138–39, 140, 145 (1967) (no vested property right in an unreasonable use; unreasonable use evolves in light of facts and circumstances); *In re Consol. Salmonid Cases*, 791 F. Supp. 2d 802, 953 (E.D. Cal. 2011) ("reasonable use doctrine protects . . . fish protection interests that go far beyond prevention of jeopardy"). And California's public trust doctrine provides that water rights holders "can assert no vested right to use those rights in a manner harmful to the trust." *Nat'l Audubon Soc'y v. Superior Ct.*, 33 Cal. 3d 419, 437 (1983); *People v. Rinehart*, 1 Cal. 5th 652, 661 (2016) (wild fish recognized as trust resources).

---

[3] There are some exceptions not relevant here, as where Congress expresses a clear intention to preempt. *California v. United States*, 438 U.S. 645, 670–71 (1978).

[4] The CVPIA "elevated 'mitigation, protection, and restoration of fish and wildlife' to Project purposes on par with irrigation." *San Luis & Delta-Mendota Water Auth. v. United States*, 672 F.3d 676, 683–84 (9th Cir. 2012) (quoting CVPIA § 3406(a)(1)–(2), 106 Stat. at 4714).

Where the public trust so requires, "the courts retain jurisdiction to fashion a judicial remedy for enforcement of the statutory mandate appropriate to the circumstances." *Nat. Res. Def. Council v. Patterson*, 333 F. Supp. 2d 906, 923 (E.D. Cal. 2004); *United States v. State Water Res. Control Bd.*, 182 Cal. App. 3d 82, 147 (1986) (when public welfare clashes with contractual right, courts must "balance the interests involved" and craft a remedy).

These doctrines provide further support for this Court to adopt the IOP, which under present drought conditions sets forth water use priorities to protect public trust resources. Doing so as an interim remedy is consistent with the public interest in species protection that the federal ESA and state water law guard, and the contracts do not preclude.

### B. Intervenors' Remaining Arguments Do Not Demonstrate that the Equities Weigh in Favor of the 2019 BiOps over the IOP

Intervenors do not and cannot dispute that endangered species have an "incalculable" value, and that the public therefore has a weighty interest in preventing their extinction. *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 187 (1978); *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 767 (9th Cir. 2014). Nor do Intervenors try to explain how their potential and temporary economic harms can outweigh that interest.[5] Instead, they contend that the IOP will result in worse environmental impacts than continued operation under the 2019 BiOps. The claim the status quo is more environmentally protective than the IOP.

First, Intervenors argue that a court may not issue an injunction if it would "undermine one species for the benefit of another," and contend that the IOP would allegedly harm the giant garter snake, the steelhead trout, and migrating birds. The only case they cite, *Idaho Rivers United v. U.S. Army Corps of Eng'rs*, 156 F. Supp. 3d 1252, 1266–67 (W.D. Wash. 2015), does not concern the Endangered Species Act or a listed species. Intervenors present no evidence of

---

[5] Intervenors do not discuss the vast majority of the agricultural economic opinions offered by their declarant Dickey. ECF 242. Accordingly, the Court should not consider anything from Dickey beyond the amount of rice planted in the Sacramento Valley, which is all Intervenors cite that declaration for. Further, the opinions in the Dickey declaration as to the actual effects of fallowing rice fields are non-specific, speculative, and inadmissible. *See Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993); Fed. R. Evid. 702; *Diviero v. Uniroyal Goodrich Fire Co.*, 114 F.3d 851, 853 (9th Cir. 1997) (expert testimony should not include "unsubstantial speculation and subjective belief"). Even if accepted, any potential economic injuries cannot outweigh the loss of entire species to extinction.

potential impacts to steelhead trout (ECF 248, Yasutake Decl.¶ 15) and only speculative opinion about potential impacts to the giant garter snake. *See*, *e.g.*, ECF 244, Hanson Decl. ¶ 10 ("long-term population effects remain unclear"). And they fail to explain why the balance of the equities weighs against protecting endangered fish species to avoid impacts on unlisted migrating birds. *See* ECF 233 at 25; ECF 245, Petrie Decl. ¶¶ 10–15 (identifying ducks and geese).

Second, Intervenors fault California and the Federal Defendants for not providing analysis of potential impacts to American River steelhead, green sturgeon, Least Bell's vireo, and the Giant Garter Snake. ECF 233 at 24. But Intervenors do not cite to any authority suggesting California and the Federal Defendants had an obligation to provide such analysis, particularly when Intervenors have themselves failed to identify any non-speculative impacts to those species.

## CONCLUSION

For the reasons set forth above, the Court should order the IOP as interim injunctive relief for the balance of the current water year.

Dated: January 24, 2022

Respectfully submitted,

ROB BONTA
Attorney General of California
TRACY L. WINSOR
Supervising Deputy Attorney General

*/S/ Daniel M. Fuchs*
DANIEL M. FUCHS
Deputy Attorney General
*Attorneys for Plaintiffs California Natural Resources Agency, California Environmental Protection Agency, and People of the State of California ex rel. California Attorney General Rob Bonta*

SA2019300725
35854034.docx