ROB BONTA, State Bar No. 202668
Attorney General of California
TRACY L. WINSOR, State Bar No. 186164
Supervising Deputy Attorney General
COLLEEN R. FLANNERY, State Bar No. 297957
DANIEL M. FUCHS, State Bar No. 179033
SARA D. VAN LOH, State Bar No. 264704
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7827
  Fax: (916) 327-2319
  E-mail: Daniel.Fuchs@doj.ca.gov
*Attorneys for Plaintiffs*
*California Natural Resources Agency,*
*California Environmental Protection Agency, and*
*People of the State of California, ex rel. California*
*Attorney General Rob Bonta*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **THE CALIFORNIA NATURAL RESOURCES AGENCY, ET AL.**<br><br>Plaintiffs,<br><br>v.<br><br>**GINA RAIMONDO, ET AL.,**<br><br>Defendants. | Case No. 1:20-cv-00426-DAD-EPG<br><br>**DECLARATION OF COLLEEN R. FLANNERY IN SUPPORT OF MOTION FOR INTERIM INJUNCTIVE RELIEF AND TEMPORARY STAY OF LITIGATION**<br><br>Date: February 1, 2022<br>Time: 9:30 a.m.<br>Dept: 5<br>Judge: The Honorable Dale A. Drozd<br>Trial Date: TBD<br>Action Filed: February 20, 2020 |

1

2          I, COLLEEN R. FLANNERY, hereby declare as follows:

3          1.      I am a deputy attorney general with the California Attorney General's Office and

4   admitted before the state courts of California and the United States District Court for the Eastern

5   District of California. I represent Plaintiffs California Natural Resources Agency, California

6   Environmental Protection Agency, and People of the State of California by and through Rob

7   Bonta, Attorney General of the State of California (collectively, California) in this matter.

8          2.      Attached to this Declaration as **Exhibit 1** is a true and correct copy of the Notice of

9   Deposition of Bradley Cavallo and Deposition Subpoena for Testimony and Production of

10  Documents, dated January 13, 2022.

11         3.      Attached to this Declaration as **Exhibit 2** is a true and correct copy of excerpts from

12  the deposition transcript of Bradley Cavallo, taken on January 19, 2022, including the reporter's

13  certification.

14         4.      Attached to this Declaration as **Exhibit 3** is a true and correct copy of Exhibit 6,

15  Bates-numbered P_CAVALLO_00063; Exhibit 11(no Bates number); and Exhibit 13, Bates-

16  numbered P_CAVALLO_00113, to the Cavallo deposition.

17         5.      Attached to this Declaration as **Exhibit 4** is a true and correct copy of documents

18  Bates-numbered CAVALLO_002143-CAVALLO_002148, produced by Mr. Cavallo in response

19  to the Notice of Deposition and Subpoena.

20         6.      Attached to this Declaration as **Exhibit 5** is a true and correct copy of a letter from

21  the California Department of Water Resources and the U.S. Bureau of Reclamation to the

22  California State Water Resources Control Board, dated January 18, 2022, available at

23  https://www.waterboards.ca.gov/waterrights/water_issues/programs/drought/tucp/docs/2022/2022

24  0118_dwr-usbr-letter_tucp-withdrawal.pdf (last accessed January 24, 2022).

25         7.      Attached to this Declaration as **Exhibit 6** is a true and correct copy of pages 49

26  (record page A_000080); 173 (record page A_000204); 510 (record page A_000541); 531 (record

27  page A_000562); and 761 (record page A_000792), of the 2019 NMFS BiOp.

28

1

Flannery Decl. Supp. Mot. Interim Inj. and Temporary Stay (1:20-cv-00426-DAD-EPG)

1       I declare under penalty of perjury under the laws of the United States of America that the

2   foregoing is true and correct.

3       Executed this 24th day of January 2022 at Sacramento, California.

4

5                                           */S/ Colleen R. Flannery*
                                            Colleen R. Flannery
6                                           Deputy Attorney General

7
    SA2019300725
8   35853910

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

# Exhibit 1

1 | Rob Bonta, State Bar No. 202668
Attorney General of California
2 | Tracy L. Winsor, State Bar No. 186164
Supervising Deputy Attorney General
3 | Colleen R. Flannery, State Bar No. 297957
Daniel M. Fuchs, State Bar No. 179033
4 | Deputy Attorneys General
  1300 I Street, Suite 125
5 | P.O. Box 944255
  Sacramento, CA 94244-2550
6 | Telephone: (916) 210-7827
  Fax: (916) 327-2319
7 | E-mail: Daniel.Fuchs@doj.ca.gov
*Attorneys for Plaintiffs*
8 | *California Natural Resources Agency,*
*California Environmental Protection Agency, and*
9 | *People of the State of California, ex rel. California*
*Attorney General Rob Bonta*
10 |

EXHIBIT 1

11 | IN THE UNITED STATES DISTRICT COURT

12 | FOR THE EASTERN DISTRICT OF CALIFORNIA

13 |

14 |

**THE CALIFORNIA NATURAL RESOURCES AGENCY, ET AL.**

Plaintiffs,

v.

**GINA RAIMONDO, ET AL.,**

Defendants.

Case No. 1:20-cv-00426-DAD-EPG

**NOTICE OF DEPOSITION OF BRADLEY CAVALLO; DEPOSITION SUBPOENA FOR TESTIMONY AND PRODUCTION OF DOCUMENTS**

Judge:         The Honorable Dale A. Drozd
Trial Date:    Not set
Action Filed:  February 20, 2020

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that, pursuant to Rule 30 of the Federal Rules of Civil Procedure (FRCP) (Rule 30), Plaintiffs California Natural Resources Agency, California Environmental Protection Agency, and People of the State of California, ex rel. California Attorney General Rob Bonta (collectively, California Plaintiffs) will take the deposition of Bradley Cavallo in the above-captioned action, commencing at 9:30 a.m. on January 19, 2022.

1

**P_CAVALLO_00001**

1    The deposition will be conducted before a certified court reporter duly authorized to administer

2    oaths, be stenographically recorded, and will continue until completed consistent with Rule 30.

3         This deposition will be conducted remotely, and will be facilitated and administered via

4    Zoom by Veritext. The court reporter will administer the oath remotely and separately. The

5    procedures for attending the remote deposition are set forth below.

6         For any technical questions before or concerns during the deposition, attending participants

7    should contact Veritext at remote@veritext.com, or call (855) 440-4861.

8         1. Participants need to have a computer, laptop, or mobile device equipped with a webcam

9    and a high-speed, reliable internet connection.

10        2. The permanent link to these proceedings, including the Zoom link, is:

11    https://proceedings.veritext.com/?token=12c1dd912cbedaabc219026240611518.  Participants are

12    advised that sharing this link with non-parties or unaffiliated individuals could affect the security

13    of the session.

14        3. If you would like to participate via Meeting ID/Password, video teleconference, or

15    conference call, click the link above within an hour of the scheduled start time, identify yourself,

16    and click **Show My Meeting ID/Password and Additional Session Details.**

17        4. Participants should be prepared to connect to audio via landline or mobile phone with

18    clear reception in order to achieve the best quality sound.

19        5. Participants should mute their microphone unless actively participating to reduce

20    interference, echo, and ambient noise.

21        A copy of California Plaintiffs' deposition subpoena to Bradley Cavallo is attached hereto

22    and served on January 13, 2022, via counsel along with this notice. Bradley Cavallo is required to

23    produce all documents, records, or other materials described in Exhibit A of the deposition

24    subpoena attached hereto. Production may be, to the extent practicable, accomplished by

25    electronic means.

26        PLEASE TAKE FURTHER NOTICE that the deposing party intends to cause the

27    proceedings to be recorded by video. If an interpreter is required, the undersigned must be

28

**P_CAVALLO_00002**

1  notified in writing at least 5 days before the deposition date of the language spoken by the

2  deponent.

3

4  Dated: January 13, 2022                              Respectfully submitted,

5                                                       ROB BONTA
                                                        Attorney General of California

6

7                                                       /S/ Tracy L. Winsor
                                                        TRACY L. WINSOR

8                                                       Supervising Deputy Attorney General
                                                        Attorneys for Plaintiffs California Natural

9                                                       Resources Agency, California
                                                        Environmental Protection Agency, and

10                                                      People of the State of California, ex rel.
                                                        California Attorney General Rob Bonta

11  35781533.docx

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

**P_CAVALLO_00003**

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | |
|---|---|
| California Natural Resources Agency, et al. | ) |
| *Plaintiff* | ) |
| v. | ) |
| Gina Raimondo, et al. | ) |
| *Defendant* | ) |

Civil Action No.   1:20-cv-00431-DAD-EPG
1:20-cv-00426-DAD-EPGL

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                            Bradley Cavallo

*(Name of person to whom this subpoena is directed)*

☑ Testimony:  YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:

| Place: Zoom, available at https://proceedings.veritext.com/?token=12c1dd912cbedaabc219026240611518 | Date and Time:<br><br>01/19/2022 9:30 am |
|---|---|

The deposition will be recorded by this method:      Stenographically and by video

☑ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

See Exhibit A (attached)

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:      01/13/2022

| *CLERK OF COURT* | OR | |
|---|---|---|
| | | /s/ Tracy Winsor |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*  Plaintiffs California Natural Resources Agency, et al.
, who issues or requests this subpoena, are:

Tracy Winsor, Office of the California Attorney General, 1300 I Street, Ste. 125, Sacramento, CA 95814, (916) 210-7796
Tracy.Winsor@doj.ca.gov

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

P CAVALLO 00004

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.

**PROOF OF SERVICE**
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)*  Bradley Cavallo

on *(date)*      01/13/2022      .

❑ I served the subpoena by delivering a copy to the named individual as follows:

_____ on *(date)* _____ ; or

❑ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $      0.00      .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

**P_CAVALLO_00005**

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**EXHIBIT A**

Pursuant to Rule 30 of the Federal Rules of Civil Procedure, California Plaintiffs command deponent Bradley Cavallo to produce all documents described below on or before January 19, 2022. California Plaintiffs make this request without prejudice to their right to inspect the originals at a later date.

**DEFINITIONS**

1. As used herein, the term "DOCUMENTS" should be understood to have the full meaning given in Rule 34(a)(1)(A) of the Federal Rules of Civil Procedure, and shall include, but not be limited to, all writings of any kind or nature whatsoever in their actual or constructive possession, custody, care, or physical control, including without limitation correspondence, memoranda, agreements, messages, notes, contracts, or extracts, or excerpts for any of the following Document Requests, excepting those documents which are expressly protected from disclosure pursuant to Rules 26(b)(4)(B) and 26(b)(4)(C), et seq.

2. As used herein, the terms "YOU" and "YOUR" shall refer to Bradley Cavallo.

**INSTRUCTIONS**

1. YOU are requested to produce not only those DOCUMENTS in YOUR possession, custody or control, but also those DOCUMENTS reasonably available to YOU, including those in the possession, custody or control of YOUR attorneys, agents, or other persons acting on YOUR behalf. YOU are also requested to produce DOCUMENTS in the form in which they are kept in the usual course of business, or to organize and label them to correspond with the categories in this request.

2. YOUR obligation at the commencement of litigation, YOU are obligated to take all necessary steps to prevent alteration, modification, or deletion, of all responsive Electronically Stored Information (ESI) in YOUR possession, custody, or control, including but not limited to the native files and all metadata related to the ESI. YOU are required to make a diligent search of all devices and media capable of containing ESI within YOUR possession, custody, or control, including but not limited to computers, servers, networks, cloud-based storage, back-up media, thumb drives, smartphones, PDAs, mobile devices, tablet computers

**P_CAVALLO_00007**

1  storage media, hard drives, social media accounts, and every medium in which ESI may be

2  located to determine if any ESI responsive to the individual requests is present. If any ESI is

3  responsive and non-privileged, it is required to be produced in native format together with all

4  metadata, attachments, and other related ESI unmodified, and intact. Any other non-privileged

5  responsive DOCUMENTS maintained in electronic form must also be produced. ESI shall be

6  produced as follows:

7      a.  All ESI shall be collected, processed and produced in a manner that ensures that all

8          files reflect the accurate metadata associated with the creation and maintenance of the

9          files and is not corrupted or altered by the methods of the collection of the data.

