UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, *et al*.,<br><br>Plaintiff,<br><br>v.<br><br>GINA RAIMONDO, *et al.*,<br><br>Defendants. | No. 1:20-cv-00431-DAD-EPG<br><br>QUESTIONS/ISSUES FOR FEBRUARY 11, 2022 HEARING |
| THE CALIFORNIA NATURAL RESOURCES AGENCY, *et al*.,<br><br>Plaintiffs,<br><br>v.<br><br>GINA RAIMONDO, *et al.*,<br><br>Defendants. | No. 1:20-cv-00426-DAD-EPG<br><br>QUESTIONS/ISSUES FOR FEBRUARY 11, 2022 HEARING |

On February 11, 2022, numerous motions addressing remand, vacatur, and injunctive relief are set for hearing before the undersigned in the above-captioned related cases: No. 1:20-cv-00431-DAD-EPG, *Pac. Coast Fed'n of Fishermen's Ass'ns, et al. v. Raimondo* ("*PCFFA*"); No. 1:20-cv-00431-DAD-EPG, *Cal. Nat. Res. Agency v. Raimondo* ("*CNRA*"). The court has

1

reviewed all of the briefs and declarations submitted thus far, which raise wide-ranging legal and factual issues. In order to highlight the issues currently of most concern to the undersigned, the court provides the following list of questions/issues which it requests the parties be prepared to address at the hearing scheduled for February 11, 2022 at 9:30 a.m.:

1. On the issue of remand:
   a. Federal Defendants have justified their request for remand in part by indicating that drought frequency and severity is increasing, which has implications for species that were not fully considered in the 2019 biological opinions. How is this not an admission of an Administrative Procedure Act ("APA") violation?
   b. What are the practical reasons why the court should be inclined to allow the PCFFA case to proceed to a decision on the merits at this time?
2. On the issue of vacatur:
   a. Why should the court vacate the 2019 biological opinions when the court has been presented with more than one alternative interim management proposal that proponents assert will address immediate harms while avoiding disruption?
   b. Does PCFFA actually want vacatur if the court adopts an interim injunction that has most of the elements of injunctive relief they have requested?
   c. Moreover, at this point in the water year, could Reclamation even accomplish a complete reversion to the terms of the prior biological opinions?
3. Regarding standards to be applied by the court in deciding the pending motions:
   a. State Plaintiffs argue that the Interim Operations Plan ("IOP") is akin to a "temporary settlement" and is therefore entitled to deference by the court. What does "entitled to deference" mean under these circumstances? If some form of deference applies, what analysis *is* the court required to undertake?
   b. Federal Defendants relatedly appear to argue that the court can dispense with a traditional equitable relief analysis in connection with the court's review of the IOP. From Federal Defendants' perspective, what standard of review should the court apply in connection with its consideration of the IOP?

c. Federal Defendants also strenuously argue that the court need not evaluate the likelihood of success on the merits in the context of its review of PCFFA's request for injunctive relief. Why? Does the Federal Defendants' decision not to defend the biological opinions on the merits operate as a concession that PCFFA has raised serious questions going to the merits of their claims?

4. Factual questions/issues and related legal issues:

   a. What is the latest information regarding the 2022 water supply? When will there be reasonable certainty in that regard? Assuming the court accepts the premise that early-season water curtailments are necessary, can there ever be sufficient certainty as to water supply before it is too late to take that action?

   b. There appears to be general agreement among the experts that winter-run and spring-run salmon suffered significant mortality in the past two years. There is not universal agreement, however, about the long-term impact of this mortality on the species' survival and recovery. Do Defendant Intervenors' experts assert that these two species are likely to recover from a third year of mortality at 2020 and 2021 levels? Even if so, doesn't the ESA permit—if not require—the court to err on the side of protecting the species?

   c. Regarding spring-run. The evidence presented thus far indicates that spring run salmon had extremely high levels of mortality in recent years, but that the most severe mortality occurred outside the influence of Shasta Dam. Is it movants' position that this mortality rate simply puts spring-run salmon at heightened risk and therefore the court must guard against whatever mortality can be controlled by Shasta Dam? The court is also confused as to whether any of the measures proposed by moving parties for Shasta operations uniquely target spring run salmon? If not, then is a finding of irreparable harm to the spring run actually required in order to justify one or the other alterative packages of proposed Shasta related interim relief?

