DOWNEY BRAND LLP
KEVIN M. O'BRIEN (Cal. Bar No. 122713)
kobrien@downeybrand.com
MEREDITH E. NIKKEL (Cal. Bar No. 254818)
mnikkel@downeybrand.com
BRIAN E. HAMILTON (Cal. Bar No. 295994)
bhamilton@downeybrand.com
SAMUEL BIVINS (Cal. Bar No. 300965)
sbivins@downeybrand.com
621 Capitol Mall, 18th Floor
Sacramento, California 95814
Telephone:   916.444.1000
Facsimile:   916.444.2100

Attorneys for Defendants-Intervenors TEHAMA-COLUSA CANAL AUTHORITY;
RECLAMATION DISTRICT NO. 108, et al.

SOMACH SIMMONS & DUNN
  A Professional Corporation
STUART L. SOMACH (Cal. Bar No. 090959)
ssomach@somachlaw.com
ANDREW M. HITCHINGS (Cal. Bar No. 154554)
ahitchings@somachlaw.com
BRITTANY K. JOHNSON (Cal. Bar No. 282001)
bjohnson@somachlaw.com
JARED S. MUELLER (Cal. Bar No. 257659)
jmueller@somachlaw.com
500 Capitol Mall, Suite 1000
Sacramento, CA 95814
Telephone:   (916) 446-7979
Facsimile:   (916) 446-8199

Attorneys for Intervenor-Defendants
GLENN-COLUSA IRRIGATION DISTRICT, et al.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE CALIFORNIA NATURAL RESOURCES AGENCY, *et al.*,<br><br>             Plaintiffs,<br><br>      v.<br><br>GINA RAIMONDO, *et al.*,<br><br>             Defendants. | Case No. 1:20-cv-00426-DAD-SKO<br><br>**SACRAMENTO RIVER INTERVENORS' RESPONSE TO PLAINTIFFS' OBJECTIONS TO EVIDENCE; OBJECTIONS TO EVIDENCE CITED IN PLAINTIFFS' REPLY**<br><br>Date:    February 11, 2022<br>Time:   9:30 a.m.<br>Judge:  Hon. Dale A. Drozd |

The undersigned Intervenor-Defendants Reclamation District No. 108, *et al*. and Glenn-Colusa Irrigation District, *et al*. (the "SRS Contractors"), and the Tehama-Colusa Canal Authority ("TCCA") (collectively, the "Sacramento River Intervenors") submit the following response to Plaintiffs the California Natural Resources Agency, *et al.*'s ("Plaintiffs") objections to the Sacramento River Intervenors' evidence (Dkt. 252-4, "Plaintiffs' Objections").  As addressed below, Plaintiffs' Objections to the Declaration of Bradley Cavallo ("Cavallo Decl.") are without merit and do not render any of the testimony inadmissible.

The Sacramento River Intervenors also submit objections to the Supplemental Declaration of Bruce Herbold (Dkt. 252-3, "Supp. Herbold Decl.") and the Supplemental Declaration of Les Grober (Dkt. 252-2, "Supp. Grober Decl.").  In deciding the Motion, the Court should disregard the Supp. Herbold Decl. and Supp. Grober Decl. as they are inadmissible under the Federal Rules of Evidence.  The Federal Rules of Evidence apply to evidence submitted to the Court on motion practice.  Fed. R. Evid. 101 (Rules of Evidence apply to all proceedings in the courts of the United States); Fed. R. Evid. 1101 (listing exceptions to Rule 101).  While courts have some discretion to consider inadmissible evidence when a preliminary injunction is urgently needed to prevent irreparable harm before a full resolution on the merits is possible, courts routinely decline to consider, or afford any weight to, such inadmissible evidence in appropriate circumstances.  *See Kitsap Physicians Serv. V. Wash. Dental Serv.*, 671 F. Supp. 1267, 1269 (W.D. Wash. 1987) (refusing to consider affidavits "that would have been inadmissible under Federal Rules of Evidence" and denying preliminary injunction).  Because Plaintiffs have made no showing of urgency justifying reliance on otherwise inadmissible evidence, it is appropriate to hold Plaintiffs' evidence to the usual standards of admissibility for motion practice.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**RESPONSE TO PLAINTIFFS' OBJECTIONS TO EVIDENCE**

