DOWNEY BRAND LLP
KEVIN M. O'BRIEN (Bar No. 122713)
kobrien@downeybrand.com
MEREDITH E. NIKKEL (Bar No. 254818)
mnikkel@downeybrand.com
SAMUEL BIVINS (Bar No. 300965)
sbivins@downeybrand.com
NICOLAS CHAPMAN (Bar No. 340661)
nchapman@downeybrand.com
621 Capitol Mall, 18th Floor
Sacramento, California 95814
Telephone:    916.444.1000
Facsimile:     916.444.2100

Attorneys for Intervenor-Defendants
RECLAMATION DISTRICT NO. 108 and
TEHAMA-COLUSA CANAL AUTHORITY, et al.

SOMACH SIMMONS & DUNN
  A Professional Corporation
ANDREW M. HITCHINGS (Bar No. 154554)
ahitchings@somachlaw.com
BRITTANY K. JOHNSON (Bar No. 282001)
bjohnson@somachlaw.com
JARED S. MUELLER (Bar No. 257659)
jmueller@somachlaw.com
500 Capitol Mall, Suite 1000
Sacramento, CA 95814
Telephone: (916) 446-7979
Facsimile:  (916) 446-8199

Attorneys for Intervenor-Defendants GLENN-COLUSA IRRIGATION DISTRICT, et al.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

| | |
|---|---|
| PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, *et al.*,<br>       Plaintiffs,<br>v.<br>GINA RAIMONDO, *et a*l.,<br>       Defendants. | Case No. 1:20-cv-00431-JLT-EPG<br>Case No. 1:20-cv-00426-JLT-EPG<br><br>**SACRAMENTO RIVER INTERVENORS' OBJECTION BRIEF TO INTERIM OPERATIONS PLAN**<br><br>Date:  TBD<br>Time:  TBD<br>Dept.  5<br>Judge:  Jennifer L. Thurston |
| THE CALIFORNIA NATURAL RESOURCES AGENCY, *et al.,*<br>       Plaintiffs,<br>v.<br>GINA RAIMONDO, *et a*l.,<br>       Defendants. | |

I. **INTRODUCTION**

State Plaintiffs' and Federal Defendants' efforts to declare success in this year's Shasta operations under the Interim Operations Plan ("IOP") is premature at best and misleading at worst. While data regarding winter-run Chinook salmon rearing is still being collected and analyzed, preliminary reports indicate very low juvenile production notwithstanding operations under the IOP. Given this poor performance for winter-run, the State Plaintiffs and Federal Defendants have failed to meet the Court's expectation to provide a "more nuanced consideration"[1] of the tradeoffs associated with their continued request to operate Shasta to meet a single metric for a single life stage of a single species as is called for by the IOP. Experience and data derived from this year's Shasta operations demonstrate the proposed extension of the IOP ("IOP Extension") is not necessary, fair, reasonable, equitable, and will continue to violate state and federal law and public policy. Better outcomes are indeed possible if the State Plaintiffs and Federal Defendants are allowed greater flexibility in their operations and immediately undertake the hard work to address the numerous stressors that adversely affect winter-run. The Court should reject the State Plaintiffs' and Federal Defendants' unorthodox request to extend the IOP and instead restore the status quo to the 2019 biological opinions for the coordinated operation of the Central Valley Project and State Water Project.

II. **ARGUMENT**[2]

A. **Extending The IOP Is Unnecessary Because It Does Not Prevent Any Appreciable Harm To Winter-Run Chinook Salmon That Would Have Occurred Under the 2019 NMFS BiOp.**

To the extent the IOP's purported necessity may be relevant to the analysis, extending the IOP is unnecessary because Shasta operations under the IOP in 2022 did not avoid "appreciable (i.e. considerable or substantial) harm" to winter-run Chinook salmon that would have occurred under the National Marine Fisheries Service's 2019 Biological Opinion for the Long Term

---

[1] Order Granting Motion to Remand without Vacatur, Stay, and Imposing Interim Injunctive Relief, *PCFFA* ECF No. 394, *CNRA* ECF No. 276, at 107 ("IOP Order").
[2] Sacramento River Intervenors concur with and join Sections I and II of Defendant-Intervenor State Water Contractors' Response to Federal Defendants and State Plaintiffs' Proposed Interim Operation Plan.