10         Further, all ESI shall be produced in a manner to indicate the custodian of the ESI. All

11         ESI shall be made accessible for review by "unhiding" any information hidden in the

12         ESI, or by providing passwords necessary to access the ESI, or by any other means

13         necessary to permit the ESI to be reviewed completely.

14     b.  All ESI shall be produced in its native format. Note that any ESI, regardless of format,

15         must not be redacted in the native format to avoid spoliation of evidence. If ESI

16         requires proprietary software to read the native files, then versions not requiring the

17         proprietary software to read shall be produced in addition to the native files.

18     c.  Spreadsheets shall be produced in native format (e.g., as .XLS files) including related

19         searchable text, metadata, formulas, and other information intact and unchanged. All

20         hidden information shall be unhidden or otherwise made available for review.

21     d.  Presentations, such as those created in Microsoft PowerPoint or similar programs,

22         shall be produced in native full slide image format along with speaker notes, with any

23         speaker notes following the full images of the slides with related searchable text and

24         metadata and other information intact and unchanged. Presentations shall also be

25         produced in native format (e.g., as .PPT files).

26     e.  If YOU wish to produce ESI post-processing, the documents shall be processed in a

27         manner that preserves the original ESI in an unaltered state, including all metadata and

28         other related information. Processed electronic documents shall be provided in a

**P_CAVALLO_00008**

1    single-page .tif format with corresponding load files. The load files shall include an

2    ASCII delimited load file containing the metadata associated with the file, the text

3    extracted from the native file, and a directory path to the native file. Contact counsel

4    for Requesting Party for further information regarding formatting of processed

5    electronically stored information.

6    f.   Electronic mail shall be produced in a .pst file native to Microsoft Outlook, with the

7        metadata in an unaltered state. All necessary passwords to access all emails,

8        attachments, and metadata relating to the .pst file shall also be produced. Contact

9        counsel for Requesting Party for further information regarding formatting of processed

10       electronically stored information.

11   g.   If there are multiple formats in which to produce ESI to Requesting Party, and the

12       above guidelines do not address which format ESI must be produced, YOU shall

13       contact counsel for Requesting Party to meet and confer regarding the proper

14       production format.

15   3. If YOU claim that the attorney-client privilege, the attorney work-product doctrine, or any

16   other privilege is applicable to any DOCUMENTS, production of which are sought by this

17   request, the substance of those DOCUMENTS need not be disclosed in YOUR answers, but YOU

18   shall, with respect to those DOCUMENTS provide a privilege log with at least the following

19   information:

20   a.   State the date of the DOCUMENTS;

21   b.   Identify each and every author of the DOCUMENTS;

22   c.   Identify each and every other person who prepared or participated in the preparation of

23       the DOCUMENTS;

24   d.   Identify each and every person who received the DOCUMENTS;

25   e.   Identify each and every person from whom the DOCUMENTS were received;

26   f.   State the present location of the DOCUMENTS and all copies thereof;

27   g.   Identify each and every person having custody or control of the DOCUMENTS and all

28       copies thereof; and

**P_CAVALLO_00009**

h.  Provide sufficient further information concerning the DOCUMENTS and the circumstances thereof to explain the claim of privilege and to permit the adjudication of the propriety of that claim.

4. In the event YOU are able to produce only some of the DOCUMENTS called for in a particular request, please produce all the DOCUMENTS YOU are able to and state the reasons for YOUR inability to produce the remainder.

5. If YOU object to a portion of a request, please produce all DOCUMENTS called for by that portion of the request to which YOU do not object.

6. When YOU produce the DOCUMENTS requested herein for inspection and photocopying, YOU are to identify the DOCUMENTS produced by reference to the number of the Request.

## **REQUESTS FOR PRODUCTION**

1. YOUR complete file in connection with YOUR investigation and evaluation of the issues involved in the LITIGATION, including but not limited to:

a.  all DOCUMENTS furnished to YOU by anyone; and

b.  all DOCUMENTS obtained or created by YOU.

2. All DOCUMENTS, including, but not limited to, posts to social media which YOU have considered in reaching the opinions or conclusions that YOU have or will testify on in the LITIGATION, including, but not limited to, opinions and conclusions in YOUR DECLARATION.

3. All DOCUMENTS, including, but not limited to, website content, blog posts, emails, text messages, and social media posts and replies, exchanged between YOU and any other person concerning the LITIGATION between April 1, 2021 and January 13, 2022.

4. Any and all DOCUMENTS which constitute a contract or agreement between YOU and any PARTY with respect to the LITIGATION.

5. Any and all timekeeping, billing, and payment records regarding the work performed by YOU with respect to the LITIGATION.

**P_CAVALLO_00010**

## DECLARATION OF SERVICE BY E-MAIL

Case Name: **California Natural Resources Agency, et al. v. Gina Raimondo, et al.**
No.:        **1:20-cv-00426-DAD-EPG**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made.  I am 18 years of age or older and not a party to this matter.

On January 13, 2022, I served the attached **NOTICE OF DEPOSITION OF BRADLEY CAVALLO; DEPOSITION SUBPOENA FOR TESTIMONY AND PRODUCTION OF DOCUMENTS** by transmitting a true copy via electronic mail to the following person(s) or representative(s) at the email address(es) listed on the attached service list.

**PLEASE SEE ATTACHED EMAIL SERVICE LIST**

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on January 13, 2022, at Sacramento, California.

| Valerie A. Tamulevich | /s/ Valerie A. Tamulevich |
|---|---|
| Declarant | Signature |

**P_CAVALLO_00011**

## Email Service List

ack@vnf.com;
aclark@downeybrand.com;
agabu@vnf.com;
ahitchings@somachlaw.com;
akhalifa@vnf.com;
amcadam@vnf.com;
bchisholm@altshulerberzon.com;
bhamilton@downeybrand.com;
bjohnson@somachlaw.com;
btrull@kaplankirsch.com;
calendar8@kmtg.com;
cbeecham@kmtg.com;
cgermain@downeybrand.com;
cheryll.dobson@sol.doi.gov;
christopher.keifer@noaa.gov;
clifford.stevens@usdoj.gov;
colleen.flannery@doj.ca.gov;
courtfilings@downeybrand.com;
crivera@somachlaw.com;
crodder@somachlaw.com;
daniel.fuchs@doj.ca.gov;
derek.woodman@wilmerhale.com;
docketclerk@stoel.com;
docketingsfcls@doj.ca.gov;
dohanlon@kmtg.com;
efile_nrs.enrd@usdoj.gov;
efile_wmrs.enrd@usdoj.gov;
elizabeth.ewens@stoel.com;
elizabeth.sarine@doj.ca.gov;
evan.eickmeyer@doj.ca.gov;
evelyn.mcdonald@usdoj.gov;
evissers@altshulerberzon.com;
fe.domingo@doj.ca.gov;
fish1ifr@aol.com;
gwynn.roberson@wilmerhale.com;
ha.nguyen@stoel.com;
hcandee@altshulerberzon.com;
hjj@bkslawfirm.com;
jacio@bpmnj.com;
jeffrey.reusch@doj.ca.gov;
jeremy.brown@calepa.ca.gov;
jgee@kmtg.com;

**P_CAVALLO_00012**

jhughey@downeybrand.com;
jmueller@somachlaw.com;
jrm@vnf.com;
jtb@bkslawfirm.com;
jzamora@altber.com;
kevin.tanaka@sol.doi.gov;
kmr@rbgmlaw.com;
kobrien@downeybrand.com;
kristen.castanos@stoel.com;
kroberson@fresnocountyca.gov;
lcoffman@caed.uscourts.gov;
lesley.lawrence-hammer@usdoj.gov;
leticia.aguirre@doj.ca.gov;
linda.gerst@stoel.com;
lori.caramanian@sol.doi.gov;
madams@kaplankirsch.com;
mbruner@perkinscoie.com;
mbyrne@altshulerberzon.com;
mhernandez@caed.uscourts.gov;
mnikkel@downeybrand.com;
mzt@vnf.com;
ncollins@altshulerberzon.com;
nicole.m.smith@usdoj.gov;
rachel.jacobson@wilmerhale.com;
rharms@kmtg.com;
rochelle.udaquillen@doj.ca.gov;
romney.philpott@usdoj.gov;
samberson@vnf.com;
sara.vanloh@doj.ca.gov;
sbivins@downeybrand.com;
seth.allison@usdoj.gov;
sheila.brown@stoel.com;
shontane.adams@doj.ca.gov;
smogharabi@kaplankirsch.com;
snagle@bpmnj.com;
sramirez@kmtg.com
ssomach@somachlaw.com;
swurth@bpmnj.com;
tim@olaughlinplc.com;
towater@olaughlinparis.com;
tracy.winsor@doj.ca.gov;
tw@pariskincaid.com;
twasiewski@olaughlinparis.com;
twhitman@kmtg.com;

**P_CAVALLO_00013**

valerie.tamulevich@doj.ca.gov;
vkincaid@olaughlinparis.com

SA2019300725
35828755.docx

**P_CAVALLO_00014**

# Exhibit 2

```
 1              IN THE UNITED STATES DISTRICT COURT
 2            FOR THE EASTERN DISTRICT OF CALIFORNIA
 3                          ---oOo---
 4
 5     THE CALIFORNIA NATURAL
       RESOURCES AGENCY, ET
 6     AL.,
             Plaintiffs,
 7                                     Case No.
       vs.                             1:20-cv-00426-DAD-EPG
 8
       GINA RAIMONDO, ET AL.,
 9          Defendants.
       _____/
10
11
12
               VIRTUAL ZOOM DEPOSITION OF BRADLEY CAVALLO
13
14
15                      January 19, 2022
16
17
         Taken before EARLY K. LANGLEY RMR, RSA, B.A.
18
                        CSR No. 3537
19
20
21
22
23
24
25
                                            Page 1
```

```
 1              DEPOSITION OF BRADLEY CAVALLO
 2
 3         BE IT REMEMBERED, that pursuant to Notice and
 4    Subpoena, and on January 19, 2022, commencing at the
 5    hour of 9:35 a.m., before me, EARLY LANGLEY, a
 6    Certified Shorthand Reporter, State of California, via
 7    Virtual Zoom appeared BRADLEY CAVALLO, produced as a
 8    witness in said action, and being by me first duly
 9    sworn, was thereupon examined as a witness in said
10    cause.
11                         ---oOo---
12    APPEARANCES VIA VIRTUAL ZOOM:
13    For the Plaintiffs California Natural Resources Agency,
      California Environmental Protection Agency, and People
14    of the State of California, ex rel. California Attorney
      General Rob Bonta:
15
              TRACY L. WINSOR
16            DAN FUCHS
              COLLEEN R. FLANNERY
17            Office of the Attorney General of California
              1300 I Street, Suite 125
18            Sacramento, CA 94244
              (916) 210-7827
19            Tracy.winsor@doj.ca.gov
              Dan.fuchs@doj.ca.gov
20            Colleen.flannery@doj.ca.gov
21
              SARA D. VAN LOH
22            Office of the Attorney General of California
              California Department of Justice
23            1515 Clay Street
              Suite 2000
24            Oakland, CA 94612
              (510) 879-3139
25            Sara.vanloh@doj.ca.gov

                                              Page  4
```

```
 1     For Defendants-Intervenors Tehama-Colusa Canal
       Authority; Reclamation District No. 108, Sutter Mutual
 2     Water Company; Natomas Central Mutual Water Company;
       River Garden Farms Water Company; Pleasant Grove-Verona
 3     Mutual Water Company; Pelger Mutual Water Company;
       Meridian Farms Water Company; Henry D. Richter, et al.;
 4     Howald Farms, Inc., Oji Brothers Farm, Inc.; Oji Family
       Partnership, Carter Mutual Water Company; Windswept
 5     Land and Livestock Company; Maxwell Irrigation
       District; Beverly F. Andreotti, et al.; Tisdale
 6     Irrigation and Drainage Company; Provident Irrigation
       District; and Princeton-Codora-Glenn Irrigation
 7     District:
 8             MEREDITH E. NIKKEL
               Downey Brand LLP
 9             621 Capitol Mall
               18th Floor
10             Sacramento, CA 95814
               (916) 444-1000
11             @downeybrand.com
12
       For the Defendants Intervenors Glenn-Colusa Irrigation
13     District, et al.; Sacramento River Settlement
       Contractors:
14
               JARED MUELLER
15             ANDREW HITCHINGS
               Somach Simmons & Dunn
16             500 Capitol Mall
               Suite 1000
17             Sacramento, CA 95814
               (916) 446-7979
18             Jmueller@somachlaw.com
               Ahitchings@somachlaw.com
19
20     For the Defendants Intervenors San Luis & Delta-Mendota
       Water Authority and Westlands Water District:
21
               DANIEL O'HANLON
22             Kronick Moskovitz Tiedemann & Girard
               1331 Garden Highway
23             Second Floor
               Sacramento, CA 95833
24             (916) 321-4500
               Dohanlon@kmtg.com
25
```