/////

    d.  There remains a dispute over the appropriate target temperature for winter-run egg incubation. The court invites concise testimony related to that dispute.

    e.  Is the half a degree difference between the winter-run egg incubation protective measures proposed in the IOP versus those set forth in PCFFA's proposed injunction material to fish survival? If so, why does the IOP choose the temperature targets it has chosen?

    f.  PCFFA's proposed injunction calls for temperature requirements designed to protect pre-spawning winter run salmon, but Federal Defendants call into question whether imposing this requirement would be a wise use of cold water under the circumstances likely to be presented in the coming year. Where is there evidence in the record to help the court determine what the relative tradeoffs would be in this regard? Should any such use be given lesser priority than temperatures for egg incubation?

    g.  PCFFA also appears to be calling for curtailments of deliveries to senior water rights holders if such curtailments are necessary to meet their proposed temperature requirements on the Upper Sacramento River. The court understands PCFFA's position that holdings in *NRDC v. Norton*, 1:05-cv-1207 (E.D. Cal.), Doc. No. 1314 at 23, suggest that future biological opinions may have to consider whether jeopardy can be avoided without senior contract renegotiation. However, no such process has yet occurred. At the present time, how does Reclamation have the authority to curtail senior contractors beyond any curtailments permitted by the contracts themselves? How would this court have the authority to order Reclamation to perform an act that would constitute a breach those contracts?

    h.  Relatedly, the court reads the IOP as a pledge not to deliver water from Shasta until a temperature management plan is ready, and that even after a temperature management plan is approved that Reclamation will only deliver water to senior contract holders if the habitat goals set forth in the IOP can be met. Is the court understanding the IOP correctly? If so, how is PCFFA's plan for delivery

        curtailments truly distinct from the IOP?

    i. The court understands generally that the moving parties' contend that at least three of the species in question (winter-run, spring-run, delta smelt) are at high risk in the coming year due to mortality suffered in recent years (for the salmonids) and/or lack of a viable population (delta smelt).  The moving parties also point to some evidence suggesting that steelhead have not fared well in recent years either.  However, the court requires assistance in identifying evidence in the record regarding the magnitude of the likely impact on these species from delta operations this coming year.  While it may not be possible to identify specific numbers, what data does currently exist?  In addition, the court needs assistance identifying and understanding the available data on steelhead population trends and whether those trends warrant injunctive relief with respect to steelhead independently of the other species.

    j. When will operators have a sense of whether the 2019 biological opinions will be likely to control Delta operations this year?  If the answer to this question will not be known until it is too late to make a difference, does the law permit the court act without that information and, if so, based upon what evidence?

    k. Is there any material distinction between the IOP and PCFFA proposal regarding the I:E ratio?

    l. Relatedly, the court invites focused testimony on the issue of whether the I:E ratio remains scientifically justified as a fish protection measure and if so for which species.

    m. Regarding stormflex:  The court has reviewed Mr. Herbold's Declaration in which he opines that the IOP's stormflex constraints retain the option of increasing exports "at times of potentially significant risk" to listed species.  Why is the promise that the provision will only be used under the supervision of FWS and NMFS not merely a "trust us" argument?  Why do the proponents of the IOP believe the court should permit stormflex at all?

      n. Regarding PCFFA's delta smelt protective measure, the court invites very brief testimony as to the scientific justification for the proposed seven-day net positive OMR flow requirement.

5. Closing issues: If the court determines injunctive relief is appropriate, should any bond be required?

In light of the above highlighted issues, the court believes a portion of the hearing day should be set aside for legal argument with the remainder set aside for testimony. The court invites the parties to reach an agreement as to the exact schedule for the proceedings on February 11, 2022.

IT IS SO ORDERED.

Dated: **February 7, 2022**

*/s/ Dale A. Drozd*
UNITED STATES DISTRICT JUDGE