| MATERIAL OBJECTED TO: | PLAINTIFFS' GROUNDS FOR OBJECTION | SACRAMENTO RIVER INTERVENORS' RESPONSE | RULING ON OBJECTION |
|---|---|---|---|
| Cavallo Decl. ¶¶ 10, 12, 13 | Fed. R. Evid. (FRE) 702.<br><br>Mr. Cavallo states, "in the summer of 2021, I and two of my colleagues surveyed three separate spawning riffles on the Sacramento River at Redding. We collected data on the characteristics of the spawning riffles and found them to be free of excessive fine sediment and with gravels within the acceptable size range for Chinook salmon spawning."<br><br>Mr. Cavallo contends that his survey demonstrates that the quality of the Sacramento River is better for salmon than the published, peer-reviewed literature suggests.<br><br>From this survey, Mr. Cavallo concludes, "[O]ur measurements of Sacramento River hydraulic conductivity almost certainly underestimated the quality of conditions experienced by winter-run Chinook salmon."<br><br>"The data we collected on the Sacramento River this year, along with evidence from other comparable Central Valley Rivers . . . suggest conditions hypothesized by the Martin papers are not likely to occur for winter-run in the Sacramento River."<br><br>No data have been distributed, and none of this analysis has been peer-reviewed. Mr. Cavallo fails to establish that his survey and related | In accordance with FRE 602 and 702, Mr. Cavallo has both personal knowledge of the surveys that he conducted himself and the expert qualifications to opine on the meaning of such surveys. An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. FRE 703. The distribution of data and peer review are not prerequisites to the admissibility of this sworn testimony. *See, e.g., Kumho Tire Co. v. Carmichael*, 119 S.Ct. 1167, 11178 (1999) ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."); *Summit 6, LLC v. Samsung Electronics Co., Ltd.*, 802 F.3d 1283, 1298 (Fed. Cir. 2015) (expert may express opinions that have not been peer reviewed or published); *and see Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994) ("[T]he advisory committee notes emphasize that Rule 702 is broadly phrased and intended to embrace more than a narrow definition of qualified expert.").<br><br>Rather, in addition to citing to methodological | ☐ Sustained<br>☐ Overruled |

| | | | |
|---|---|---|---|
| | | conclusions are based on sufficient facts and data and are the product of reliable principles and methods that were appropriately applied. | sources that he relied upon (Cavallo Decl. ¶¶ 11-12). Mr. Cavallo presents data on intergravel flow and dissolved oxygen because no published, peer-reviewed data is available for the Sacramento River. Cavallo Decl. ¶¶ 13-14.<br><br>Plaintiffs and their expert fail to acknowledge that Martin et al. (2017) did not collect any field data on intergravel flows or dissolved oxygen occurring in the Sacramento River. | |
| | Cavallo Decl. ¶¶ 14. | FRE 702.<br><br>Mr. Cavallo suggests that old data from the Feather and American Rivers provides useful information for the dissolved oxygen content in the Sacramento River.<br><br>"Data collected from other large Central Valley rivers hosting Chinook salmon spawning also suggests dissolved oxygen is not generally limiting. DWR conducted extensive studies of intergravel flow and dissolved oxygen in spawning gravels of the Feather River (CDWR 2004). They observed mean dissolved oxygen concentrations between 8.5 and 11 mg/L (Table 5.1-6). Similar studies were conducted in Chinook salmon spawning gravels of the American River."<br><br>Mr. Cavallo does not provide a basis for applying these data to winter-run Chinook salmon in the Sacramento River, and admits that conditions in the | In accordance with FRE 702, Mr. Cavallo is qualified to opine on the relevance of data from other rivers to winter-run Chinook, and citation to Dr. Herbold's contrary opinion is not a basis to exclude Mr. Cavallo's expert testimony.<br><br>Regarding Plaintiffs' assertion that the data is "old," this is misleading given that citations are from 2004 and 2018 (i.e., not "old").<br><br>Regarding Plaintiffs' assertion that Mr. Cavallo does not provide a basis for applying these data to winter-run Chinook salmon in the Sacramento River, Mr. Cavallo explains that these data are relevant because, other than the data collected by Mr. Cavallo himself in the summer of 2021, no studies or data are available for the Sacramento River. Cavallo Decl. ¶¶ 13-14.<br><br>Again, Plaintiffs and their expert fail to | ☐ Sustained<br>☐ Overruled |