Operation of the Central Valley Project and State Water Project ("2019 NMFS BiOp").  *Pacific Coast Federation of Fishermen's Associations v. Gutierrez*, 606 F.Supp.2d 1195, 1213 (E.D. Cal. 2008).  The reasons put forward by the State Plaintiffs and Federal Defendants misrepresent the IOP's goal.  *See generally,* Fed. Defs. and State Pls. Joint Status Report, *PCFFA* ECF No. 406, *CNRA* ECF No. 286 ("JSR"); *see also* Decl. of Les Grober In Support of Extension to Interim Operations Plan, *PCFFA* ECF No. 406-6, *CNRA* ECF No. 286-6 ("Grober Decl.") at ¶ 19.[3]  The IOP is supposed to prescribe "goals and process to achieve better outcomes than the BiOp," (IOP Order, at 107), thus avoiding "appreciable harm" to the winter-run Chinook Salmon that would have occurred under the 2019 NMFS BiOp.  *Pacific Coast Federation of Fishermen's Associations*, 606 F.Supp.2d at 1213.  The State Plaintiffs and Federal Defendants claim the process resulted in greater carry-over storage and greater temperature control, but do not meaningfully connect how the process purportedly avoided appreciable harm to the species that would have occurred under the 2019 NMFS BiOp.  JSR, at 10–14.  As explained below, the IOP did not do so.

    1.  **The IOP's multi-agency approach is also called for under the 2019 NMFS BiOp.**

The IOP's multi-agency approach to Shasta operations that Federal Defendants and State Plaintiffs described for 2022 is precisely what is contemplated under the 2019 NMFS BiOp approach for Tier 4 years.  *Compare* Decl. of C. Marcinkevage Decl. In Support of Extension to Interim Operations Plan, *PCFFA* ECF No. 406-4, *CNRA* ECF No. 286-4, at ¶¶ 12–13 ("Marcinkevage Decl."); *with* Decl. of N. Smith, *PCFFA* ECF 120-4, Ex. D at 35 ("2019 NMFS BiOp") (conferring with Sacramento River Settlement Contractors on measures to conserve storage "that may be beyond Reclamation and DWR's discretion"), National Marine Fisheries Service Admin. Record, *CNRA* ECF No. 143-6 (2019 NMFS BiOp).  However, the 2022 IOP's

---

[3] Where applicable, ECF citations are to the dockets in both *Pacific Coast Federation of Fishermen's Associations, et al., v. Raimondo*, Case No. 1-20-cv-00426-JLT-EPG and *California Natural Resources Agency v. Raimondo*, Case No. 1-20-cv-00431-JLT-EPG, and pinpoint citations are to ECF pagination unless specified otherwise.

Shasta Planning Group only focused on controlling one variable, temperature, instead of considering the multitude of important variables that impact winter-run survival.[4]  As a result, the IOP's multi-agency approach was not necessary to avoid appreciable harm to winter-run Chinook salmon that would have occurred under the 2019 NMFS BiOp.

    **2.**    **Results of 2022 Shasta operations do not mean the IOP met its goals or demonstrate that the IOP was necessary.**

State Plaintiffs and Federal Defendants claim that 2022 operations achieved the goals of the IOP because they resulted in higher carry-over storage in Shasta and temperature targets were achieved.  *See* JSR, at 4:7–8.  Data and experience under the IOP in 2022 show that the IOP alone did not cause higher carry-over storage in Shasta, and further, that the IOP failed to secure meaningful temperature control or water temperatures that avoided appreciable harm to winter-run that would have occurred under the 2019 NMFS BiOp.

First, the State Plaintiffs mistakenly credit reduced deliveries for achieving higher end-of-September Shasta Storage in 2022.  JSR, at 13:11–15 (citing Grober Decl., at ¶¶ 19–20).  The State's expert, Mr. Grober, argues that reduced water deliveries resulted in higher end-of-September storage in Shasta.  Grober Decl., at ¶¶ 19–24.  He bases his argument on comparing the difference in end-of-September storage between 2022 and 2021 to the difference in end-of-September storage between 2020 and 2019.  *Id.* at ¶ 21.  Using this flawed comparison, Mr. Grober asserts that despite less inflow into Shasta in 2022 than in 2020, Shasta end-of-September storage in 2022 increased, whereas end-of-September storage decreased between 2020 and 2019.  *Id.* at ¶¶ 21–22.  He attributes the net loss to end-of-September storage in 2020 to water deliveries, and does not explain how other hydrological conditions have no impact on the end-of-September storage.  *Id.* at ¶¶ 19–24.