Page 5

```
 1    For the Federal Defendants:
 2            EVE W. MCDONALD
              U.S. Department of Justice
 3            Environment & Natural Resources Division
              Natural Resources Section
 4            999 18th Street, South Terrace
              Suite 370
 5            Denver, CO 80202
              (303) 844-1381
 6
              NICOLE M. SMITH
 7            U.S. Department of Justice
              Environment & Natural Resources Divisio
 8            Wildlife & Marine Resources Section
              150 M Street NE
 9            Washington, D.C. 20002
              (202) 305-0368
10
11    For the PCFFA Plaintiffs in the companion PCFFA case:
12            KATE POOLE
              Natural Resources Defense Council
13            111 Sutter Street
              21st Floor
14            San Francisco, CA 94104
              (415) 875-6100
15            Kpoole@nrdc.org
16
17    For the Defendant Intervenor State Water Contractors:

              JENNA MANDELL-RICE
18            VanNess Feldman
              1191 Second Avenue
19            Suite 1800
              Seattle, WA 98101
20            (206) 829-1817
              Jrm@vnf.com
21
22
23
24
25

                                          Page  6
```

```
 1    For the Defendant-Intervenor San Juan Water District:
 2            KRISTEN CASTANOS
              Stoel Rives LLP
 3            500 Capitol Mall
              Suite 1600
 4            Sacramento, CA 95814
              (916) 319-4655
 5            Kristen.castanos@stoel.com
 6
      For the Defendant-Intervenor South San Joaquin
 7    Irrigation District:
 8            TIM WASIEWSKI
              Paris Kincaid Wasiewski LLP
 9            2617 K Street
              Suite 100
10            Sacramento, CA 95816
              (916) 264-2045
11            Tw@pariskincaid.com
12    Also present:
13            ERIC DANNER, PH.D.
14            JENNIFER BUCKMAN
15            CHRISTOPHER KEIFER
16            BECKY SHEEHAN
17            DEANNA SERENO
18            BRUCE HERBOLD, PH.D.
19
20
21
22
23
24
25
```

                                                        Page  7

```
 1    Environmental Protection Agency, and People of the
 2    State of California, ex rel. Attorney General Rob
 3    Bonta.
 4              THE REPORTER:  Mr. Mueller?
 5              MR. MUELLER:  Yes, my name is Jared Mueller.  I
 6    represent the Sacramento River Intervenors.  I'm with
 7    Somach Simmons & Dunn and also agree to your statement
 8    put before.
 9                        BRADLEY CAVALLO
10                     sworn as a witness,
11                     testified as follows:
12              THE REPORTER:  Thank you.
13              Go ahead, Counsel.
14              MS. WINSOR:  Thank you, Madam Court Reporter.
15              Just to clarify on the record since there are a
16    number of separately represented parties here, I just
17    want to ask any party that has any disagreement to the
18    proceedings occurring remotely to please state it now.
19    If I don't hear any disagreement, we will all infer
20    that everyone agrees.
21              Hearing none.
22    EXAMINATION BY MS. WINSOR:
23         Q.   Good morning, Mr. Cavallo.  How are you today?
24         A.   Good.  Thank you.
25         Q.   Excellent.
```

Veritext Legal Solutions
866 299-5127

1    Cramer Fish Sciences?

2         A.   Correct.

3         Q.   So you've done some work on this case; true?

4         A.   Yes.

5         Q.   And Cramer has received some money for that

6    work; true?

7         A.   Yes.

8         Q.   Do you know how much money Cramer has received

9    for that work?

10        A.   I -- I don't.  We're billing our hours at, you

11   know, our standard rates.  There has been a lot of

12   activity since the work began, you know, reviewing

13   filings, so I would -- I could make an estimate, if

14   that's what you are looking for.

15        Q.   Yes.

16        A.   $40,000.

17        Q.   So you would estimate $40,000 for the work that

18   you've done on this case has been paid to Cramer.  Is

19   that for you alone or you and other people?

20        A.   That's -- that's for Cramer Fish Sciences, and

21   that is based on the last invoice that I reviewed that

22   went through December.  So there would be some

23   additional charges associated with work done in January

24   that I have not seen.

25        Q.   All right.  To clarify, you believe that Cramer

1    interested in in Celsius?

2    BY MS. WINSOR:

3        Q.  Yeah.  So in Farenheit, please -- you can

4    convert it, if you need to -- what range of

5    temperature-dependent mortality do you -- is your

6    opinion that -- from the start is this showing at

7    approximately 53 degrees?

8           I would like to walk through this one degree at

9    a time -- actually, half a degree at a time.

10       A.  53 degrees?  Is that what I heard?

11       Q.  Yes.

12       A.  So I would say that temperature, at 53, that

13   the range of temperature-dependent mortality ranges

14   from zero to about 40 percent.

15       Q.  And what about at 53.5 degrees?  Are you able

16   to estimate that for me?

17       A.  About 0 to 60 percent.

18          MR. MUELLER:  I'm going to object to this line

19   of questioning, using this table, to the extent that

20   Mr. Cavallo did not prepare it, we are not using

21   precise figures here, and he's eyeballing.

22   BY MS. WINSOR:

23       Q.  What about 54 degrees?

24       A.  54 looks like it's about 0 to 73 percent.

25       Q.  What about 55 degrees?

```
 1          A.   That's about 0 to 87 percent.

 2          Q.   And then together, we've estimated -- or you've

 3     estimated, and I have made a note, that the outer

 4     boundary of this blue area would be approximately

 5     56.6 degrees Farenheit; correct?

 6               MR. MUELLER:   Mischaracterizes prior testimony.

 7     Vague.   Calls for speculation.   Document speaks for

 8     itself.

 9     BY MS. WINSOR:

10          Q.   What about at 56.5 degrees Farenheit?   What

11     would you estimate the range of temperature-dependent

12     mortality?

13               MR. MUELLER:   Same objections.

14               THE WITNESS:   56.5?

15     BY MS. WINSOR:

16          Q.   I'm attempting to use what I understood to be

17     the approximate outer boundary of your blue area here,

18     which you, I think, said 13.7 degrees Celsius.   And

19     rough conversion on that would be about 56.6 degrees

20     Farenheit; correct?

21               MR. MUELLER:   Vague.

22               THE WITNESS:   Yes, 56.5 is 13.6 degrees

23     Celsius.

24     BY MS. WINSOR:

25          Q.   All right.
```

Page 78

1         A.   Do you want me --

2         Q.   What about at that temperature?  What would you

3    expect the range of temperature-dependent mortality to

4    be?

5              MR. MUELLER:  Vague.  Mischaracterizes prior

6    testimony.

7              THE WITNESS:  Looks like zero percent mortality

8    up to, you know, 99 percent.

9    BY MS. WINSOR:

10        Q.   And what about at 57 degrees?

11             MR. MUELLER:  Same objections.

12             THE WITNESS:  That looks like the temperature-

13   dependent mortality would be maybe 85 to 100 percent.

14   BY MS. WINSOR:

15        Q.   So using this chart and your calculations, it

16   is certain that temperature-dependent mortality at

17   57 degrees or above would range from a minimum of

18   85 percent up to what appears to be 100 percent; true?

19             MR. MUELLER:  Objection -- same objections.

20   Calls for speculation.  It's vague as to his

21   calculations, which are eyeballing based on Figure 9

22   that he did not craft.

23             MS. WINSOR:  Counsel, I would like to ask that

24   you not make speaking objections.  If you have an

25   objection, please state it.  Please don't speak.

Page 79

1           MR. MUELLER:  To the extent you would not want

2     me to clarify why it's vague, I won't.  I'll just

3     interpose that it's vague, then.

4           MS. WINSOR:  Thank you.

5           Could I have a read-back on that question.

6           MR. MUELLER:  Can you repeat the question.

7           MS. WINSOR:  Thank you.

8           (Record read by the court reporter.)

9           THE WITNESS:  That is what the figure depicts.

10          I would add that this is not reality.  This is

11    the Martin model, and there is a lot of issues

12    underlying even this about whether that's completely

13    accurate or not.  Probably is not.

14    BY MS. WINSOR:

15        Q.  Does your --

16          I'm sorry, Mr. Cavallo.  I didn't mean to step

17    on you.  What were you saying?

18        A.  I'm -- I'm good.

19        Q.  I apologize for stepping on you.  I thought you

20    were finished.

21        A.  I'm finished.

22        Q.  Do you agree that if there is as much potential

23    loss as is predicted in Figure 9 at lower temperatures

24    and great certainty of high temperature-dependent

25    mortality at higher temperatures, that is prudent to

Veritext Legal Solutions
866 299-5127

1    manage temperature in a manner that is protective of

2    species as temperatures increase?

3              MR. MUELLER:  Vague.  Outside the scope.

4              THE WITNESS:  So what I would say -- and this

5    is something I described in more detail in my

6    declaration -- is that if cold water supply is not

7    limiting, then yes, you might choose a colder

8    temperature to be more conservative.

9              But in practice, cold water supply is limiting,

10   so there is a need to try and identify what -- what the

11   right temperature is that allows you to, you know, have

12   reasonably good survival of incubating eggs while also

13   being able to maintain that temperature throughout the

14   incubation period.  There is a risk of going colder

15   than needed and then running out of cold water.

16             That's my observation and also on the basis of

17   reviewing the declarations of Mr. Deas and Mr. Bergfeld

18   about the challenges of managing cold water pool.

19        Q.   The cold water is not going to hurt the

20   species; correct?

21             MR. MUELLER:  That's vague.  Calls for a legal

22   conclusion.

23             THE WITNESS:  Yeah, I'm not aware of any

24   information that suggests that colder water

25   temperatures, you know, down certainly to, you know,

Page 81

1    54, 53 are going to be harmful to winter-run.

2          There is scientific literature that has

3    expressed concern about that, how that adversely

4    affects another endangered species like green sturgeon.

5    BY MS. WINSOR:

6        Q.  I would like to turn back to Exhibit 2 of your

7    declaration -- sorry -- Exhibit 2, which is your

8    declaration minus exhibits.