| | | | |
|---|---|---|---|
| | Feather and American Rivers are not the same as in the Sacramento River. Herbold Decl. ¶ 51; Flannery Decl., Exh. 2, 145:3–146:19. | acknowledge that Martin et al. (2017) did not collect any field data on intergravel flows or dissolved oxygen occurring in the Sacramento River. | |
| Cavallo Decl. ¶¶ 31 (Table 2). | FRE 702.<br><br>By using percentages as data and using single numbers rather than two sets of data, Mr. Cavallo violates standard guidance on how to use his statistic. Herbold Decl. ¶ 17. As one example, the two very small numbers, the smallest overall in fact, have a difference that is very small, but a % deviation that is very large, because the 2.4% "difference" between 5% and 2.6% is a misleadingly large 90% of that tiny 2.6% actual difference. *Id.* | In accordance with FRE 702, Mr. Cavallo is qualified to opine on such matters, and citation to Dr. Herbold's contrary opinion is not a basis to exclude Mr. Cavallo's expert testimony. *See Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 588-89 (7th Cir. 2000) (disagreement between experts is not an adequate basis to exclude testimony); *and see In re Roundup Products Liability Litigation*, 390 F.Supp.3d 1102, 1137 (N.D. Cal. 2018) ("Court may not take sides on questions that are currently the focus of extensive scientific research and debate---and on which reasonable scientists can clearly disagree.") (internal quotations and citations omitted).<br><br>Table 2 speaks for itself as egg-to-fry survival estimates compared to egg-to-fry survival predictions of the Martin model. | ☐ Sustained<br>☐ Overruled |
| Cavallo Decl. ¶¶ 31, 35. | FRE 702.<br><br>Cavallo admits at paragraph 6 that thiamine effects are "uncertain," but by paragraph 35, calls thiamine deficiency "the primary culprit" for the low egg-to-fry survival. He | In accordance with FRE 702, Mr. Cavallo is qualified to opine on the effects of thiamine deficiency on egg or early fry survival.<br><br>Plaintiffs mischaracterize Mr. Cavallo's statements. At Cavallo Decl. ¶ 6, Mr. | ☐ Sustained<br>☐ Overruled |

1778801v2

5

SACRAMENTO RIVER INTERVENORS' RESPONSE TO PLAINTIFFS' OBJECTIONS TO EVIDENCE; OBJECTIONS TO EVIDENCE CITED IN PLAINTIFFS' REPLY

| | | | |
|---|---|---|---|
| | | provides no known scientific basis for the following conclusion:<br><br>"The effects of thiamine deficiency on egg or early fry survival have not been studied for naturally spawning winter-run Chinook salmon, but these effects are expected to be more severe than adverse effects observed in the hatchery or laboratory settings." | Cavallo states that "[l]ower than expected egg-to-fry (ETF) survival in 2020 is most likely a result of thiamine deficiency…" Also, "[l]ower than expected ETF survival in 2021 resulted from an uncertain combination of continued thiamine deficiency, high adult abundance and elevated water temperatures…" Cavallo Decl. ¶ 6.<br><br>At Cavallo Decl. ¶ 35, Mr. Cavallo states that "[t]hiamine deficiency is thought to be an important factor that contributes to relatively poor ETF survival (11%) in 2020 (CDFW 2021a). Thiamine deficiency is the primary culprit for low ETF survival observed in 2020 because water temperatures were cold (averaging 53.8°F at CCR, May-October)."<br><br>Cavallo Decl. ¶¶ 6 and 35 are entirely consistent. Yet Plaintiffs have manufactured a contradiction by erroneously comparing what Mr. Cavallo said about factors influencing egg-to-fry survival in 2020 (thiamine) and factors influencing egg-to-fry survival in 2021 (thiamine, water temperature, and high adult abundance).<br><br>Regarding the basis for Mr. Cavallo's opinion, Cavallo Decl. ¶ 33 cites to the National Marine Fisheries Services webpage describing their study of thiamine deficiency in California Chinook salmon and ¶ 35 | |

1778801v2

6

SACRAMENTO RIVER INTERVENORS' RESPONSE TO PLAINTIFFS' OBJECTIONS TO EVIDENCE;
OBJECTIONS TO EVIDENCE CITED IN PLAINTIFFS' REPLY

| | | | | |
|---|---|---|---|---|
| | | | to CDFW's final winter run juvenile production estimate for brood year 2020. | |
| | Cavallo Decl. Fig. 4. | FRE 702.<br><br>No underlying data or analysis are provided, and Mr. Cavallo himself admits in the caption of this figure that he "cherrypicked" data by omitting certain years in which temperature-dependent mortality and flows would have affected the outcome. Mr. Cavallo fails to establish that this figure is based on sufficient facts and data and is the product of reliable principles and methods that were appropriately applied. Herbold Decl, ¶ 15. | In accordance with FRE 702, Mr. Cavallo is qualified to opine on such matters.  He may base his opinion on facts or data that he has been made aware of or personally observed.  FRE 703.  Alternatively, he may state his opinion – and give the reasons for it – without first testifying to the underlying facts or data.  FRE 705.<br><br>Nevertheless, nowhere does the Cavallo Decl. state that Mr. Cavallo "cherrypicked" data for Figure 4.  Rather, the data for Figure 4 were provided in Table 1 of the Cavallo Decl., with analysis described in the caption of Figure 4.  Mr. Cavallo expressly explained the reasons for excluding certain years "to more clearly depict the relationship between female abundance and egg-to-fry survival in the absence of those factors."<br><br>Furthermore, Dr. Herbold's declaration does not support Plaintiffs' objection.  In Supp. Herbold Decl. ¶ 15, Dr. Herbold appears to accept the density-dependence relationship depicted in Figure 4 and adopts it to help explain discrepancies between observed egg-to-fry survival and Martin model predictions. | ☐ Sustained<br>☐ Overruled |
| | Cavallo Decl. ¶ 37. | FRE 702.<br><br>Mr. Cavallo asserts conclusions | In accordance with FRE 702, Mr. Cavallo is | ☐ Sustained |