However, that operations under the IOP included reduced diversions by the Sacramento River Settlement Contractors does not, by itself, mean that Shasta's end-of-September storage levels were the direct result of the IOP.  Decl. of Lee G. Bergfeld, dated Oct. 31, 2022, ("Bergfeld

---

[4] See *infra*, II.B.

Decl."), at ¶¶ 13–18.  Mr. Grober does not account for key hydrological differences in his analysis, like higher than forecasted inflow into Shasta and tributaries of the Sacramento River in 2022, which explains higher carry-over storage in Shasta compared to 2021.  *Id*.  Shasta's end-of-September storage is a result of higher than forecasted flow into Shasta from April precipitation and fewer releases from Keswick, which is a direct result of those precipitation events.  *Id.*, at ¶¶ 13–17.  The same precipitation that resulted in higher inflow into Shasta also caused higher inflow into streams tributary to Sacramento.  *Id*. at ¶ 17.  Higher than expected tributary flow was available to meet demands downstream of Shasta Dam with fewer releases than called for in the final temperature management plan (TMP).  *Id*.  As a result, Reclamation released less stored water from Keswick and Shasta and was able to retain this water behind Shasta Dam.  This distinction is important because it demonstrates that the IOP's restructuring of operational priorities was not the cause of higher carry-over storage in Shasta.[5]

Second, while Shasta operations under the IOP were driven by temperature considerations, State Plaintiffs and Federal Defendants notably do not explain how (a) maintaining lower temperature, in (b) a shorter stretch of the river, for (c) less time avoided any appreciable harm that would have occurred under the 2019 BiOps, much less achieved the IOP's Shasta operations goals.  *See* Grober Decl., at ¶ 27 n. 5 ("Targeting similar temperatures suitable for winter run Chinook salmon further upstream generally provides less habitat than if attained further downstream.").  The Court itself previously noted the scientific dispute between maintaining water temperatures at 53.5ºF or 56ºF, stating the IOP "does not necessarily mean that 53.5º F is the correct temperature to set as a management target (or mandate) in order to manage the risks to winter-run in dry years."  IOP Order, at 53.  The results of operations under the 2022 IOP strongly suggests the Court was right to note this dispute.

Under the 2019 NMFS BiOp, Reclamation would have operated pursuant to the Tier 4 year criteria targeting 56 º F  or higher at the Clear Creek gage.  2019 NMFS BiOp, *CNRA* ECF No.

---

[5] Moreover, it remains to be seen whether the additional storage will be available for beneficial use next year or whether it will be forgone during a spill event at Shasta Lake, for which there is about a 35% chance of occurring this winter.  Bergfeld Decl., at ¶ 19.

143-6, *PCFFA* ECF No. 120-4, at 83.  Under the IOP, however, the 2022 TMP sought to maintain temperature control of 54.5º F at Highway 44 (*See* Grober Decl., at ¶ 27), a critical reach of winter-run Chinook spawning grounds and five miles upstream from Clear Creek.  Declaration of Brad Cavallo, dated October 31, 2022, at ¶¶ 6, 21, 26 ("Cavallo Decl.").  Had Reclamation operated to a temperature target in line with the 2019 NMFS BiOp instead, then Reclamation would have expected to maintain temperature control for approximately four more weeks than under the IOP and in a longer stretch of the river.  Decl. of Michael Deas, dated Oct. 31, 2022, ("Deas Decl."), at Fig. 1.  Furthermore, had Reclamation operated to meet 56º F at Highway 44, the loss of temperature control would have occurred approximately seven weeks later than expected in the TMP, which is also approximately seven weeks later than the date on which Reclamation actually transitioned to the use of the temperature control device to only operating the side gates on August 22, 2022.[6]  Deas Decl., at ¶ 5; Bergfeld Decl., at ¶ 10.  In fact, by operating to 56º F at Clear Creek or Highway 44, as would have occurred under the 2019 NMFS BiOp, river temperatures would have remained colder than under the TMP from mid-September through the end of the temperature management season.  *See* Deas Decl., at Fig. 1.