9          And if you have that in hard copy, feel free to

10   refer to the hard copy that you have.  And I am going

11   to go to paragraph 74, if you could refer to that with

12   me.

13         In paragraph 74, you state that "Laboratory

14   studies conducted by the USFWS" -- the U.S. Fish and

15   Wildlife Service -- "provide the best available

16   scientific information to inform management of

17   Sacramento River water temperatures during egg

18   incubation.  It might be argued that poor ETF" --

19         Meaning egg-to-fry; correct?

20       A.  Correct.

21       Q.  -- "ETF survival observed in 2014, 2015, and

22   2021 demonstrates that the 56-degree F standard is

23   inadequately protective."

24         Have I read that correctly?

25       A.  Yes.

Veritext Legal Solutions
866 299-5127

1       Q.  What did you mean when you said "the 56-degree

2   Farenheit standard"?

3       A.  Well, the 56 degrees was the standard, trying

4   to keep temperatures below -- at or below that level

5   prior to the 2014-'15 drought.  And the basis for that

6   was that U.S. Fish and Wildlife Service 1999 study.

7       Q.  When you say in this part of your declaration

8   that "It might be argued that poor ETF survival

9   observed in 2014, 2015, and 2021 demonstrates that the

10  56-degree standard is inadequately protective," does

11  that mean, in your mind, that reasonable people could

12  consider the same data and conclude that management at

13  temperatures below 56 degrees is necessary to reduce

14  the risk of poor egg-to-fry survival observed in 2014,

15  2015, and 2021?

16          MR. MUELLER:  Objection.  Vague.  Incomplete

17  hypothetical.

18          THE WITNESS:  I understood the question to be,

19  is it reasonable to conclude that temperatures at or

20  below 56 are needed for, you know, good egg incubation

21  survival?

22          And I agree.  I think that's true, based on the

23  information we have.

24  BY MS. WINSOR:

25      Q.  And, in fact, that is what the NMFS concluded

Page 83

1    in the 2019 BiOp; true?

2         A.  Yeah, I don't -- I don't know that that was

3    specifically concluded in the NMFS BiOp, I know the

4    56-degree standard was part of their criteria for

5    Tier 3 and Tier 4 years.

6              MS. WINSOR:  I'd like to mark -- actually, I'm

7    just going to show it -- no, I'm going to mark it.

8              Are we on Exhibit 5 now?  We're on Exhibit 6.

9              I'd like to mark as Exhibit 6 --

10             And, Colleen, if you could please email it to

11   all counsel.

12             -- the excerpt of the BiOps.

13             (Whereupon, Plaintiffs' Exhibit 6 was marked

14             for identification.)

15   BY MS. WINSOR:

16        Q.  Mr. Cavallo, I will represent to you that this

17   exhibit is a screenshot taken of page 54 of the

18   National Marine Fisheries Service 2019 BiOp.

19             Have you seen this part of this document

20   before?

21        A.  I have.

22        Q.  And there are tiers provided for on this page

23   of the document; correct?

24        A.  Yes.

25        Q.  And in Tier 3, it reads, "Targets 53.5 to

1          Q.  But from a species-protection perspective, just

2     based on science, you don't dispute that range;

3     correct?

4               MR. MUELLER:  Vague.

5               THE WITNESS:  I -- I dispute the range because

6     of the consequences of trying to manage to it.  It's an

7     area of uncertainty, how much mortality occurs between

8     53.5 and 56.

9               The U.S. Fish and Wildlife Service study

10    suggests that temperature-related mortality is pretty

11    low below 56, and so the fine point of the temperature

12    to manage to there just isn't an area we have a lot of

13    clarity on right now.

14              The Martin model suggests a lower standard, but

15    as I've described previously in detail in my

16    declaration and in the exhibits, there's a lot of

17    questions about how much we can really distinguish.

18              So it may very well be that -- that survival --

19    egg incubation survival is reasonably good at 56 and

20    that you would be wasting cold water pool trying to

21    maintain it at 54.

22              MS. WINSOR:  I didn't -- I move to strike,

23    because I didn't ask you the question based off of

24    operational concerns.

25    BY MS. WINSOR:

Veritext Legal Solutions
866 299-5127

1    isolate the effect of temperature on eggs and hatching?

2            MR. MUELLER:  Vague.  Calls for a legal

3    conclusion.

4            THE WITNESS:  So that may be the stated intent,

5    but that's a problem, because we know those things are

6    not constant; we know there are other sources of

7    mortality other than temperature-related mortality that

8    occurs during egg incubation.

9            MS. WINSOR:  And we'll talk about those later.

10           For now, I think I asked a yes-or-no question.

11           Could I have the question read back.

12           (Record read by the court reporter.)

13           MS. WINSOR:  And that should read "eggs and

14   hatching," actually.

15           THE REPORTER:  Thank you.

16   BY MS. WINSOR:

17       Q.  Do you understand the question, Mr. Cavallo?

18       A.  I do.  It's not a -- it's not a "yes" or

19   "no" -- it's not a question that can be answered with a

20   "yes" or "no."

21       Q.  I have to disagree.  The question is, does it

22   assume that all other factors are constant to isolate

23   the effect of temperature on eggs and hatching?

24       A.  Correct.  But implicit in that is the

25   assumption that it's valid to do that.  And I don't

                                              Page 90

1          So it's not reasonable to just pick a lower

2     number because it's, you know, lower.  It may have

3     consequences for the species.  And that's part of the

4     application of science to these management issues, is

5     understanding, you know, benefits and risks.

6          Q.  Is it your opinion that managing at 55 degrees

7     or 54 degrees will have negative consequence for the

8     winter-run Chinook?

9          MR. MUELLER:  Objection.  Vague.  Calls for a

10     legal conclusion.

11          THE WITNESS:  It could.

12     BY MS. WINSOR:

13          Q.  How?

14          A.  If -- if it was -- if it was not achieved as

15     prescribed.

16          Q.  I think you're introducing facts into my

17     question that I didn't include.

18          So let's go back to this document.  We are now

19     looking, again, at Exhibit 6, which is the excerpt of

20     the 2019 Biological Opinions.  Do you see that

21     document?

22          A.  Yes.

23          Q.  "Yes"?

24          A.  Yes.

25          Q.  And earlier, you agreed that management

1  that is Exhibit 2.  This is, again, the declaration

2  minus the exhibits.

3          In paragraph 15 -- and apologize for scrolling

4  while sharing the screen because that is not easy on

5  the eyes.

6          So if you want to look at the hard copy,

7  Mr. Cavallo, I'm turning to -- it's document page 7,

8  PDF page 8.  On the exhibit, it's Bates-numbered

9  P_CAVALLO_22, for the record.

10         Paragraph 15 talks about water temperature and

11  dissolved -- oxygen; true?

12     A.  Yes.

13     Q.  There is a relationship between water

14  temperature and dissolved oxygen; true?

15     A.  Correct.

16     Q.  Can you explain that relationship, please, with

17  reference to your declaration or otherwise?

18     A.  Yeah.  So colder water will hold -- dissolved

19  oxygen has a saturation point in the water, and colder

20  water can hold somewhat more dissolved oxygen than

21  warmer water.

22     Q.  All right.  And paragraph 17 of your

23  declaration, if you want to turn to that?  I'm

24  screen-sharing it, for the record.  And that paragraph

25  appears on page -- document page 8, PDF page 9, Bates

Page 101

1          A.  Yes.

2          Q.  All right.  My question about that sentence was

3     whether Figure 9, which we looked at earlier together

4     in Exhibit 5, which I am now screen-sharing -- whether

5     the -- Figure 9 shows the results of the analysis

6     described in paragraph 61.

7          A.  You're not sharing a figure right now.

8          Q.  Can you now see Figure 9?

9          A.  Yes, I see it now.

10         Q.  And the question was --

11         A.  I'm sorry.  The question?

12         Q.  The question is, in paragraph 61, you say, "We

13    used code to develop appropriate confidence intervals

14    for TDM and while doing so identified serious problems

15    that have not previously been disclosed or considered."

16              And my question was, does Figure 9 show the

17    results of your use of code to develop appropriate

18    confidence intervals, as described in paragraph 61?

19         A.  It -- it does describe the generation of

20    confidence intervals.  It isn't getting at the other

21    problems that are alluded to in paragraph 61.

22              MS. WINSOR:  I am going to mark now another

23    document momentarily.

24              (Whereupon, Plaintiffs' Exhibit 9 was marked

25              for identification.)

Veritext Legal Solutions
866 299-5127

1              And the detailed methods for estimating the

2     parameters that compose the Martin model was really not

3     well described in that -- in that paper, was not part

4     of the paper or the supplementary materials.

5         Q.  So focusing in on the question, response was

6     explanation, which you are fully welcome to give, "Yes,

7     it has been peer-reviewed"; correct?

8              MR. MUELLER:  Mischaracterizes prior testimony.

9              THE WITNESS:  There is a publication that has

10    gone through peer review, but that doesn't necessarily

11    mean that everything in the publication has been

12    reviewed in the manner that it should be.

13    BY MS. WINSOR:

14        Q.  Is this litigation the first time that you have

15    ever provided an opinion regarding the Martin model?

16        A.  No.

17        Q.  When did you first offer an opinion regarding

18    the Martin model?

19              MR. MUELLER:  Vague.

20              THE WITNESS:  Assuming that you mean a formal

21    opinion in a legal setting, and I believe that would be

22    the NRDC litigation in 2018 in my expert report for

23    that.

24    BY MS. WINSOR:

25        Q.  And there have been responses to the opinions

1        A.  I don't -- I don't think that that's -- that it

2    was programmed in that way deliberately.  And I don't

3    even think that's how it -- how it works.

4            I think the model -- the model provides results

5    that have been misinterpreted and misunderstood because

6    there hasn't been enough discussion about how the --

7    how the model was developed and the parameter estimates

8    that it provides.

9        Q.  Was this Technical Memorandum the first time

10   that you raised concerns regarding the frequentist

11   methods in the Martin model to NMFS?

12       A.  Well, that's a little bit difficult to answer

13   because we did not -- we originally requested the

14   frequentist code in October, and we didn't receive

15   that.  We received the Bayesian code.

16           And then it wasn't until December 17th that we

17   received the frequentist code with the statement that

18   that was the code that the science center was relying

19   on for estimating TDM.

20           So it was only after that and working with that

21   code that we, you know, found what we did with it.

22       Q.  And prior to the discussion and response

23   described in this Technical Memorandum, have you

24   previously raised other concerns regarding the Martin

25   model with NMFS?

Veritext Legal Solutions
866 299-5127

1          A.   Yes.

2          Q.   And did you get a response to those concerns?

3          A.   Not a response that -- that was constructive,

4     no.

5          Q.   You got a response, though; correct?

6          A.   Well, a nonconstructive response isn't -- isn't

7     a good response, in my view.

8          Q.   Is it fair to say that reasonable scientists

9     can disagree about the data points that you have

10    presented in your prior communications with NMFS?

11              MR. MUELLER:  Vague.

12              THE WITNESS:  Yeah, I think -- I think there

13    can be reasonable interpretations and discussion of the

14    methodology and the consequences.  That hasn't

15    happened, and that's part of the problem, you know.

16              I -- it's my opinion, having reviewed this

17    stuff pretty carefully and worked with Alex, that these

18    are serious issues, that there isn't a -- there isn't

19    an answer that involves that you're wrong -- or that

20    we're wrong and there's nothing here and that the

21    Martin model is appropriate for estimating temperature-

22    dependent mortality with -- or Tcrit with the precision

23    with which it's been applied to management problems.

24              I don't -- I don't see that being an outcome of

25    that kind of a discussion.  We just haven't had that

                                        Page 120

1          Q.  Why did you choose those years for the data

2     used to prepare this table?

3          A.  Are you referring to the fact that I excluded,

4     like, three or four years?