| | | | | |
|---|---|---|---|---|
| | | dramatically overestimating passage of winter-run fry. These conclusions are entirely unsupported by reliable data or methods and are not peer reviewed. The adjustments to fish passage are already accounted for in the JPE letter using standard scientific methods. Herbold Decl., Exh. A, p. 6. | qualified to opine on such matters. He may base his opinion on facts or data that he has been made aware of or personally observed. FRE 703. Alternatively, he may state his opinion – and give the reasons for it – without first testifying to the underlying facts or data. FRE 705. Plaintiffs and their expert's disagreement is not a basis for exclusion of expert testimony. *In re Roundup Products Liability Litigation*, 390 F.Supp.3d 1102, 1137 (N.D. Cal. 2018) ("Court may not take sides on questions that are currently the focus of extensive scientific research and debate---and on which reasonable scientists can clearly disagree.") (internal quotations and citations omitted) | ☐ Overruled |
| | | | Nevertheless, Mr. Cavallo analyzed consequences of the United States Fish and Wildlife Service not sampling for two days coincident with a high flow event in the Sacramento River in October 2021. That analysis indicated that winter-run fry abundance may have been underestimated by 60,000 fish. Cavallo Decl. ¶ 37. This represents a 7.5% increase in total estimated abundance. | |
| | Cavallo Decl. ¶ 61. | FRE 702.<br><br>Mr. Cavallo reports unreviewed results of running a revised Martin model:<br><br>"As detailed in Exhibit D, we | In accordance with FRE 602 and 702, Mr. Cavallo has both personal knowledge of the revised model and the expert qualifications to opine on the results. He may base | |

| | | | |
|---|---|---|---|
| | requested and eventually received the analytical code NMFS indicated they have relied upon (and continue to rely on) to estimate TDM. In addition to the foundational problems of the Martin model described previously, we used the code to develop appropriate confidence intervals for TDM, and while doing so identified serious problems that have not previously been disclosed or considered." <br><br> Unlike the Martin model itself, these results have not been published or peer reviewed and should not be considered. Herbold, ¶ 54. Moreover, Exhibit D shows that NMFS has addressed the underlying issues with the model. Cavallo Decl. Ex. D at 3. Mr. Cavallo's document production shows the same. Flannery Decl. Ex. 4 at CAVALLO_002143-CAVALLO_002148. | his opinion on facts or data that he has been made aware of or personally observed. FRE 703. The publication of results and peer review – or Dr. Herbold's agreement – are not prerequisites to the admissibility of this sworn testimony. *Summit 6, LLC v. Samsung Electronics Co., Ltd.*, 802 F.3d 1283, 1298 (Fed. Cir. 2015) (expert may express opinions that have not been peer reviewed or published) <br><br> Plaintiffs mischaracterize Exhibit D. At page 14, Exhibit D concludes: "Even with corrected code, the Martin model remains non-identifiable and thus is not appropriate for estimating parameters needed to make TDM predictions. Furthermore, tests using simulated data where values of $T_c$ and $B_f$ were known demonstrate that noise inherent to currently available field data will inevitably lead to erroneous parameter estimates for the Martin model..." <br><br> Additionally, the document cited by Plaintiffs does not demonstrate that Mr. Cavallo's criticisms of the Martin model have been addressed. In fact, Mr. Cavallo's Exhibit D post-dates Ms. Flannery's Exhibit 4 and, along with the Cavallo Decl., explains the outstanding problems with the Bayesian and frequentist codes of the Martin model. Cavallo Decl. ¶¶ | |

| | | 61-72.  The code "fix" provided by NMFS was for a version of the model that they now claim not to rely on, so the major issues remain and Dr. Herbold makes no attempt to address them. | |