Targeting 56º F at either Clear Creek or Highway 44 would have also given Reclamation an opportunity to utilize the cold water pool to prevent any adverse impacts to winter run Chinook from the early September heat wave.  *See* Marcinkevage Decl., *PCFFA* ECF No. 406-4, *CNRA* ECF No. 286-4, at ¶ 16.  By instead focusing on a lower temperature, Reclamation lost use of the temperature control device in August 22, 2022,[7] and any resulting water temperatures in the river was outside of their physical, operational, control.  Bergfeld Decl., at ¶ 10; see also 2019

---

[6] When Reclamation transitions to use of only the side gates of the temperature control device, typical operations no longer provide a measure of operational control of the temperature of water released from Shasta Dam.  Final Biological Assessment on Coordinated Long-term Operation of Central Valley Project and State Water Project, U.S. Bureau of Reclamation Admin. Record, *CNRA* ECF No. 143-2, Decl. of Chrisholm, *PCFFA* ECF No. 85-12, at 38 ("2019 Biological Assessment").

[7] This is at odds with Mr. Grober's conclusion in paragraph 34 that "…it was possible to maintain 54.5 degrees at the State Route 44 Bridge using the TCD into mid-September…." Mr. Grober provides no support or explanation for this conclusion and it should therefore be disregarded.

Biological Assessment, *CNRA* ECF No. 143-2, *PCFFA* ECF No. 85-12 at 38 ("The last tool to reduce temperatures is to operate the TCD in the full side gate position, drawing the lowest (and coldest) possible water from the reservoir.")  In fact, the State Plaintiffs' proffered expert Mr. Grober agrees that it becomes "impossible" to use the temperature control device to control river temperature when cold water is unavailable at the lowest gates.  Grober Decl., at ¶¶ 28, 33.  The IOP can hardly be credited for maintaining a certain water temperature under operational conditions beyond Reclamation's control.

Moreover, whether the IOP met its storage and temperature goals does not mean that the IOP was necessary to avoid appreciable harm that would have occurred under the 2019 NMFS BiOp.  State Plaintiffs only establish colder water at Highway 44—for a shorter amount of time—but this does not translate to higher egg-to-fry survival.  In fact, early data suggests colder water did not benefit the species.  Cavallo Decl., at ¶¶ 5, 11, 13.  There are fewer juvenile winter-run Chinook at the Red Bluff Diversion Dam in 2022 than there were in 2021, when Shasta was operated pursuant to the 2019 NMFS BiOp.  Cavallo Decl., at ¶¶ 11.  Focusing solely on water temperature to address merely one stressor on winter-run eggs and fry underscores why the IOP Extension is not necessary to avoid appreciable harm that would have occurred under the 2019 NMFS BiOp.  Lower temperature does not necessarily mean a greater egg-to-fry survival because there are numerous other influences on salmon survival.  Cavallo Decl., at ¶¶ 16, 20, 26-27, 29.  Federal Defendants and State Plaintiffs cannot claim success when they measure the wrong results.

In summary, despite maintaining water temperatures purported to achieve a 17% temperature-dependent mortality rate, production of juvenile winter-run Chinook in 2022 has been poor, and the continued focus on managing for coldest-possible water temperatures during egg incubation while inadequately considering how flows and other habitat conditions might affect production of juvenile winter-run Chinook debunks any argument that the proposed IOP Extension is necessary.  Cavallo Decl., at ¶¶ 5, 14, 15, 21, 22, 27.

**B.    The IOP Extension Is Not Substantively Fair, Equitable, and Reasonable.**

The IOP Extension is not substantively fair, equitable and reasonable because its focus on

a single stressor (water temperature) at a single life stage (egg incubation) of a single species (winter-run) ignores impacts on other life stages of winter-run Chinook salmon and impacts to other species (giant gartersnake) and health and human safety.  "In evaluating substantive fairness, it is important for the district court to be fully informed regarding the costs and benefits" of the IOP.  IOP Order, at 83.  The State Plaintiffs and Federal Defendants have not fully informed the Court of these costs and benefits, and have equally failed to provide the "more nuanced consideration" of the tradeoffs called for in the original IOP Order.  IOP Order, at 111.  Thus, this Court should not approve the IOP Extension because it is not a "reasonable factual and legal determination" of the issues before it.  IOP Order, at 83.