5          Q.  Yes.

6          A.  Yeah, it is explained in the figure caption,

7     but what I was trying to convey here is, if you ignore

8     years where things have been off, either because of

9     temperature or thiamine, to depict what the general

10    relationship is between female abundance and egg-to-fry

11    survival, that there is some evidence of density

12    dependence; that the more spawners you have, the lower

13    egg-to-fry survival you will get.

14          So it was appropriate to leave those out just

15    to kind of demonstrate that there is this relationship

16    that occurs independently of these other things that we

17    know have happened in recent years.

18          Figure 10 depicts all the data points,

19    including the other years.

20          Q.  Wasn't it a primary criticism that you have of

21    the Martin model that it excludes other factors to

22    focus on temperature?

23          A.  I -- I wouldn't put it that way, no.

24          Q.  Have you done something similar here?  You've

25    excluded other factors to focus on what you wanted to

Page 129

1          Do you have that in front of you?

2      A.  I do.

3      Q.  And in the latter part of this paragraph, in

4  particular, but in general, this paragraph is

5  describing a field survey done on the Feather River,

6  correct, in 2004?

7      A.  Yeah.  That's lines 5 through 8 on page 7?  Is

8  that what you're referring to?

9      Q.  Yes, I am.

10          Were those -- was that field survey a survey of

11  winter-run Chinook salmon?

12      A.  It was not.  It was a survey of gravel

13  conditions -- spawning gravel conditions in the Feather

14  River where there's spring-run and fall-run Chinook.

15      Q.  The Feather River is not identical to the

16  Sacramento River; true?

17      A.  Well, no river is identical to the Sacramento

18  River, but it's similar, like the other rivers I cited,

19  in that it's downstream of a major impoundment that

20  affects gravel quality and quantity.  And it's -- it is

21  regulated.

22          So there haven't -- unfortunately, there have

23  not been a lot of studies of this issue in the

24  Sacramento River, though there have been a lot of

25  efforts to enhance gravel, and that's why I'm bringing

Page 145

1      in all the data that's relevant from other Central

2      Valley systems that are as comparable as we can get to

3      the Sacramento River.

4          Q.  Do you agrees that these 18-year-old data from

5      the Feather River do not represent current conditions

6      in the Sacramento River today?

7          A.  Yeah, I don't -- I don't believe I have

8      represented the data that they are representative of

9      the Sacramento River today.  They're just a point of

10     reference due to the lack of other data.

11              And I would add, too, that I did report data

12     that we did collect in the summer in the Sacramento

13     River that would be specific to that.

14         Q.  In this same paragraph, you discuss a study --

15     a field survey done in the American River; correct?

16         A.  Correct.

17         Q.  And same question for that survey.  Was that a

18     survey of winter-run Chinook?

19         A.  No.

20         Q.  I'm going to move to paragraph 21.  For the

21     record, paragraph 21 begins on document page 9 and

22     spills over to document page 10.  It starts Bates

23     number P_CAVALLO_24 to P_CAVALLO_25.

24              Have you found that paragraph?

25         A.  Yes.

                                                Page 146

1           Q.  Is it fair to say in this paragraph 21, you're

2      criticizing other scientists for not discussing the

3      existence of a fish hatchery in offering their opinions

4      in this case?  In both paragraph 21 and paragraph 22.

5           A.  No, I don't think that's accurate.

6           Q.  Are you critical of other experts in this case

7      for not analyzing fish hatcheries in offering their

8      opinions?

9           A.  I pointed out that it was not something that

10     they had considered and that it needs to be considered

11     because those are a part of the ESA-listed population.

12          Q.  Is it your opinion that the existence of a fish

13     hatchery is relevant to how much water should be

14     released from Shasta Dam in this water year?

15               MR. MUELLER:  Vague.  Incomplete hypothetical.

16               THE WITNESS:  I think it's relevant in the

17     sense that I brought it up in my declaration, that

18     we're trying to assess risk of irreparable harm for the

19     population.

20               I don't think it necessarily affects how you

21     manage the river, but it's important when you're

22     assessing the consequences of, you know, the last few

23     years and what happened previously that that context

24     include the operation of this hatchery, which is unique

25     in the Central Valley and actually being managed in a

                                                      Page 147

1    of you; correct?

2         A.   Yeah.

3         Q.   There is Twitter handle, DeMaxwell@bcavallo.

4              Do you see that?

5         A.   Uh-huh.

6         Q.   And that is your Twitter handle?

7         A.   Yes.

8         Q.   And I'm going to read that into the record for

9    those that maybe can't see it:

10             "We found this out this week, that most

11   (approximately 80 percent) of the fish used as

12   winter-run broodstock at LNSFH this year were hatchery

13   returns.  Lots of wild fish in the river, but the

14   Keswick trap can't catch them.  Relatively easy problem

15   to solve but going unaddressed."

16             Did I read that properly?

17        A.   Yes.

18        Q.   And did you write that tweet and tweet it on

19   November 6, 2021?

20        A.   Yes.

21        Q.   Does it concern you that approximately

22   80 percent of the fish used as winter-run broodstock at

23   LSNFH were hatchery returns?

24        A.   Yeah, it does concern me.  That's why I posted

25   on it.  This is something I would like to have --

Page 161

1    is Mr. Cavallo's declaration, PDF page 24, document

2    page 23, Bates P_CAVALLO_38.  Paragraph 46 appears on

3    this page.

4            In paragraph 46, you state that "Estimated

5    ETF" -- or egg-to-fry -- "survival was relatively low

6    in 2020."

7            Are you able to quantify what you mean by

8    "relatively low" in this sentence?

9        A.  Yeah.  By referring to my Figure 10, the -- the

10   egg-to-fry survival was lower for 2020 than it has been

11   for any year except '14, '15, and '21.

12       Q.  So it's fair to say that --

13       A.  It was low but not the lowest.

14       Q.  Fair to say egg-to-fry survival was not good;

15   true?

16       A.  Relative to the other years, yeah, it wasn't --

17   it was lower than you'd expect.  I wouldn't say that it

18   was -- you know, again, the context here is evaluating

19   the idea that there was an irreparable harm, and I

20   don't -- I don't agree with that conclusion.

21           MS. WINSOR:  All right.  I'm going to mark

22   Exhibit 13, I believe.

23           And, Colleen, this will be Twitter 12.

24           (Whereupon, Plaintiffs' Exhibit 13 was marked

25           for identification.)

Veritext Legal Solutions
866 299-5127

1     A.   Yes.

2     Q.   And then below, it says, "Ray Hilborn observed,

3   'Critical peer review has been replaced by faith-based

4   support for ideas and too many scientists have become

5   advocates.'"

6          Have I read that correctly?

7     A.   Yes.

8     Q.   Do you reject the idea of peer review?

9     A.   Not at all.

10    Q.   Do you believe peer review is important?

11    A.   I do believe it's important.

12    Q.   Have your opinions and conclusions in this case

13  have been peer reviewed?

14    A.   By definition, no, although some of the things

15  that are touched on in the blog post that are here are,

16  you know, in peer-reviewed papers, mine and others.

17    Q.   Do you consider yourself to be a maverick in

18  your community?

19          MR. MUELLER:   Vague.  Argumentative.

20          THE WITNESS:   I consider myself to be somebody

21  that follows the data and is willing to, you know, look

22  at the data and draw conclusions, even if the

23  conclusions aren't necessarily what everybody agrees

24  with; also somebody that will change my mind

25  180 degrees when presented with data that supports --

Page 170

1          Q.   You've expressed a negative view about the NRDC

2     and Golden Gate Salmon, who are the plaintiffs in this

3     case, in this post; correct?

4               MR. MUELLER:   Objection.   Mischaracterizes his

5     testimony.   Mischaracterizes the exhibit.

6               THE WITNESS:   Yeah, I don't -- I don't think

7     that characterization is accurate.   I mean, what I see

8     is me reaching out, trying to engage on science, and

9     being rebuffed.

10    BY MS. WINSOR:

11         Q.   Why were you engaging with the plaintiff in

12    this case on Twitter?

13              MR. MUELLER:   Mischaracterizes the --

14    BY MS. WINSOR:

15         Q.   Why were you --

16              MR. MUELLER:   -- the prior testimony.

17    BY MS. WINSOR:

18         Q.   -- engaging with a party in the Pacific Coast

19    Fisheries Association case on Twitter?

20              MR. MUELLER:   Lacks foundation.   Calls for

21    speculation.   Mischaracterizes prior testimony, and

22    mischaracterizes the document, the exhibit itself.

23              THE WITNESS:   I'm not an attorney, so I

24    don't -- I don't view things through that lens.   I'm a

25    scientist.   If there is an opportunity to engage on

Page 189

1    science in a way that I think could be constructive,

2    then I will do that.

3    BY MS. WINSOR:

4        Q.  Is there something that inspired you to respond

5    to this because it was directed at the State Water

6    Contractors?

7        A.  Well, the article went down, so I can't see it

8    anymore.

9        Q.  Beginning of the feed referenced the State

10   Water Contractors.  So my question was if that caught

11   your attention, because the State Water Contractors

12   were mentioned at the beginning of the feed --

13       A.  I don't recall.

14       Q.  -- if that was part of the reason why you

15   responded?

16       A.  Yeah, there's lots of stuff that flies by on

17   Twitter, and 99 percent of it, I don't respond to.  And

18   why something grabs me has more to do with what other

19   stuff I'm reading or what's on my mind or...

20            So I don't think there's any meaning to that.

21            MS. WINSOR:  Give me just a short break.  I

22   think that's it for me, unless your counsel have

23   questions or other folks have questions, but I do want

24   to take just a short break and look at my notes.  Maybe

25   a three-minute, five-minute break, and then I'll let

Page 190

1    STATE OF CALIFORNIA

2

3    REPORTER'S CERTIFICATE

4

5           I, EARLY LANGLEY, a Shorthand Reporter, State

6    of California, do hereby certify:

7           That BRADLEY CAVALLO, in the foregoing

8    deposition named, was present via Zoom and by me sworn

9    as a witness in the above-entitled action at the time

10   and place therein specified;

11          That said deposition was taken before me via

12   Zoom at said time and place, and was taken down in

13   shorthand by me, a Certified Shorthand Reporter of the

14   State of California, and was thereafter transcribed

15   into typewriting, and that the foregoing transcript

16   constitutes a full, true and correct report of said

17   deposition and of the proceedings that took place;

18          That before completion of the proceedings,

19   review of the transcript was requested.

20          IN WITNESS WHEREOF, I have hereunder subscribed

21   my hand this 21st day of January, 2022.

22

23

24

     EARLY LANGLEY, CSR NO. 3537

25        State of California

                                        Page 194

# Exhibit 3

### 3.1.1   Cold Water Pool Management

The proposed action proposes to improve cold water pool management so that Shasta Reservoir is generally held higher than under current operations by May 1. This approach will allow Reclamation to better manage the limited cold water resource to improve Winter-run Chinook salmon egg survival. The tiered approach recognizes the substantial influence of hydrology on available cold water and targets a temperature of 53.5°F in the upper Sacramento River above Clear Creek at the Clear Creek California Data Exchange Center temperature gauging station from May 15 to October 31. Reclamation would manage water temperatures based on the following tiers:

- Tier 1 – Targets 53.5°F or lower starting May 15
- Tier 2 – Targets 53.5°F during critical egg incubation period
- Tier 3 – Targets 53.5-56°F during critical egg incubation period; consider intervention measures in lower Tier 3 years
- Tier 4 – Targets 56°F or higher; consider intervention measures

EXHIBIT
6

P_CAVALLO_00063

| Population | $N$ | $\hat{S}$ | 10-year trend (95% CI) | Recent Decline (%) |
|---|---|---|---|---|
| LSNFH winter chinook | 645 | 215.0 | 0.102 (-0.019, 0.222) | 2.7 |
| SR winter-run chinook | 11125 | 3708.3 | -0.155 (-0.345, 0.034) | 67.4 |

The observed levels of hatchery influence exceed the low-extinction risk criteria met in the previous viability assessment and place the genetic integrity of the population at a moderate risk of extinction (Figure 2; Lindley *et al.* 2007). Since the beginning of hatchery production at LSNFH in 1997, the proportion of SR winter-run Chinook salmon spawning in the river that is of hatchery origin has increased (Figure 2). Prior to 2005, the proportion of LSNFH-origin spawners in the river was between 5% to 10%, consistent with guidelines from the Hatchery Scientific Review Group for conservation hatcheries (Figure 2; California HSRG 2012). However, the hatchery proportion has increased since 2005 and reached ~20% in 2005, 2014, and >30% in 2012. The average over the last 12 years (approximately four generations) is 13% (SD= ±8%) with the most recent generation at 20% hatchery influence, placing the population at a moderate risk of extinction (Table 7; Figure 3).