## OBJECTIONS TO PLAINTIFFS' SUPPLEMENTAL EVIDENCE

| MATERIAL OBJECTED TO: | GROUNDS FOR OBJECTION | RULING ON OBJECTION |
|---|---|---|
| Supp. Herbold Decl. ¶ 11, 38, 53. | FRE 403, 901, 1002.<br><br>Although Ms. Flannery authenticated true and correct excerpts from the deposition transcript of Bradley Cavallo (Dkt. 251, Declaration of Colleen R. Flannery ("Flannery Decl.") ¶ 3), Dr. Herbold uses the Flannery Decl. excerpts to mischaracterize Mr. Cavallo's deposition testimony.  As such, Dr. Herbold's testimony is misleading and confuses the issues.  FRE 403.<br><br>Dr. Herbold claims that Mr. Cavallo "estimated during the deposition that the range of temperature-dependent mortality for temperatures of 54 degrees at up to 73 percent mortality, for 55 degrees at up to 87 percent mortality, and of 56 degrees at up to 99 percent mortality."  Supp. Herbold Decl. ¶ 11.  However, the subject of Mr. Cavallo's deposition testimony on this topic was based on results of the Martin model, the very model that Mr. Cavallo opines is unreliable.  Specifically, Mr. Cavallo testified that "this is not reality.  This is the Martin model, and there is a lot of issues underlying even this about whether that's completely accurate or not.  Probably is not."  Flannery Decl. ¶, Ex. 2 at 80:10-13.  Thus, while Dr. Herbold represents that these mortality estimates are Mr. Cavallo's estimates, in fact Mr. Cavallo clarified on the record that these come from the unreliable Martin model.<br><br>Moreover, Mr. Cavallo's deposition testimony states that at 54 degrees it is "about 0 to 73 percent," at 55 degrees it is "about 0 to 87 percent," and 56.5 degrees it "[l]ooks like zero percent mortality up to, | ☐     Sustained<br>☐     Overruled |

1778801v2

10

SACRAMENTO RIVER INTERVENORS' RESPONSE TO PLAINTIFFS' OBJECTIONS TO EVIDENCE; OBJECTIONS TO EVIDENCE CITED IN PLAINTIFFS' REPLY

| | | | |
|---|---|---|---|
| | | you know, 99 percent." Flannery Decl. ¶ 3, Ex. 2 at 77:3-79:8. In fact, rather than opining that the mortality figure from the Martin model is the maximum percentage, as Dr. Herbold represents, Mr. Cavallo testified that it is equally likely that the Martin model's figure would be zero.<br><br>Second, at no point did Mr. Cavallo testify regarding 56 degrees. Plaintiffs' counsel asked Mr. Cavallo about the Martin model's estimates at 56.5 and 57 degrees. Flannery Decl. ¶ 3, Ex. 2 at 78:10-79:13. Estimates of temperature-dependent mortality can vary substantially over small changes in water temperature, so this mischaracterization of testimony regarding water temperatures and mortality estimates is extremely misleading.<br><br>Dr. Herbold's "cherry picking" of the maximum Martin model mortality estimate and mischaracterization of Mr. Cavallo's testimony should, at a minimum, render his testimony inadmissible as improperly authenticated and/or inconsistent with the evidence itself (i.e., the Cavallo deposition transcript) or, at maximum, substantially outweigh any possible probative value. | |
| Supp. Herbold Decl. ¶ 11. | FRE 403, 901, 1002.<br><br>Dr. Herbold misleadingly claims that he agrees "with Mr. Cavallo's findings that predict lower temperature-dependent mortality at 54 and 55 degrees, which are temperatures contemplated by the IOP." Supp. Herbold Decl. ¶ 11. As such, Dr. Herbold's testimony is misleading and confuses the issues. FRE 403.<br><br>However, in his declaration, Mr. Cavallo states that "[w]hen appropriate [confidence intervals] are included [citations omitted], it becomes clear that the different water temperatures recommended and disputed by the Plaintiffs and Federal Defendants result in indistinguishable changes in [temperature-dependent mortality]." Dkt. 333, Declaration of Bradley Cavallo ("Cavallo Decl.") ¶ 59. Mr. Cavallo's deposition testimony is consistent with this point, demonstrating that temperature-dependent mortality is equally likely to be zero as the higher values | ☐ Sustained<br>☐ Overruled |