### 1. The IOP Extension's unreasonably narrow focus ignores prudent alternatives and may actually harm winter run.

The IOP Extension is unreasonable because its faulty approach to achieve effective protective measures hamstrings any benefits the IOP Extension could provide, and it continues to fail to address and prioritize impacts to other salmon life stages.  Cavallo Decl., at ¶¶ 5-7, 16-20.  State Plaintiffs and Federal Defendants continue to rely on highly questionable temperature dependent mortality modeling to prioritize cold water for winter-run Chinook spawning grounds, without considering how increased temperature control means less water flows later in the year and causes harm to the species during other life stages.  Cavallo Decl., at ¶¶ 5, 22-23, 27-28.  Low river flows impair egg incubation successes, which directly undermines the purported goals of the IOP.  Cavallo Decl., at ¶¶ 22, 27.  The data underscores an important point, unaddressed by the IOP Extension's proponents: egg-to-fry survival cannot be reliably predicted or managed by water temperature alone.  Cavallo Decl., at ¶¶ 13-15, 23-24, 29.

As an example, modeling tools used by the Federal Defendants indicates between 2.3 and 2.9 million fry equivalents should have resulted from water temperatures targeted under the 2022 IOP.  Cavallo Decl., at ¶¶ 15, 24.  In addition, applying the recent thiamine-dependent estimated survival value of 55%, between 1.2 and 1.6 million fry should have arrived at Red Bluff Diversion Dam (RBDD).  Cavallo Decl., at ¶ 29.  These modeling-generated estimates are nowhere near the current forecast based on catch to-date with a mean predicted estimate of

165,000 juvenile fish production (range 126,398 to 250,216).  And, even if the high range abundance forecast based on RBDD catch is doubled (from 250,216 to 500,432 fish)—for example due to large pulses of late arriving juveniles—fry production in 2022 will still be well below the estimates generated by the Martin model. Cavallo Decl., at ¶ 29.

By ignoring impacts that the IOP Extension would have on other salmon life stages, the IOP Extension ignores potential solutions to its shortcomings.  First, the IOP Extension could optimize hatchery operations as a means of avoiding appreciable harm.  Hatchery operations are necessary to address thiamine deficiency.  Cavallo Decl., at ¶¶ 29, 34, 36–37.  Indeed, the Federal Defendants and State Plaintiffs point to thiamine deficiency as a reason the IOP Extension is necessary for the coming year.  JSR, at 4 ("[i]ncluding a thiamine deficiency that is still expected to compromise winter-run Chinook salmon egg-to-fry survival, IOP-provided . . . protections are still needed.").  The Federal Defendants and State Plaintiffs do not, however, indicate that the IOP Extension actually addresses the thiamine deficiency and the proposed IOP Extension inexcusably fails to contain any provisions designed to address thiamine deficiency.

In addition, the IOP Extension ignores habitat improvements that would benefit the species at later life stages.  For example, the IOP Extension could accelerate the development of alternative spawning locations, and prioritize flow over temperature to protect these spawning locations.  Cavallo Decl., at ¶¶ 38–40.  Additionally, the IOP Extension could direct NMFS to develop and implement additional protections for winter-run Chinook salmon from harvest by commercial and recreational fishing in the ocean.  Cavallo Decl., at ¶¶ 16–20, 44.

In short, the IOP Extension is so narrowly focused on using temperature to improve winter-run egg-to-fry survival that it plainly ignores a host of other alternative means to prevent appreciable harm to the species.  This is patently unfair, inequitable, and unreasonable.

  **2. The Federal Defendants and State Plaintiffs fail to fully inform the Court of costs to other listed species.**

Interim relief like the IOP Extension must be equitable.  IOP Order, at 83:24–25 (quoting *U.S. v. Telluride Co.*, 849 F.Supp. 1400, 1402 (D. Colo. 1994)).  The IOP Extension is not supported by the equities because it will detrimentally impact other listed species.  *Idaho Rivers*

*United v. U.S. Army Corps of Eng'rs*, 156 F.Supp.3d 1252, 1266–67 (W.D. Wash. 2015) (holding the equities do not favor interim relief that will undermine efforts to protect another listed species). Further, the fact that the IOP Extension does not incorporate a "more nuanced consideration" (IOP Order, at 111) of the impacts on other listed species underscores the failure of the IOP Extension's proponents to "fully inform" the Court of the "costs and benefits of the IOP." IOP Order, at 83.