EXHIBIT
11



# Tweet

**Ryan Sabalow** ✓ @RyanSabalow · Jan 3

Everyone knew things were looking awful for the winter run this summer, but the death toll was unprecedented for this unique species of Chinook that survived for eons spawning in frigid spring fed creeks during the middle in California's blast-furnace summers. #cawater

> **Dale Kasler** ✓ @dakasler · Jan 3
> Grim #drought death toll: endangered salmon perished in Sacramento River - reporting with @RyanSabalow sacbee.com/news/californi...

💬 5    🔁 13    ♡ 16    ⬆

**DeMaxwell**
@bcavallo

Replying to @RyanSabalow

Facts that could also have been reported: 1) 800k juvenile winter are estimated to have survived (more than in '14 and '15), and 2) the winter run conservation hatchery will release 500k+ smolts this month. Egg-to-fry survival was not good, but this is not a year class failure.

10:00 PM · Jan 3, 2022 · Twitter for iPhone

**5** Likes

💬    🔁    ♡    ⬆

**Will Satterthwaite** @satterwill · Jan 4
Replying to @bcavallo and @RyanSabalow
Plus ~175K "jump start" fish released in Battle Creek. But also fair to note that 2017 (from 2014 juveniles) escapement lowest on record, 2018 quite low and hatchery-dominated. [Do you have source on 800K? Is that fry-equivalents?]

💬 3    🔁    ♡    ⬆

**Will Satterthwaite** @satterwill · Jan 4
So IMO the real "point" here -- WR escapement in 2024, especially natural-origin, likely to be quite low. How do we make sure that cohort doesn't face similarly poor survival, since there won't be 10K spawners to make up for it?

💬 3    🔁    ♡ 3    ⬆

**Cyril Michel** @cyriljmichel · Jan 4
This is totally the point. Or to flip it, as a result of good conditions and human efforts, we finally had a great return this year and the potential to double down for even better returns in 2024, but the drought and resource management got in the way

💬 1    🔁 2    ♡ 3    ⬆

**Dalton Hance** @TekeliLi · Jan 4
Can we "double down" though given current habitat constraints? Conceptually, there is only so much habitat capacity even in ideal conditions (Battle Creek aside). I'm not sure I know what that is, but perhaps there are estimates out there.

💬 2    🔁    ♡    ⬆

**Cyril Michel** @cyriljmichel · Jan 4
If history is any evidence, it seems there is room for some more growth.

Winter-run Chinook Salmon Returns

## New to Twitter?
Sign up now to get your own personalized timeline!

G  Sign up with Google

 Sign up with Apple

Sign up with phone or email

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

## Relevant people

**DeMaxwell** ✓
@bcavallo    [ Follow ]
Consulting fisheries scientist, former CA state employee, libertarian, small-business owner, bird hunter, dog lover.

**Ryan Sabalow** ✓
@RyanSabalow    [ Follow ]
Duck hunter, dad, provider of shoes for a puppy to chew. Writing about ecological collapses, global plagues and other uplifting topics for The Sacramento Bee.

## What's happening

NCAA Men's Basketball · Last night
**Sooners at Longhorns**

🟠 Houston Chroni... ✓ · This morning
**Years after Hurricane Harvey, Houston homes are in disrepair. Now, the feds want to know why**

🔵 The New York Ti... ✓ · Earlier today
**Why some workers are getting all the Covid tests they need**

Ⓥ Variety ✓ · 3 hours ago
**Ronnie Spector, the girl group icon and leader of the Ronettes, has died at 78**
Trending with Ronnie Spector, Be My Baby

Sports · Trending
**Paolo**
12.5K Tweets

Show more

Terms of Service   Privacy Policy   Cookie Policy
Accessibility   Ads info   More ···
© 2022 Twitter, Inc.

EXHIBIT
13

**P_CAVALLO_00119**

**Don't miss what's happening**
People on Twitter are the first to know.    [ Log in ]  [ Sign up ]

# Exhibit 4

UNITED STATES DEPARTMENT OF COMMERCE
**National Oceanic and Atmospheric Administration**
National Marine Fisheries Service
Southwest Fisheries Science Center
110 McAllister Road
Santa Cruz, CA 95060

December 17, 2021

TO:        Kristen Koch, SWFSC Science and Research Director

FROM:    Steve Lindley, Fisheries Ecology Division Director

RE:        SWFSC Response to SRSC analysis of TDM model used in Martin et al. (2018)

<u>Background:</u> In October 2021 we received a request through the NMFS West Coast Region California Central Valley Office for the code used for estimating $T_{crit}$, $b_t$, and background mortality for the Martin et al. (2018) publication. At that time, we had difficulty identifying the exact code that was used for the publication, and as a substitute we developed a Bayesian fitting procedure that produced identical results to the values published in Martin et al. (2018). We felt that this Bayesian approach would meet the stated needs of the SRSC, as it included additional information on the quantification of uncertainty. We have since identified the original code used for the publication and have included it along with this response. If the issues that were raised regarding the Bayesian analysis are still of interest, our response is below. We apologize for any confusion caused by introducing this alternative approach - it was our good faith effort to meet the needs of the initial request.

<u>Overall Response:</u> We have reviewed the concerns of the SRSC and their consultants and our response is detailed below. Overall, out of the various concerns stated by the SRSC, only one has significant merit in relation to the best fit parameters. This was the concern of the hard-coded acceptance/rejection criteria of 5% in the Metropolis-Hastings algorithm. This was an oversight on our part while testing the model code and we have since resolved this (see Point 2 Response). The results of the model fitting procedure, however, were not sensitive to this oversight and the same best fit parameters of $T_{crit}$ and $b_t$ were obtained after correcting the code. Additionally, while updating the code, we included estimation of background survival and carrying capacity in the fitting routine to align with the methods outlined in Martin et al. (2018). In conclusion, the re-fitting procedure outlined in the document/code sent the WCRO-CCVO is consistently estimating $T_{crit}$ and $b_t$ parameter values as published in Martin et al. (2018).

Detailed comments to individual concerns are below. Comments from the SRSC are italicized with responses from the SWFSC presented below each comment.

<u>*COMMENT 1a:*</u> *The Martin model code uses Bayes theorem to assess the probability of winter run temperature-related survival based on water temperature during incubation and estimates of egg-to-fry survival.  The code, however, implements a combination of the logarithmic and multiplicative forms of the Bayes theorem equation which is not mathematically equivalent to the Bayes theorem equation itself, and potentially a misapplication of the theorem.*

<u>Response:</u>  We do not agree that Bayes theorem was misapplied and do not agree that we are

CAVALLO_002143

using a combination of logarithmic and multiplicative forms Bayes theorem. Specifically, Bayes theorem is defined as:

$$P(H|E) = \frac{P(E|H) * P(H)}{P(E)}$$

Where H is the hypothesis being tested (specifically, a mathematical model and its parameter values) and E is the evidence (i.e. data).

When using Bayesian inference the goal is to estimate the posterior probability [P(H|E)] of model parameters (i.e. $T_{crit}$ and $b_t$ in our case). When E is fixed, as in our case, only the numerator is involved in the calculation. Therefore, the posterior probability is calculated as the likelihood [P(E|H)] times the prior [P(H)].

While it is not entirely clear what the SRSC mean by "combination of logarithmic and multiplicative forms Bayes theorem", in our fitting procedure, we assumed non-informative uniform priors, which equates to P(H) = 1; and therefore only the likelihood function is involved with estimating the posterior probability of the two parameters of the model ($T_{crit}$ and $b_t$). Therefore, whether we treat the P(E|H) as the log-likelihood or likelihood we arrive at the same solution. To make this clear we have updated the code to use likelihood for P(E|H). Results for the best fit parameter were identical as when using log-likelihood.

_COMMENT 1b:_ _Metropolis-Hastings accept/reject criterion used in the code was incorrectly implemented by unconditionally accepting proposed values when it decreases probability (the opposite of what it should do), while also accepting otherwise rejected proposals with a fixed 5% probability.  The accept-reject criterion is designed to ensure that the Markov chain satisfies a condition called detailed balance. This hard coded, unconditional 5% acceptance breaks the detailed balance condition and adversely affects the mathematical integrity and reliability of estimated posterior values for $T_c$ and $\beta_T$._

Response: This comment appears to have two points. Point 1 is that the model is incorrectly accepting proposed parameter values when probability is decreased, and Point 2 is that the hard coded acceptance criteria of 5% affects the integrity and reliability of the model fit for $T_{crit}$ and $b_t$. Each point is addressed separately below.

Point 1 Response: SRSC incorrectly state that the fitting procedure chooses parameter values that have lower probability. This confusion may stem from the model code using log-likelihood rather than likelihood when deciding to accept or reject a new parameter set. Using either log-likelihood or likelihood, however, will produce the same result when this mathematical condition is understood and when using non-informative uniform priors. To make this clear, we have re-fit the model using likelihood and came to the identical solution as when using log-likelihood in the accept/reject criteria. If the SRSC statement were true, it would be exceedingly unlikely that the model fitting routine would converge on a single solution as it did.

Point 2 Response: SRSC correctly state that the unconditional acceptance criteria of 5% does not fulfill the conditions of the Metropolis-Hastings sampling theory. This was an oversight on our part while we were testing the code and we thank the SRSC and their consultants for bringing this to our attention. We have corrected this oversight and re-run the modeling procedure. As can be seen in Figure 1, making this update had little effect on the posterior estimate of the both $T_{crit}$ and $b_t$. Primary changes were that the peak marginal likelihood of $T_{crit}$ shifted slightly up in temperature and converged on a unimodal distribution, while the peak of

$b_t$ was slight reduced. Importantly, however, the parameter set with the highest joint probability density remained unchanged. This last point is important because the fitting routing is maximizing the joint probability based on the data. When using models with more than one parameter, as in our case, it is critical to consider the joint probability and not the marginal probability for inferential purposes.



Figure 1: Plot of the joint PDFs for the $T_{crit}$ and $b_t$ parameter fit using 1996-2015 (prior document using 1997-2015 time series) areal red data with the best fit conditions printed. Note, background survival and carrying capacity were left as free parameters to be fit; results of best fit parameter set for background survival and carrying capacity were 36% and 8,989 respectively.