| | | | |
|---|---|---|---|
| | | suggested by Dr. Herbold.  Flannery Decl. ¶ 3, Ex. 2 at 77:8-79:13.  Dr. Herbold's mischaracterization of Mr. Cavallo's testimony is so misleading and confusing that it substantially outweighs any possible probative value.<br><br>Sacramento River Intervenors object to Dr. Herbold's mischaracterization of Mr. Cavallo's testimony. | |
| | Supp. Herbold Decl. ¶ 10, 41, 43. | FRE 403, 901, 1002.<br><br>Dr. Herbold mischaracterizes the Cavallo Decl. by asserting that Mr. Cavallo stated "that thiamine deficiency is the 'main culprit' in the exceptionally poor survival to hatching in *2021*…" Supp. Herbold Decl. ¶ 11 (emphasis added.).  As such, Dr. Herbold's testimony is misleading and confuses the issues.  FRE 403.<br><br>In fact, Mr. Cavallo stated that "[t]hiamine deficiency is thought to be an important factor that contributed to relatively poor ETF survival (11%) in *2020* (CDFW 2021a). Thiamine deficiency is the primary culprit for low ETF survival observed in *2020* because water temperatures were cold (averaging 53.8°F at CCR, May-October) and because there were fewer than 4,000 female spawners."  Cavallo Decl. ¶ 35 (emphasis added.).<br><br>Dr. Herbold has misleadingly and incorrectly conflated Mr. Cavallo's statements about causes of egg-to-fry survival in 2020 with his statements about causes of egg-to-fry survival in 2021.<br><br>Regarding 2021, Mr. Cavallo stated that "[l]ower than expected ETF survival in 2021 resulted from an uncertain combination of continued thiamine deficiency, high adult abundance and elevated water temperatures…" (Cavallo Decl. ¶ 6.)<br><br>Citing only to Cavallo Decl. ¶ 6, Dr. Herbold invokes the word "uncertain" to claim that Mr. Cavallo has inconsistently evaluated the impact of thiamine deficiency on winter-run Chinook salmon.  However, nothing in Cavallo Decl. ¶ 6 supports his assertion.<br><br>At Cavallo Decl. ¶ 6, Mr. Cavallo states that | ☐ Sustained<br>☐ Overruled |

1778801v2

12

SACRAMENTO RIVER INTERVENORS' RESPONSE TO PLAINTIFFS' OBJECTIONS TO EVIDENCE;
OBJECTIONS TO EVIDENCE CITED IN PLAINTIFFS' REPLY

| | | | |
|---|---|---|---|
| | | "[l]ower than expected egg-to-fry (ETF) survival in 2020 is most likely a result of thiamine deficiency…"  Further, "[l]ower than expected ETF survival in 2021 resulted from an uncertain combination of continued thiamine deficiency, high adult abundance and elevated water temperatures…"  Cavallo Decl. ¶ 6.<br><br>At Cavallo Decl. ¶ 35, Mr. Cavallo states that the magnitude of thiamine deficiency was not "uncertain" in 2020 when it was the only factor that could explain unexpectedly low (11%) egg-to-fry survival.  Mr. Cavallo's testimony is that thiamine deficiency continued to be problematic in 2021, and that an "uncertain combination of thiamine deficiency, high spawner abundance and elevated water temperatures" produced worse egg-to-fry survival in 2021.  Cavallo Decl. ¶ 35.<br><br>Dr. Herbold's mischaracterization of Mr. Cavallo's testimony is so misleading and confusing that it substantially outweighs any possible probative value.<br><br>Sacramento River Intervenors object to Dr. Herbold's mischaracterization of Mr. Cavallo's testimony. | |
| | Supp. Herbold Decl. ¶ 45. | FRE 403, 901, 1002.<br><br>Dr. Herbold claims that "Mr. Cavallo also states that thiamine deficiency effects 'are expected to be more severe' in wild than in laboratories – a statement that has no apparent basis."  Supp. Herbold Decl. ¶ 45.  As such, Dr. Herbold's testimony is misleading and confuses the issues.  FRE 403.<br><br>This is false.  At Cavallo Decl. ¶ 33, Mr. Cavallo provided a citation to the National Marine Fisheries Service webpage describing their study of thiamine deficiency in California Chinook salmon.  It explains why thiamine deficiency effects are likely more severe in the natural environment.<br><br>Dr. Herbold goes on to mischaracterize Mr. Cavallo's opinion by citing to Cavallo Decl. ¶¶ 15 and 33, and then erroneously stating that Mr. Cavallo asserts "that temperature effects are more severe in the laboratory | ☐  Sustained<br>☐  Overruled |

1778801v2

13

SACRAMENTO RIVER INTERVENORS' RESPONSE TO PLAINTIFFS' OBJECTIONS TO EVIDENCE;
OBJECTIONS TO EVIDENCE CITED IN PLAINTIFFS' REPLY