The IOP Order referred to these impacts on other listed species, like the giant gartersnake, as speculative. IOP Order, at 109–11. One year of operating under the IOP demonstrates that the predicted harm became a real threat to other listed species. Decl. of Eric Hansen, dated Oct. 31, 2022, ("Hansen Decl.") at ¶¶ 4–7. In 2022, farmers within the Sacramento River Intervenors' combined service area only planted 35,204 acres of rice because of hydrologic conditions, which means 155,952 acres of rice were fallowed compared to 2021, another critical year. Decl. of Joel Kimmelshue, dated Oct. 28, 2022, at Table 1; *see also id.*, at Figs. 2, 3. The giant gartersnake, a state and federally-listed species, relies on rice acreage for habitat in the Sacramento Valley. Hansen Decl., at ¶ 6. Fallowing and dewatering 155,952 acres of important habitat negatively affects feeding, reproduction, and survival of the giant gartersnake in half of the species' range in the Sacramento Valley. Hansen Decl., at ¶ 6. This outcome of 2022 Shasta operations has undeniably placed pressure on the species, resulting in severe population reductions, skewed demographic rates, and extirpations of genetically distinct populations. *Id.* at ¶ 7. The negative impacts associated with fallowing 155,952 acres of rice, such as habitat fragmentation, population reductions, and loss of genetic variation, will ultimately threaten the long-term viability of the giant gartersnake. *Id.* The IOP Extension does not mitigate, let alone consider, any of these impacts on this listed species.[8]

The IOP Extension also fails to address risks to health and human safety, including "adverse impacts such as land subsidence, land fallowing leading to air quality impacts, and

---

[8] The State Plaintiffs have also failed to offer any consideration of impacts to species listed under the California Endangered Species Act that they assert to be relevant here. *See* IOP Order at 105, n. 67 ("CESA is also arguably relevant because State Plaintiffs assert claims against Federal Defendants under it.").

community dislocations arising from job losses." IOP Order, at 46. For example, Dr. Daniel A. Sumner, a world-renowned professor of agricultural and resource economics, estimated that the dire "water situation" resulted in 14,300 lost jobs in the Sacramento Valley alone. Request for Judicial Notice in Support of Sacramento River Intervenors' Objection to Interim Operations Plan Extension, Ex. A (168 Cong. Rec. E1067–69 (daily ed. Oct. 21, 2022) (statement of Rep. Garamendi regarding Sumner Report)). Fallowing of the rice acreage because of water shortages is estimated to have resulted in 5,293 lost jobs in the rice industry alone. *Id*. at E1069. The original IOP did not mitigate or even consider job losses and the resulting community dislocations. IOP Order, at 108–09. In this regard, the Court previously found the provisions of the IOP were "reasonable and tailored to address the specific needs of the imperiled species in question without unnecessarily restricting water supply." *Id*. at 109. However, the experience over the past year demonstrates the IOP's provisions unnecessarily restricted water supply, which in turn fallowed hundreds of thousands of acres that tens of thousands of people rely on for work in the Sacramento Valley.

In sum, the meager benefits the IOP Extension may provide do not outweigh the costs it imposes on other life stages of winter-run Chinook salmon, other listed species, and the Sacramento Valley at large.

> **3. Federal Defendants could have complied with environmental review requirements in developing the IOP Extension but declined to do so, and this inhibits the Court's ability to determine whether the IOP Extension is reasonable.**

Federal Defendants fail to provide the Court with sufficient information to determine whether the IOP Extension is reasonable by failing to fulfill their statutory obligations that would allow meaningful environmental review and consideration of the complex effects of changes to the coordinated operations of the Central Valley Project ("CVP") and State Water Project ("SWP"). Without the type of rigorous analysis, expert input, and peer-review called for under the National Environmental Policy Act ("NEPA"), the Endangered Species Act ("ESA"), and Water Infrastructure Improvements for the Nation Act ("WIN Act"), Federal Defendants request the

IOP Extension without knowing what the impacts of the IOP Extension would be on federally listed species or on the human environment, thus failing to provide the Court with sufficient information to determine whether the IOP Extension is in fact reasonable.

While NEPA may not mandate particular results, it does require federal agencies to consider the impacts of their decisions on the human environment before they make those decisions. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976) (NEPA requires agencies to take a "hard look at environmental consequences"); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (NEPA "ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts"). The ESA ensures that federal agency action does not jeopardize the existence of, nor adversely modify critical habitat of, endangered species. 16 U.S.C. § 1536(a)–(b). The WIIN Act requires early consultation with water contractors to ensure that the federal agencies are providing the opportunity for the water contractors—who are intimately familiar with project operations and relevant environmental and biological considerations—to inform the ESA analysis conducted on such operations. Pub. L. No. 114-322 (2016). These statutes enshrine the Federal Defendants' obligation to make an informed decision and to document the rationale for that decision. It is undisputed that Federal Defendants did not comply with these statutes in putting forth the IOP Extension.