_COMMENT 2_: _Noisy data on egg-to-fry survival estimates. The "best fit" parameter values for $T_c$ (12.06°C/53.7°F) and $\beta_T$ (0.0237) were identified in the Martin curve fitting procedure. Independent of the coding errors described above, model fitting results do not support any "best fit" parameter values. Instead, fitting results after correction of the coding errors suggest infinitely many combinations of $T_c$ and $\beta_T$, which effects the validity of attempting to model TDM based on the available data._

Response: There is only one point estimate for the parameter set with the highest likelihood (i.e. the best fit parameter set) in our model fitting procedure. While there is uncertainty in any model fitting procedure and the data used, we do not agree with the SRSC that there are "infinitely many combinations" of the best fit parameters. Rather, further exploration of the joint probability density space indicates a clear peak in the joint distribution of parameters. This is best viewed both in 3D and 2D space highlighting the probability density, where a clear zone, i.e. 'peak', of higher density is seen in the 11.8-12.5 ℃ zone on the x-axis and the 0.02-0.05 ℃$^{-1}$ day$^{-1}$ zone on the y-axis (Figure 2).



Figure 2: Plot showing the highest density region (in magenta; density >= 0.9) for the joint PDFs for the $T_{crit}$ and $b_t$ parameter fit using 1996-2015 (prior document using 1997-2015 time series) areal red data. The figure illustrates a clear zone of the parameters that have a higher density, i.e. 'peak', corresponding to a $T_{crit}$ range of 11.8-12.5 °C and $b_t$ range of 0.02-0.05 °C$^{-1}$ day$^{-1}$.

Additional clarifications:

1. We included data for 1996 that we did not have in the original re-fit and we have included background survival and carrying capacity as free parameters to be fit.

2. We have adjusted the dates redds were assumed to be deposited based on the USFW areal redd survey. This was done by assuming redds were deposited 7 days before being observed by the survey. This assumption was made in the original analysis in Martin et al. (2018).

CAVALLO_002146

Water Year 2021 Winter-Run Chinook Temperature-Dependent Mortality Estimate
*Prepared by the Southwest Fisheries Science Center (SWFSC), October 24ᵗʰ, 2021*

This document provides hindcast estimates of temperature-dependent mortality (TDM) for water year 2021. River temperature was generated using the RAFT model with data assimilation and associated TDM estimates using the SWFSC stage-independent temperature mortality model (Martin et al. 2017). Additionally, since the RAFT model showed a bias in predicting temperature during the peak month of observed spawning in June and July, TDM was also estimated using observed water temperatures at the CDEC gauges (KWK, SAC, CCR, and BSF) and linearly interpolating in space between gauge locations.



Figure 1: Differences in daily mean river temperature between CDEC data and the RAFT hindcast model at the KWK, SAC, and CCR gauge. Note: RAFT model error statistics, bias and root mean square error (RMSE), are displayed.



Figure 2: Estimated temperature-dependent egg survival produced by the SWFSC stage-independent model under a 2012-2019 redd distribution (left plot) and 2021 redd distribution (right plot). Note: redd distribution shown as white circles, scaled to the number of redds observed during the aerial survey.

Table 1: Estimated TDM under two spatial and temporal redd distribution using output from the RAFT model and linear interpolation of observed gauge data. TDM estimates were generated for the SWFSC stage-independent temperature mortality model by running the following parameter conditions, $T_{crit}$ = 11.98 °C, $b_T$ = 0.023 °C$^{-1}$ day$^{-1}$.

| Redd distribution (years) | Method to estimate river temperature | Mean Annual TDM (%) |
|---|---|---|
| 2012-2019 | RAFT Model | 77 |
| 2021 | RAFT Model | 70 |
| 2021 | Linear interpolation of observed gauge data | 75 |

Reference: Martin, B. T., Pike, A., John, S. N., Hamda, N., Roberts, J., Lindley, S. T. and Danner, E. M. (2017), Phenomenological vs. biophysical models of thermal stress in aquatic eggs. Ecology Letters 20: 50–59. doi:10.1111/ele.12705

CAVALLO_002147

*Summary Document for re-fitting temperature-dependent egg mortality model*
*Prepared by the Southwest Fisheries Science Center on October, 2021*

The temperature-dependent egg mortality model outlined in Martin et al. 2017 was re-fit using a Bayesian approach. Specifically, the posterior probability density function (PDF) of each model parameter ($T_{crit}$ and $b_t$) was estimated given the model and observations using Metropolis Markov Chain Monte Carlo (MCMC) sampling (Givens and Hoeting, 2012; Metropolis et al., 1953). This approach requires specification of a likelihood function, which assumed that variation of observations from model predictions were normally distributed. Thus:

$$Error = \frac{1}{\sqrt{2\pi\sigma^2}} e^{-\frac{(x-u)^2}{2\sigma^2}}$$

where $x$ is the difference between observed egg-to-fry survival at Red Bluff Diversion Dam (logit-transformed) and model predicted values, $u$ is the mean variation (assumed to be zero), and $\sigma$ is the standard deviation from the mean in variation (assumed to be 1). Each MCMC run comprised three chains of 300,000 iterations with random starting points. Convergence was determined using the Gelman and Rubin diagnostic in the BOA package for R (Brooks and Gelman, 1998; Gelman and Rubin, 1992; Smith, 2007; burn in 5000K, mpsrf <1.1).  Uncertainty around parameter estimates was inferred using 95% Bayesian credible intervals (CI) based on the posterior PDF; calculated using the highest probability density function in the BOA package (Smith, 2007). Figure 1 below is a summary of the results that show parameter estimates of $T_{crit}$ = 12.06 °C (CI = 10.31-15.28) and $b_t$ = 0.026 °C$^{-1}$ day$^{-1}$ (CI = 0.001-0.273).



Figure 1: Plot of joint posterior PDFs for the $T_{crit}$ and $b_t$ parameters fit using 1997-2015 areal red data with best fit conditions printed. Note, background survival was set at 36.6% as in Martin et al. 2017.

**References:**

- Brooks SP, Gelman A. General methods for monitoring convergence of iterative simulations. Journal of computational and graphical statistics 1998; 7: 434-455.
- Gelman A, Rubin DB. Inference from iterative simulation using multiple sequences. Statistical science 1992: 457-472.
- Smith BJ. boa: an R package for MCMC output convergence assessment and posterior inference. Journal of Statistical Software 2007; 21: 1-37.
- Givens GH, Hoeting JA. Computational statistics. Vol 708: John Wiley & Sons, 2012.
- Metropolis N, Rosenbluth AW, Rosenbluth MN, Teller AH, Teller E. Equation of state calculations by fast computing machines. The journal of chemical physics 1953; 21: 1087.
- Martin, Benjamin T., et al. "Phenomenological vs. biophysical models of thermal stress in aquatic eggs." *Ecology Letters* 20.1 (2017): 50-59.

# Exhibit 5

DocuSign Envelope ID: 30756A07-67AE-4077-AD90-F9DE6124830C



**DEPARTMENT OF WATER RESOURCES**
Division of Operations and Maintenance
3310 El Camino Avenue, Suite 300
Sacramento, California  95821

**BUREAU OF RECLAMATION**
Central Valley Operations Office
3310 El Camino Avenue, Suite 300
Sacramento, California  95821

January 18, 2022

Ms. Eileen Sobeck
Executive Director
California State Water Resources Control Board
1001 I Street
Sacramento, California 95814

Subject: Withdrawal of 2022 Temporary Urgency Change Petitioner Regarding Delta Water Quality

Dear Ms. Sobeck,

On December 1, 2021, the U.S. Bureau of Reclamation (Reclamation) and California Department of Water Resources (DWR) jointly submitted a 2022 February through April Temporary Urgency Change Petition (TUCP) to request the California State Water Resources Control Board (State Water Board) consider modifying requirements set forth in Reclamation's and DWR' s water right permit Decision 1641. The primary goal of the TUCP was to conserve upstream storage at all Central Valley Project (CVP) and State Water Project (SWP) (collectively Projects) reservoirs should dry conditions persist through the fall and into 2022. The TUCP is one action of a portfolio of early drought actions that Reclamation and DWR considered to proactively manage the CVP and SWP for beneficial uses during a very challenging period.

October and December hydrology showed a marked improvement from conditions experienced in 2021, and storage conditions improved at Oroville and Folsom reservoirs. In fact, Folsom is currently in flood operation status. However, storage levels at Shasta and Trinity reservoirs continue to be low with relatively lower runoff projections than seen in the central and DWR' s watersheds. Within this context, Reclamation and DWR reviewed the request for the TUCP to determine if it would benefit Shasta and Trinity reservoirs by helping to preserve storage. Although the requested TUCP may result in some storage conservation under certain dry hydrology, the forecasted conditions of 2022 do not appear that this storage benefit would be in either Shasta or Trinity reservoirs. These reservoirs are not expected to be relied upon for meeting Delta outflow and/or salinity requirements in the February through April period due to the expected higher releases from Folsom, and Oroville, if needed, and/or additional systemwide runoff in general.  Reclamation and DWR analyzed this expected benefit under very conservative hydrologic assumptions from the January runoff forecast. As a result, Reclamation and DWR no longer believe there is an urgent need for the February through April modifications contained in the 2022 TUCP. Because of this, Reclamation and DWR are withdrawing the TUCP.

Reclamation and DWR continue to conduct operational studies and plan for a resumption of dry conditions. If those conditions occur, then modifications may be needed to protect upstream storage levels. If future modifications are needed, a separate petition will be filed with supporting information. Reclamation and DWR look forward to cooperatively working with the State Water Board and its staff during this challenging period to manage Delta water resources for the benefit of the people and natural resources of the state of California.

Karla A. Nemeth
Director
Department of Water Resources

Ernest A. Conant
Regional  Director
United State Bureau of Reclamation

# Exhibit 6

Biological Opinion on Long-Term Operation of the CVP and SWP        WCRO-2016-00069

| Source of Uncertainty | Information from biological assessment and Supplemental Reclamation Submissions | How NMFS Applied Assumptions to Address Uncertainty |
|---|---|---|
|  | Anderson model is based on previous (Rombough 1994) analyses, but has not completed a published peer-review process. Martin model is based on a meta analysis of fishery information and has completed the peer-review process. | Considered external reviews and field-testing in assigning weight of evidence applied to methods according to categories identified in Section 2.1 Analytical Approach. Acknowledges the uncertainties and needs for additional research identified in review of Martin et al. (2017) but also that it is a "realistic representation of temperature effects on eggs" (Gore et al. 2018). |
| Uncertainty During Real-Time Implementation of Proposed Action | Annual and seasonal uncertainties with precipitation and runoff, air temperatures, and cloud cover. | NMFS considers that the water temperature that fish experience may exceed 53.5°F, or other temperatures as described in other tiers. |
|  | Uncertainty about forecasted temperature control device performance. | NMFS considers that the water temperature that fish experience may exceed 53.5°F, or other temperatures as described in other tiers. |
|  | Assumptions about actual accretions and depletions in upper Sacramento River may not be accurate | NMFS considers that the water temperature that fish experience may exceed 53.5°F, or other temperatures as described in other tiers. |

A specific example of uncertainty related to real-time implementation of the proposed action is the exposure risk to temperature conditions during summer temperature management. For current operations, Reclamation takes a conservative approach to building storage that starts by targeting minimum flows in the fall and winter until either the reservoir nears the flood control elevation or another requirement, such as Delta water quality, requires increased releases of stored water. With this approach, Reclamation develops a monthly Keswick Dam release forecast using the Shasta end of September carryover storage and various historical hydrologies. The current operations include an interagency workgroup that provides input to Reclamation on taking additional actions, including export curtailments, if necessary, to conserve storage and other protections/measures. Similarly, for the proposed action action component fall and winter refill and redd maintenance, Reclamation is proposing to set minimum fall flows according to Shasta end of September carryover storage.