| | | | |
|---|---|---|---|
| | | setting." Supp. Herbold Decl. ¶ 45. | |
| | | This is again false. Nowhere in either of Cavallo Decl. ¶¶ 15 or 33 does Mr. Cavallo make any statement about temperature effects being more severe in the laboratory setting. | |
| | | Dr. Herbold's mischaracterization of Mr. Cavallo's testimony is so misleading and confusing that it substantially outweighs any possible probative value. | |
| | | Sacramento River Intervenors object to Dr. Herbold's mischaracterization of Mr. Cavallo's testimony. | |
| | Supp. Grober Decl. ¶¶ 5-10, 13-14, 16, 24-26, 31-32, 34, 37-41, 44-45, 50, 53-54, 57-60. | FRE 701, 702. As Mr. Grober declares here and in his original declaration (Dkt. 223), he is a hydrologist – not a fisheries biologist. During his January 5, 2022 deposition, Mr. Grober testified that he does not consider himself an expert in fisheries biology, he did not consider any documents in developing his opinions about survival of winter-run Chinook salmon, and he did not speak to any fisheries biologists in developing his opinions. Dkt. 246, Declaration of Samuel Bivins ¶ 4, Ex. C, Transcript of Deposition of Les Grober ("Grober Trans.") at 145:8-9, 147:10-25. Yet in his supplemental declaration, Mr. Grober continues to express expert opinions on issues of fisheries biology. In fact, throughout his supplemental declaration, Mr. Grober mentions "Chinook" 34 times, "salmon" 36 times, "effect/s" to the same 10 times, "harm" to the same 12 times, and "protect/ing/ive/ion of the same 22 times. Mr. Grober's fisheries biology opinions are well beyond the scope of the "scientific, technical, or other specialized knowledge" (i.e., as a hydrologist) on which his opinions are based. Therefore, these objections should be sustained and the fisheries biology opinions disregarded. | |
| | Supp. Grober Decl. ¶¶ 5-8, 11, 13-15, 20, 26, 32- | FRE 701, 702. Neither his declaration nor his curriculum | |

1778801v2

14

SACRAMENTO RIVER INTERVENORS' RESPONSE TO PLAINTIFFS' OBJECTIONS TO EVIDENCE; OBJECTIONS TO EVIDENCE CITED IN PLAINTIFFS' REPLY

| | | |
|---|---|---|
| 35, 37-42, 44-56. | vitae provide a basis for Mr. Grober to testify as an expert on Central Valley Project (CVP) operations or Sacramento River temperature management.<br><br>During his deposition, Mr. Grober testified that "[he] know[s] a lot more than many other people [about CVP operations] but not as much as the people that are the real principal experts." Grober Trans. at 148:5-15.  In other testimonial words, "frankly [Mr. Grober] do[es]n't know what [he] do[es]n't know." Grober Trans. At 28:10-17.  And knowing "more than many" does not satisfy Rule 702's requirement for "scientific, technical, or other specialized knowledge." FRE 702.  Thus, Mr. Grober is not a "real" expert on CVP operations.  Regarding Sacramento River temperature management, Mr. Grober specifically admits that he is not an expert.  Grober Trans. At 149:18-25.<br><br>Yet in his supplemental declaration, Mr. Grober continues to express expert opinions on issues of Sacramento River temperature management.  In fact, throughout his supplemental declaration, Mr. Grober mentions "temperature" management/ control/requirements/profiles/ targets/goals/ problems/compliance/outcomes/objectives 108 times.<br><br>Mr. Grober's CVP operations and Sacramento River temperature management opinions are well beyond the scope of the "scientific, technical, or other specialized knowledge" (i.e., as a hydrologist) on which his opinions are based.  Therefore, these objections should be sustained and the opinions disregarded. | |
| Supp. Grober Decl. ¶ 22 | FRE 403, 901, 1002<br><br>In paragraph 22 of his supplemental declaration, Mr. Grober indicates that Lee Bergfeld, an expert on CVP operations, "confirmed how much wetter the overall conditions were leading up to and through 2021 than were the three years leading up to and through 2015." Mr. Bergfeld did not conduct such an analysis or confirm any such thing.  Mr. Grober also misleadingly suggests that Mr. Bergfeld's declaration agrees that "Sacramento River Watershed unimpaired flow is an excellent measure of | |

15

SACRAMENTO RIVER INTERVENORS' RESPONSE TO PLAINTIFFS' OBJECTIONS TO EVIDENCE;
OBJECTIONS TO EVIDENCE CITED IN PLAINTIFFS' REPLY