The potential for the operations of the CVP and SWP to impact ESA-listed species and the human environment is confirmed by the history of NEPA analysis and ESA consultation on the CVP and SWP. *See, e.g.*, *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 594–95 (9th Cir. 2014). As recognized in each of the past Environmental Impact Statements and BiOps, the operation of the CVP and SWP have the potential to impact water quality, water supply, and

aquatic species. *Id.*[9]  Even for minor changes to CVP-SWP operations, Federal Defendants have previously undertaken substantial analysis and completed ESA consultation on temporary modifications to the operations of the CVP and SWP. Chilmakuri Decl., *PCFFA* ECF No. 330, *CNRA* ECF No. 237, at ¶ 7.

Federal Defendants' failure to comply with these statutes inhibits the Court's ability to determine whether the IOP Extension is indeed a "reasonable factual and legal determination." IOP Order, at 83.  The IOP Extension (like the 2022 IOP) substantially departs from the action analyzed under the 2019 biological opinions and Final Environmental Impact Statement or any subsequent NEPA and ESA analysis. Federal Defendants have not provided the technical analysis that would allow the Court to evaluate the appropriateness of the IOP Extension. Instead, Federal Defendants ask this Court to impose the IOP Extension without conducting any meaningful environmental review of how the CVP and SWP operated under the original IOP and whether or not it is reasonable to continue.  Effectively, Federal Defendants shift their burden onto this Court without providing the Court with the right tools to make the decision.

C.     **The IOP Extension is contrary to state water law and policy.**

The IOP Extension furthers an interpretation of the Sacramento River Settlement (SRS) Contracts that is unlawful under state and federal law and operates to reverse the water right priority system.  The IOP Extension proposes to clarify that "senior water contractor deliveries" means "deliveries of stored water to senior water contractors." JSR, at 7:5–7.  Federal Defendants and State Plaintiffs call it a mere "clarification."  *Id*.  However, restricting deliveries of stored water to SRS Contractors violates the SRS Contracts because Reclamation must furnish full contract quantities, regardless of whether such water is stored.  *See PCFFA* ECF No. 328, *CNRA*

---

[9] *See generally* Decl. of J. Rice in Response to Fed. Defs.' Mot. Voluntary Remand without Vacatur and State Pls.' Mot. Interim Inj. Relief and Temp. Stay , *PCFFA* ECF No. 329, *CNRA* ECF No. 236, at Ex. D at C_011334 ("Rice Decl.") (2009 National Marine Fisheries Service Biological Opinion);  U.S. Fish and Wildlife Service, Admin. Record, *PCFFA* ECF No. 218-6, *CNRA* ECF No. 143-3, at FWS064591 (2009 U.S. Fish and Wildlife Service Biological Opinion); U.S. Bureau of Reclamation, Admin. Record *PCFFA* ECF No. 218-2, *CNRA* ECF No. 143-2, at BOR0009682 (2019 Final Environmental Impact Statement); Rice Decl., *PCFFA* ECF No. 329, *CNRA* ECF No. 236, at Ex. B at A_000783 (2019 NMFS BiOp); *Id.*, Ex. C at FWS054631 (2019 U.S. Fish and Wildlife Service Biological Opinion).

ECF No. 235, at 15–17.

### 1. The IOP Extension conflicts with the rule of priority.

Reclamation must perform under the contracts in compliance with state water law. Reclamation Act, § 8; *California v. United States*, 438 U.S. 645 (1978). As such, it is bound by the rule of priority, a central tenet of California state water law and policy. *California v. United States*, 438 U.S. 645 (1978); *City of Barstow v. Mojave Water Agency*, 23 Cal.4th 424, 450 (Cal. 2000).