Reclamation will coordinate under all conditions, and seek technical assistance from NMFS and the FWS regarding species intervention measures only in the driest of the four proposed Tiers (i.e., March 90 percent exceedance runoff forecast indicate May 1 Shasta storage of less than 2.5 MAF). In contrast, the existing process includes monthly consultations between NMFS and Reclamation from the February forecast through the issuance of the Sacramento River temperature management plan in May. These consultations provide NMFS with the opportunity to provide information regarding biological criteria for spring operations of Keswick Dam

A_000080

**Biological Opinion on Long-Term Operation of the CVP and SWP**                    **WCRO-2016-00069**

On August 2, 2016, Reclamation requested using the adaptive management provision in the NMFS 2009 Opinion related to Shasta Reservoir operations. The basis for this request included recent, multiple years of drought conditions, new science and modeling, and data demonstrating the low population levels of endangered winter-run Chinook salmon and threatened CV spring-run Chinook salmon. In response, Reclamation implemented a 2017 pilot approach that applied new science on the thermal tolerance of Chinook salmon eggs (Martin et al. 2016) and which was designed to efficiently utilize Shasta Reservoir's limited supply of cold water by basing the spatial distribution of protective temperatures on the within-season spatial distribution of winter-run Chinook salmon redds. The intent was to provide daily average water temperatures of 53°F or less to the Clear Creek gauging station as a surrogate for the furthest downstream redds. The 2009 RPA requirement was a daily average temperature of 56°F or less at compliance locations between Balls Ferry and Bend Bridge, which are not based on the within-season redd distribution. Under the 2017 pilot approach, along with one of the wettest years on record (in water year 2017), resulted in an estimated 44 percent egg-to-fry survival, one of the highest estimates on record. The pilot approach was implemented in 2018 and is also being implemented in 2019. In July 2019, CDFW aerial redd surveys indicated redd distribution was further downstream than the targeted temperature management location at CCR. Per the request of the fish agencies, and as a result of Reclamation's temperature modeling that indicated the operation was feasible, on August 7, 2019, Reclamation initiated temperature management to target 53.5°F at the Airport Road location. The effects of Sacramento River water-temperature management for listed spring-run and winter-run Chinook salmon eggs on the growth rate of juvenile green sturgeon have been modeled, and there was relatively little impact on the growth rate of the species (Hamda et al. 2019).

*Clear Creek* – 2009 RPA Action I.1.4 Spring Creek Temperature Control Curtain - required Reclamation to replace the Spring Creek Temperature Control Curtain in Whiskeytown Lake by 2011, with the objective to reduce adverse impacts of project operations on water temperature for listed salmonids in the Sacramento River. The curtain was replaced in 2011. In addition, the Oak Bottom Temperature Control Curtain, which is located at the upper end of Whiskeytown Reservoir and intended to enhance coldwater transport from the upper end of the reservoir to the lower reservoir outlets, including Spring Creek Tunnel and Whiskeytown Dam, was replaced in May of 2016. Having both temperature curtains functioning together in tandem enhance cold-water availability in the Spring Creek Tunnel and Whiskeytown Dam outlets, and Reclamation's Technical Service Center is currently evaluating their performance, with a final report expected in 2019.

RPA Action I.1.5 Thermal Stress Reduction **-** required Reclamation to reduce thermal stress to over-summering CCV steelhead and CV spring-run Chinook salmon during holding, spawning, and egg incubation by managing Whiskeytown releases to meet a daily water temperature of (1) 60°F at the Igo gauge from June 1 through September 15, and (2) 56°F at the Igo gauge from September 15 to October 31. Reclamation has operated releases for temperature management since implementation of the 2009 RPA action, though criteria was not met in some years.

The 2009 RPA action also required Reclamation, in coordination with NMFS, to assess improvements to modeling water temperatures in Clear Creek and identify a schedule for making improvements. In the NMFS, 2011 amendment to the NMFS 2009 Opinion, the need to *"explore options to avoid non-compliance with the RPA"* was specified for this action. To date, an assessment of and schedule for making improvements to modeling water temperatures in Clear

A_000204

Biological Opinion on Long-Term Operation of the CVP and SWP                    WCRO-2016-00069

| Water Year Type | Loss Under Current Operating Scenario | Loss Under Proposed Action | Proposed Action minus Current Operating Scenario | Change |
|---|---|---|---|---|
| Below Normal | 10,188 | 12,056 | 1,867 | 18% |
| Dry | 9,743 | 12,478 | 2,735 | 28% |
| Critical | 5,158 | 7,107 | 1,949 | 38% |

**Table 90. Estimated annual loss of California Central Valley steelhead at the export facilities by month for all water types based on the salvage-density method.**

| Water Year Type | Loss Under Current Operating Scenario | Loss Under Proposed Action | Proposed Action minus Current Operating Scenario | Change |
|---|---|---|---|---|
| October | 40 | 60 | 20 | 48% |
| November | 14 | 16 | 2 | 16% |
| December | 43 | 38 | -5 | -12% |
| January | 1,447 | 1,533 | 86 | 6% |
| February | 1,756 | 1,809 | 54 | 3% |
| March | 1,995 | 1,880 | -116 | -6% |
| April | 604 | 1,528 | 923 | 153% |
| May | 354 | 822 | 467 | 132% |
| June | 269 | 267 | -1 | 0% |
| July | 31 | 29 | -1 | -4% |
| August | 3 | 3 | 0 | -1% |
| September | 4 | 4 | 0 | 2% |

NMFS put the combined CCV steelhead loss in a population context (see full caveats in Section 2.5.5.8.3.1) by expressing the estimated annual combined loss as a percentage of the steelhead population in the Delta. These results should be considered a coarse screening level analysis due to limitations of the salvage-density method itself (limited historical time-frame of loss; relatively simple weighting of loss by export changes and no other operational factors) and use of the average annual modeled loss rates (over the 15-year data period) scaled to both low and high population estimates. Since it is likely that annual observed loss in a particular year is correlated with population size, use of the average loss rate likely overestimates the population effect in a low-population year, and underestimates the population effect in a high-population year.

A_000541

**Biological Opinion on Long-Term Operation of the CVP and SWP**                         **WCRO-2016-00069**

- For junctions on both the Sacramento River and San Joaquin River, "…a -5,000 cfs Old and Middle River reverse flow limit provides protection compared to more negative Old and Middle River reverse flow levels that would exert a larger influence on flow routing at distributary junctions and, thus, on juvenile routing and survival." However, the salmonid scoping team "did not conclude at what precise level of Old and Middle River flow more negative than -5,000 cfs exports would begin to affect distributary flows, juvenile routing, and survival", and also noted some technical disagreement on this point.
- Within the interior channels of the South Delta, "…the -5,000 cfs Old and Middle River flow is predicted to be less effective at preventing or minimizing export effects on juvenile routing at junctions and residence times within the interior channels of the South Delta than in the mainstems of the Sacramento River and San Joaquin River…because the export-driven influence on hydrodynamic conditions at a given Old and Middle River flow level increase with proximity to the export facilities.
- The salmonid scoping team noted that there is "inadequate empirical evidence from fish tracking studies to more precisely evaluate junction-specific relationship between distributary flow changes and changes in fish routing and survival. As a results there is uncertainty in relating specific Old and Middle River reverse flow thresholds to overall through-Delta survival.
- The salmonid scoping team concluded that "…route selection is generally proportional to the flow split at channel junctions, and the effect of exports on route selection is strongest at the junction leading directly to the export facilities (i.e., head of Old River)."

We can evaluate some of the conceptual model mechanisms described above based on modeling provided in the ROC on LTO biological assessment. The salvage density modeling shows that salvage and associated loss increases with exports during months when listed salmonids are present in the Delta. Therefore, if fish are present in the vicinity of the export facilities in the south Delta during a time that storm flex export operations are implemented, NMFS concludes there will be an increase in the number of fish entrained into the salvage facilities above that which would have been seen with no increases in exports. Furthermore, since listed salmonids tend to start migrating downstream in response to elevated flows in the Sacramento River basin and San Joaquin River basin waterways, there is a high probability that more fish will be present in the Delta exactly when the CVP and SWP increase their exports. Besides the fish entering the Delta on the elevated storm flows, listed salmonids (especially winter-run Chinook salmon) may already be present in the Delta due to migration earlier in the year. This overlap in fish presence and the potential for combined exports to reach 14,900 cfs can result in increased entrainment risk as a result of the potentially very negative Old and Middle River flows. Reclamation has committed to a risk assessment before implementing a storm flex export operation which could limit risks. Salmonid Scoping Team (2017a) concluded that "…route selection is generally proportional to the flow split at channel junctions, and the effect of exports on route selection is strongest at the junction leading directly to the export facilities (i.e., Head of Old River)." Any fish that originates in the San Joaquin River basin will be at a high risk of entrainment due to the routing of fish through Old River from the Head of Old River. The fish that stay within the main stem San Joaquin River channel at the head of Old River may enter the interior Delta at other junctions and be exposed to the increased foot print of the altered hydrodynamics created by the high level of exports in the channels leading to the pumps. Triggers based on loss density for unclipped steelhead are less likely to happen under the high export condition as greater volumes

531

A_000562

2000 which restored passage to approximately 12 miles of holding and spawning habitat. Other improvements on Clear Creek have included spawning gravel augmentation, floodplain restoration and side channel restoration projects. On the upper Sacramento River, Reclamation and others have been restoring side-channel rearing habitat and augmenting spawning habitat with spawning gravels. On Battle Creek, the Battle Creek Salmon and Steelhead Restoration Project has been improving fish passage and similar actions have been undertaken on Mill Creek and Butte Creek. On Butte Creek, a combination of fish passage improvements and flow and temperature management actions have resulted in significant increases in the population. Reclamation, through the CVPIA, has funded fish screening projects on the largest water diversions in the Sacramento Valley.

The most significant effects of the proposed action on individuals from this ESU are expected to be those of water temperature management in the upper mainstem Sacramento River, spring pulse flows, operation of the Delta Cross Channel gates, and CVP/SWP south Delta export operations. The likely effects on individuals and the viability of populations in the affected diversity groups are reviewed in the following sections.

### 11.3.1  Water Temperature Management in the Upper Sacramento River

Reclamation's management of the cold water pool in Shasta Reservoir, developed to protect the redds of winter-run Chinook salmon, is expected to result in mortality of some eggs and fry of spring-run Chinook salmon between Keswick Dam and the Clear Creek gauge. Temperatures will exceed the lethal temperature of 53.5°F in 76 percent of days during August through October under Tier 1, 80 percent of days under Tier 2, 97 percent of days under Tier 3, and 100 percent of days under Tier 4. NMFS assumes that this is a conservative metric (i.e., overestimates likelihood of egg and fry mortality) because these temperature exceedances would be observed at the Clear Creek gauge at furthest downstream point of winter-run Chinook salmon spawning where the mainstem temperatures are influenced by inflow from warmer tributaries (i.e., many fish will likely spawn further upstream where temperatures would be better). Reclamation therefore proposes to provide flows that result in 53.5°F at the Clear Creek gauge when the working group determines, based on real-time monitoring, that 95 percent of winter-run Chinook salmon eggs have hatched and their alevins have emerged, or on October 31st, whichever is earlier. Although designed to protect redds in the downstream portion of the spawning area, NMFS expects that this action also will reduce the risk of temperature dependent mortality for spring-run Chinook eggs in the upper mainstem spawning area. Considering that the spawning area used by spring-run Chinook salmon overlaps both temporally and spatially with that of fall-run Chinook salmon, it is difficult to estimate the magnitude of the benefit that water temperature management will have on the numbers and productivity of this dependent spring-run population, but NMFS expects it will provide some support for the numbers, productivity, and spatial distribution of the northern Sierra Nevada diversity group.

### 11.3.2  Spring pulse flows in the mainstem Sacramento River

Reclamation's proposal to store cold water in Lake Shasta to protect winter-run Chinook redds will reduce flows in the mainstem Sacramento River during spring when juvenile spring-run Chinook are present. Reclamation therefore proposes to release pulsed flows that improve migration habitat for this ESU when the projected total storage in Shasta Reservoir on May 1st indicates that sufficient cold water will be present for both the pulses and summer cold water

A_000792