| | | |
|---|---|---|
| | water supply for the combined SWP and CVP." Mr. Bergfeld expressed no such opinion. Instead, Mr. Bergfeld opined that "inflow to a reservoir is a key factor in the resulting storage in that reservoir," and that the "difference in inflow to Shasta between 2015 and 2021 is a more important factor in the resulting storage in Shasta in September 2021 than the 2019 Biological Opinions." Mr. Grober's mischaracterizations of Mr. Bergfeld's opinions are misleading. FRE 403. | |
| | Further, Mr. Grober's new analysis is misleading because he fails to analyze how much water from 2019, if any, would have been available as water supply for the CVP/SWP system in 2021. Nothing in Mr. Grober's declaration suggests that water is available for use by the CVP over multiple years, nor does the IOP purport to store two year-old water. Further, as Mr. Bergfeld noted in Table 4 of his declaration, 2019 was a Wet Year. The volumes of water released from CVP and SWP reservoirs for flood control and all Delta outflow in excess of requirements in 2019 must be accounted for to estimate the water supply available for temperature management in 2021,[1] but Mr. Grober has conducted no such analysis. This is unsurprising given Mr. Grober's admitted lack of expertise in CVP operations. Grober Trans. at 148:5-15; 149:18-25. And because Mr. Grober's opinions in paragraph 22 of his supplemental declarations are so unsupported and misleading, the court should decline to consider them. | |
| Supp. Grober Decl. ¶ 27 | FRE 403, 901, 1002<br><br>Paragraph 27 of Mr. Grober's supplemental declaration suggests a connection between Lee Bergfeld's description of Reclamation's historical inability to prepare and obtain approval of a temperature management plan for Shasta operations in Table 3 and paragraph 38 of his declaration with his opinion in paragraph 73 that Reclamation is better suited than NMFS to retaining final authority over operational decisions. No | |

---

[1] *See* Decision D-1641 at p. 188, fn. 2 ("A cap of 10.0 MAF is put on the previous year's index (Z) to account for required flood control reservoir releases during wet years.") (*available at* https://www.waterboards.ca.gov/waterrights/board_decisions/adopted_orders/decisions/d1600_d1649/wrd1641_1999dec29.pdf.)

| | | |
|---|---|---|
| | | such connection exists.  Table 3 and paragraph 38 of Mr. Bergfeld's declaration provide support for his opinion that it is "unlikely that a TMP will be approved under the 2022 IOP by April 1," and in doing so, would prevent Reclamation from fulfilling its non-discretionary duty to furnish water to the SRS Contractors in accordance with their contracts.  Paragraph 78 of Mr. Bergfeld's declaration, on the other hand, summarizes his opinion that the IOP's "decision-making hierarchy for CVP operational issues appears to marginalize Reclamation as one of six voices despite their greater experience, knowledge, and expertise on actual operations and operational decisions." <br><br> Mr. Grober's mischaracterization of Mr. Bergfeld's testimony is so misleading and confusing that it substantially outweighs any possible probative value, and paragraph 27 of Mr. Grober's declaration should be disregarded. | |
| Supp. Grober Decl. ¶ 55 | FRE 403, 901, 1002 <br><br> Paragraph 55 of Mr. Grober's declaration suggests that Dr. Michael Deas's declaration listed the elements of temperature management in a reservoir-river system in order of priority.  Dr. Deas offered no such opinion.  To the contrary, paragraph 14 of Dr. Deas' declaration, in which Dr. Deas writes that "[e]ach of these elements must be comprehensively and collectively considered in determining whether a particular water temperature is achievable at a specific location at any point in time" specifically rejects the notion that reservoir storage is any more important than any other element. <br><br> Mr. Grober's mischaracterization of Dr. Deas' testimony is so misleading and confusing that it substantially outweighs any possible probative value, and paragraph 55 of Mr. Grober's declaration should be disregarded. | |
| Supp. Grober Decl. ¶¶ 11-13. | Courts in the Ninth Circuit typically decline to consider evidence and argument raised for the first time on reply.  *Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1995); *Reyes v. Experian Information Solutions,* | |

|  | |  |
|---|---|---|
|  | *Inc.*, 2017 WL 3575468 at *1 (C.D. Cal. Apr. 18, 2017).  Paragraphs 11-13 of Mr. Grober's supplemental declaration generally discussing the importance of storage in Shasta Reservoir could have easily been raised in Mr. Grober's original declaration, and are not directly responsive to proof adduced in response to Mr. Grober's original declaration. *See Earth Island Institute v. Nash*, 2020 WL 1936701 at *7 (E.D. Cal. Apr. 21, 2020).  Thus, paragraphs 11-13 of Mr. Grober's supplemental declaration should be disregarded. |  |

DATED:  February 7, 2022            DOWNEY BRAND LLP


By:     */s/Meredith E. Nikkel*
        MEREDITH E. NIKKEL
        Attorneys for Intervenors-Defendants TEHAMA-COLUSA CANAL AUTHORITY; RECLAMATION DISTRICT NO. 108, et al.


DATED:  February 7, 2022            SOMACH SIMMONS & DUNN


By:     */s/Andrew M. Hitchings*
        ANDREW M. HITCHINGS
        Attorneys for Intervenors-Defendants GLENN-COLUSA IRRIGATION DISTRICT, et al.