This Court is well aware of the unique history of the SRS Contractors and the seniority of the underlying rights held by those contractors. IOP Order, at 64:9-65:2. Indeed, the Ninth Circuit has repeatedly recognized the seniority of the SRS Contractors relative to Reclamation's water rights to operate the CVP. *NRDC v. Jewell*, 749 F.3d 776, 780 (9th Cir. 2014), *Tehama-Colusa Canal Authority v. U.S. Dept. of Interior*, 721 F.3d 1086, 1091 (9th Cir. 2014) ("Settlement Contracts that grant a contractual priority to CVP water through the inclusion of provisions limiting the extent of shortage amounts. These contracts typically arose from pre-existing water rights."). Reclamation's obligations under the SRS Contracts are straight forward: Reclamation must furnish specified quantities of Sacramento River water to each contractor between April 1 and October 31 in accordance with the contracts. *PCFFA* ECF No. 75-3 (Settlement Contract) at 128, art. 3. These amounts may not be reduced, unless it is a "Shasta Critical Year," as defined in the contracts, during which contract amounts are reduced to 75% of the total contract supply for each contractor. *Id*. at 132, art. 5.[10] Thus, if water exists, it must be delivered to the SRS Contractors <u>before</u> Reclamation can appropriate water for its own purposes. *El Dorado Irrig. Dist. v. State Water Res. Ctrl. Bd.*, 142 Cal.App.4th 937, 961–65 (Cal. App. Ct., 2006). By reducing "deliveries of stored water to senior contractors" below other priorities, the

---

[10] Reclamation itself has repeatedly admitted that it has no discretion to deviate from these straightforward terms. *See, e.g.*, *PCFFA*, ECF No. 183-1 (Third White Decl.) ¶ 18(k); *AquAlliance v. U.S. Bureau of Reclamation*, 2:21-cv-01533-KJM-DMC, ECF No. 14-1 ("Mooney Decl.") ¶ 24. Indeed, Reclamation's Bay-Delta Office Manager stated under oath that the Settlement Contracts prevent Reclamation from limiting "senior water rights holders by more than 25% of the maximum surface water that they are entitled to divert." Mooney Decl. ¶ 24.

IOP Extension unlawfully puts deliveries to SRS Contractors at odds with their actual senior priority. *See id.* (holding that a restriction on a senior diverter not imposed against junior diverters violated the rule of priority). Water will be available at the SRS Contractor's priority before it is available at the Reclamation's priority. *Id*. Under the terms of the SRS Contracts, Reclamation must deliver that water to the SRS Contractors. Therefore, the IOP Extension's revision of "senior water deliveries" to "deliveries of stored water" is contrary to California water law and in this way fails to address the water right priority concerns raised in connection with the IOP itself.

### 2. Nothing about the IOP Order or the IOP Extension permits Reclamation to breach or alter the SRS Contracts.

Extreme and unprecedented dry hydrology resulted in 18% water supplies to the SRS Contractors in 2022. Marcinkevage Decl., *PCFFA* ECF No. 406-4, *CNRA* ECF No. 286-4, at ¶13. However, the implication of this operation for purposes of the Sacramento River Settlement Contracts is not before the Court, as the IOP Order expressly states that the Court "does not read the IOP as giving Reclamation permission to breach its contractual obligations." IOP Order, at 93. Indeed, the requested relief here proposes operation of the SWP and CVP "as consistent with applicable law," which includes California water rights law and the Sacramento River Settlement Contracts. Proposed Order, ¶¶ 3-4, *PCFFA* ECF No. 406-1, *CNRA* ECF No. 286-1. In addition, how the Sacramento River Settlement Contracts are to be addressed during reinitiated consultation when NMFS is "revisiting the 2019 NMFS BiOps" (IOP Order, at 93), is also outside the issue before the Court. *See, e.g.,* IOP Extension, *PCFFA* ECF No. 406-1, *CNRA* ECF No. 286-1, at ¶ 19 ("Nothing in this order shall be interpreted as precedential as to actions that Federal Defendants or State Plaintiffs may take in future consultations…").

In the event that the court adopts the IOP Extension, it too cannot be read to permit Reclamation to breach the Sacramento River Settlement Contracts.

### III. CONCLUSION

The undersigned parties respectfully request that the Court decline the Federal Defendants' and State Plaintiffs' request for entry of the IOP Extension through December 2023.

| | | |
|---|---|---|
| DATED: October 31, 2022 | | DOWNEY BRAND LLP |
| | By: | */s/ Meredith E. Nikkel* |
| | | MEREDITH E. NIKKEL |
| | | Attorneys for Intervenors-Defendants TEHAMA-COLUSA CANAL AUTHORITY; and RECLAMATION DISTRICT NO. 108, et al. |
| DATED: October 31, 2022 | | SOMACH SIMMONS & DUNN |
| | By: | */s/ Andrew M. Hitchings* |
| | | ANDREW M. HITCHINGS |
| | | Attorneys for Intervenors-Defendants GLENN-COLUSA IRRIGATION DISTRICT, et al. |